FILED
Clerk
District Court

APR 21 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

MARK B. HANSON, ESQ.
First Floor, Macaranas Building
Beach Road, Garapan
PMB 738 P.O. Box 10,000
Saipan, Mariana Islands 96950
Telephone:  (670) 233-8600
Facsimile:  (670) 233-5262

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

| | |
|---|---|
| LI YING HUA, LI ZHENG ZHE and XU JING JI, | CASE NO. CV 05-0019 |
| Plaintiffs, | |
| vs. | MOTION TO AMEND VERIFIED COMPLAINT |
| JUNG JIN CORPORATION, a CNMI corporation, ASIA ENTERPRISES, INC., a CNMI corporation, PARK HWA SUN and KIM HANG KWON, | Date: Thursday, May 25, 2006<br>Time: 8:30 a.m.<br>Judge: Hon. Alex R. Munson |
| Defendants. | |

## MOTION

COMES NOW the Plaintiffs, by and through their attorneys, with a Motion to Amend the Verified Complaint in this case to add a party — a successor in interest to the Defendants' businesses. This Motion is brought pursuant to Fed. R. Civ. P. 15(a) and L.R. 15.1, and is supported by the pleadings and records in this matter and by the declaration submitted herewith. For the reasons stated below, Plaintiffs respectfully request that the Court grant Plaintiffs leave to amend the Verified Complaint to add KSK Corp. and Kim Ki Sung as party defendants in this matter.

## MEMORANDUM IN SUPPORT OF MOTION

For the reasons discussed below, KSK Corp., a CNMI corporation, and Kim Ki Sung, the alter ego of KSK Corp., are liable to Plaintiffs for Plaintiffs' labor claims stated in their Verified

ORIGINAL

Complaint as successors to the interests of the corporate and individual defendants in this case.

A.      FACTS AND PROCEDURAL HISTORY:

Plaintiffs filed their Verified Complaint in this matter on June 22, 2005. All four present defendants were served and on June 27, 2005 a case management conference was held. As a result of that conference, the Court issued its Case Management Scheduling Order on August 26, 2005. Therein, the Court set the cut-off date for amendments to the complaint on November 25, 2005.

On January 1, 2006 defendants effected the transfer of their operating businesses to KSK Corp. *See* Excerpt from Deposition of Kim Ki Sung at page 35, lines 14 to 23; Exhibits D through I.

Thereafter, Defendant Park Hwa Sun departed the Commonwealth for South Korea with no plans of returning to Saipan. *See* Excerpt from Deposition of Kim Hang Kwon, page 8, lines 15 to 18; Declaration of Stephen J. Nutting in Support of Motion to Withdraw, ¶ 3 ("Defendant Park Hwa Sun both personally and as the sole representative and contact person for the corporate defendant Jung Jin Corporation, has left the Commonwealth and is unavailable to assist the attorney in the preparation and defense of the case.").

On January 27, 2006, at the time and date noticed for the deposition of defendant Jung Jin Corp. ("JUNG JIN"), no one appeared to testify. *See* Declaration of Mark B. Hanson ("Hanson Decl."), ¶ 22.

On February 1, 2006, a subpoena was issued for the deposition of Kim Sung Eun, the president of KSK Corp. as shown in documents on file with the Commonwealth government.

On March 9, 2006, at the time, date and place indicated in the subpoena to Kim Sung Eun, Mr. Kim Ki Sung produced copies of documents, some of which are provided herewith as exhibits.

On March 3, 2006, the Court granted the motion of defendants' attorney, Stephen J. Nutting, to withdraw in the case. *See* Motion, Declaration and Order.

On March 9, 2006, at the time, date and place indicated in the subpoena to Kim Sung Eun,

Mr. Kim Ki Sung appeared to testify on her behalf. *See* Kim Ki Sung Depo., page 5, lines 3 to 9. Mr. Kim Ki Sung volunteered to have his own deposition taken, he was sworn in, and thereafter was taken the deposition of Kim Ki Sung. *Id.*, page 3, lines 21 to 23; page 5, lines 7 to 9.

In his deposition, Kim Ki Sung testified to, among other things, that:

1. In a prior porker arcade partnership with defendant Kim Hang Kwon, in the name of defendant Asia Enterprises, Inc. ("ASIA"), Kim Ki Sung had paid, or caused to be paid, Kim Hang Kwon's "share" of the poker machine license fees for two quarters totaling $24,000.00. Kim Hang Kwon owed Kim Ki Sung $26,000.00 for such payments — the original payments plus an additional $2,000.00 for interest. Kim Ki Sung Depo., page 34, lines 1 to 17.

2. On about December 1, 2004, Kim Ki Sung loaned Park Hwa Sun $100,000.00 in cash. To memorialize the loan, Kim Ki Sung prepared and had Park Hwa Sun execute the promissory note attached hereto as Exhibit E. *Id.*

3. In about August 2005, Kim Ki Sung learned that the plaintiffs in this case had filed a lawsuit alleging that defendant Park Hwa Sun and Kim Hang Kwon had failed to pay all of the wages they were due. Kim Ki Sung Depo., page 19, lines 2 to 23; page 20, lines 1 to 13.

4. In about January 2006, the defendants agreed that Kim Ki Sung should "take over" defendants' laundry business and poker businesses in exchange for the outstanding debts. *Id.*, page35 lines 3 to 23; Page 36 lines 1 to 23; page 46 Lines 12 to 14 Page 47 Lines 1 to 9..

5. Defendant Kim Ki Sung agreed and prepared the documents he believed were necessary to accomplish the transfer, including a Bill of Sale. *Id.*; Exhibits D and I.

6. As of January 1, 2006, all of the assets of defendants' Welcome Poker, Welcome Landry and Welcome Market were purportedly transferred to KSK Corp. in exchange

for the alleged $26,000.00 debt of Kim Hang Kwon and the alleged $100,000.00 debt of Park Hwa Sun and/or their alter ego companies defendants ASIA and JUNG JIN. *Id.*, page 46, lines 12 to 23; page 47, lines 1 to 10; page 37, lines 13 to 21.

7. KSK Corp. is and acronym for Ki Sung Kim, the deponent. *Id.*, page 14 lines 17 to 20.

8. Mr. Kim Ki Sung changed the name of Welcome Laundry and Welcome Poker to Shany Landry and Shany Two Poker and now operates what was known as Welcome Market as part of what is now know as Shany Laundry. *Id.*, page 38 lines 14 to 19.

9. In addition to taking over the leases of the premises of the businesses in the name of KSK Corp., Kim Ki Sung transferred all of the employees of defendants to the employ of KSK Corp. (with the exception of two of the employees that were working in Welcome Poker), and he caused the transfer of the licenses for the poker machines of Welcome Poker to KSK Corp. *Id.*, page 38, lines 20 to 23; page 39, lines 1 to 6; page 50, lines 19 to 23.

10. As of the date of his deposition, Kim Ki Sung had yet to transfer the utility service for Welcome Poker, Welcome Laundry and Welcome Market into the name of KSK Corp., but he stated that he pays the utility bills when they come due although he has no idea in who's name the utility accounts are currently held. *Id.*, page 51, lines 3 to 11.

B. **STANDARD FOR MOTIONS TO AMEND:**

Motions for leave to amend are provided for in Fed. R. Civ. P. 15(a) and Local Rule 15.1. Generally, leave to amend "shall be freely given when justice so requires." Rule 15(a). *See also DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (Federal Rule of Civil Procedure 15's "policy of favoring amendments to pleadings should be construed with 'extreme liberality.'"); 3 *Moore's Federal Practice* §15.15[2], at 15-43-44 (3d ed. 1997) (undue prejudice resulting to non-

moving party from amendment is key factor, but delay in amending is insufficient to demonstrate such prejudice).

Here, the deadline for amendment set forth in the Court's Case Management Scheduling Order has passed. *See* Case Management Scheduling Order dated August 26, 2005 (all motions to amend pleadings shall be filed on or before November 25, 2005). Rule 16(b) provides that: "A schedule shall not be modified expect upon a showing of good cause . . . ."

> This would require the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension. The use of the good-cause standard, rather than allowing modification only in cases of manifest injustice as is done for pretrial orders, indicates that there may be more flexibility in allowing some relief. As noted by the Advisory Committee, this more liberal standard was included in recognition that the scheduling order is entered early in the litigation and that if a stricter approach to modification were adopted, counsel might be encouraged to request the longest possible time for completing pleading, joinder, and discovery because of a fear that an extension would be impossible. Nonetheless, this does not mean that scheduling orders will be modified simply upon request. In the absence of some showing of why an extension is warranted, the scheduling order shall control.

6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1522.1 (2nd ed. 2004 pocket part) (citations omitted).

In this case, the requested amendment is to add party defendants as successors in interest to defendants and, accordingly, as successors to the liability of defendants to plaintiffs. Defendants' unilateral actions, taken after the expiration of the deadline for amendments, have created the basis for and the need to amend the complaint to add the successors in interest to the case.

Additionally, although plaintiffs learned in about January 2006 that the defendants may have caused the transfer of, or attempted to transfer, some or all of their assets, the sale of the business to Kim Ki Sung itself was not confirmed by Plaintiffs until the deposition of defendant Kim Hang Kwon on January 24 and 25, 2006. Further, the extent of the transfer leading to the basis for successor liability was not known to Plaintiffs until the deposition of Kim Ki Sung on March 9, 2006. The transcripts from these two depositions were certified on March 31, 2006. This motion to amend is brought timely after Plaintiffs learned of the facts giving rise to the successor liability of

Kim Ki Sung and KSK Corp. The Court should allow the amendment to add the two parties as defendants.

C. **SUCCESSOR LIABILITY UNDER THE FLSA:**

In the seminal case of *Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. 1995), the Ninth Circuit Court of appeals held that there is successor liability for violations of the Fair labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (the "FLSA").

> The FLSA was passed to protect workers' standards of living through the regulation of working conditions. 29 U.S.C. § 202. That fundamental purpose is as fully deserving of protection as the labor peace, anti-discrimination, and worker security policies underlying the NLRA, Title VII, 42 U.S.C. § 1981, ERISA, and MPPAA. The analysis set forth in the cases extending potential liability under these statutes justifies application of the doctrine here as well. Consequently, we conclude that successorship liability exists under the FLSA.

*Steinbach v. Hubbard*, 51 F.3d at 845.

After establishing that successor liability exists under the FLSA, the Appellate Court went on to espouse the standard for successor liability:

> [S]uccessor liability can attach when 1) the subsequent employer was a bona fide successor and 2) the subsequent employer had notice of the potential liability. []. Whether an employer qualifies as a bona fide successor will hinge principally on the degree of business continuity between the successor and predecessor. []. The Ninth Circuit has fleshed out this test when dealing with other employee individual rights statutes by adding a third consideration: the extent to which the predecessor is able to provide adequate relief directly. [].

*Id.* at 846 (citations omitted).

> Business continuity is established by weighing (1) the similarity of business operations; (2) use of the same physical facilities; (3) use of the same workforce; (4) existence of the same jobs under the same working conditions; (5) presence of the same supervisors; (6) use of the same methods of production; and (7) production of similar products and/or services. *See NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 463-64 (9th Cir.1985).

*Herrera v. Singh*, 118 F. Supp. 2d 1120, 1123 (E.D. Wash. 2000) (applying successor liability to the Agricultural Workers Protection Act, citing *Steinbach v. Hubbard*).

In one case, a court in the Ninth Circuit held that: "A subsequent employer is a successor employer if it hires most of its employees from the previous employer's work force and conducts

essentially the same business as its predecessor without a fundamental change in working conditions." *Grimm v. Healthmont, Inc.*, 2002 WL 31549095 (D. Or. 2002) (citing *Trustees for Alaska Laborers-Construction Industry Health & Sec. Fund v. Ferrell*, 812 F.2d 512 (9th Cir.1987) (an individual member of a joint venture who continued to operate the same business with the same employees and equipment after the joint venture ceased operations was a successor employer for purposes of ERISA liability)). *See also Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 51 (7th Cir. 1995) (reversing the lower court's dismissal and allowing successor liability claim to proceed despite prior bankruptcy discharge of predecessor, stating: "Here, those facts include the apparent nature of the acquisition of Old Tasemkin by New Tasemkin--which clearly had the effect, intended or no, of frustrating unsecured creditors while resurrecting virtually the identical enterprise.").

D.   KSK CORP. IS SUCCESSOR TO THE LIABILITY OF DEFENDANTS:

KSK Corp. is a bonafide successor under the meaning of the FLSA. Kim Ki Sung on behalf of KSK Corp. transferred the employees of JUNG JIN to the employ of KSK Corp. Kim Ki Sung Depo., page 50, lines 19 to 23; page 51, lines 1 to 2. JUNG JIN and ASIA have transferred all of their interests in laundry machines and other laundry assets, and the poker machines they operated in Welcome Poker, to KSK Corp. Kim Ki Sung Depo., Exhibits D and I. KSK has subleased the physical property where the businesses were located from JUNG JIN. Kim Ki Sung Depo., Exhibit H. KSK continues to use those items and is still in the same physical location as the previous owners. *Id.* KSK's business is running the laundrymat and poker parlor. Kim Ki Sung Depo., page 22, lines 11 to 12.

Further, as early as August 2005, KSK Corp. and Kim Ki Sung had notice of the potential liability in taking over the businesses of ASIA and JUNG JIN. Kim Ki Sung Depo., page 18, line 7 to 21, line 8 (Kim first heard about this lawsuit in the newspaper and other third parties shortly after it was filed); page 59, lines 5 to 8 (Kim stating that defendants mentioned the labor complaint and

said they should just swap assets for the alleged outstanding debt).

In short, KSK Corp. and Kim Ki Sung conduct essentially the same business as its predecessors (the named defendants herein) without a fundamental change in working conditions. That, together with their prior knowledge of Plaintiffs' claims in this lawsuit, support this Court finding that KSK Corp. is a successor to the liability of the defendants in this matter. The Court should allow Plaintiffs leave to amend their Verified Complaint under Fed. R. Civ. P. 15(a) and Local Rule 15.1 to include KSK Corp. as a named defendant in this action.

E.  **KIM KI SUNG IS THE ALTER EGO OF KSK CORP.**

To determine whether the corporate veil should be pierced, three factors are of primary importance: (1) the degree to which the shareholders respected the separate identity of the corporation; (2) the degree to which injustice to the litigants would result were the corporate identity recognized; and (3) the fraudulent intent of the incorporators. *Seymour v. Hull & Moreland Engineering, Inc.*, 605 F.2d 1105, 1111 (9th Cir. 1979). The *Seymour* test has been consistently applied in this Circuit. *See, e.g., Audit Servs., Inc. v. Rolfson*, 641 F.2d 757, 764 (9th Cir. 1981); *Operating Eng's Pension Trust v. Reed*, 726 F.2d 513, 515 (9th Cir. 1984).

By his own admission, Kim Ki Sung's business is KSK Corporation. Kim Ki Sung Depo., page 14, lines 10 to 20. Kim Ki Sung incorporated KSK Corp. in the CNMI in about February 2003. *Id.* page 14, lines 21 to 23; page 15, lines 1 to 4. KSK Corp., by its corporate documents, purports to have two shareholders, Kim Sung Eun and Kim Ok Ja. Id. Kim Ki Sung Depo.; Exhibit J. Kim Sung Eun is Kim Ki Sung's wife. Kim Ki Sung Depo., page 16, lines 12 to 15. Kim Ok Ja is Kim Ki Sung's mother-in-law. *Id.*, page 16, lines 20 to 23.

Although Kim Ki Sung is not listed as a shareholder or an officer of KSK Corp., he refers to the corporation as his own. *See, e.g.,* Kim Ki Sung Depo., pages 13, line 19 to 14, line 23 (Kim

opened his own poker parlor under the name Fun and Win with a corporation he formed named KSK Corporation which stands for Ki Sung Kim); page 21, line 13 to 22, line 23 (Kim has a company named KSK Corporation); page 24, line 22 to 25, line 9 (Kim wondering why "his" corporation and "his" business is being deposed); page 26, lines 4 to 8 (Kim denying any relationship of "his" corporation to defendant Kim Hang Kwon's corporation insisting that his loan was personal to Kim Hang Kwon, not a loan between their corporations); page 63, line 16 to 65, line 18 (Kim describing how he, his wife and KSK are all really one, and how he collects and uses money indiscriminately).

Additionally, Kim Ki Sung has personally given and received property to and from the defendants here, but he now claims that the assets he swapped for the debt owed to him are owned by "his" corporation – KSK Corp. *See, e.g.*, Kim Ki Sung Depo., Exhibits D and E.[1]

Based upon the above alleged facts, this Court must allow the Plaintiffs to amend their complaint under Fed. R. Civ. P. 15(a) and Local Rule 15.1 to include Kim Ki Sung as a named defendant in this action — as a successor in interest to the liability of the defendants herein.

---

[1] For example, the document that transferred poker machines from ASIA to KSK Corp. is entitled a bill of sale. Kim Ki Sung Depo., Exhibit D. There was not a transfer of money for the machines, but rather the machines were transferred in "repayment" of a $26,000.00 "debt" allegedly owed by defendant Kim Hang Quan, personally, as a "business partner" of Kim Ki Sung, personally. Kim Ki Sung Depo. page 26, lines 18 to 23; page 27, lines 2 to 15.

On the same day, Park Hwa Sun executed a bill of sale for transfer to KSK Corp. of JUNG JIN's laundry machines. Kim Ki Sung Depo., Exhibit I. Again, no money exchanged hands – this transfer also was a swap for an alleged prior debt of Kim Hang Kwon and Park Hwa Sun to Kim Ki Sung personally. Kim Ki Sung Depo., pages 50-51.

In both instances whereby KSK Corp. came to "own" and operate all or most of defendants businesses, the transactions were swaps for alleged debts (allegedly) owed personally to Kim Ki Sung.

## CONCLUSION

Despite the late date of this motion, the facts and circumstances of this case warranty the Court's granting of leave to Plaintiffs to file an amended complaint to add KSK Corp. and its alter ego, Mr. Kim Ki Sung, as party defendants — successors to the liability of the defendants to Plaintiffs in this matter. Wherefore, the Plaintiffs respectfully request leave to amend their complaint.

Respectfully submitted this 21st day of April, 2006.



/s/ MARK B. HANSON

First Floor, Macaranas Building
Beach Road, Garapan
PMB 738, P.O. Box 10,000
Saipan, MP 96950
Telephone:   (670) 233-8600
Facsimile:   (670) 233-5262

Attorney for Plaintiffs