

1  MARK B. HANSON, ESQ.
   First Floor, Macaranas Building
2  Beach Road, Garapan
   PMB 738 P.O. Box 10,000
3  Saipan, Mariana Islands 96950
   Telephone:    (670) 233-8600
4  Facsimile:    (670) 233-5262

5  Attorney for Plaintiffs

6

7              IN THE UNITED STATES DISTRICT COURT
                          FOR THE
8                NORTHERN MARIANA ISLANDS

9  LI YING HUA, LI ZHENG ZHE and XU JING JI, )   CASE NO. CV 05-0019
                                            )
10              Plaintiffs,                  )
                                            )
11     vs.                                   )     PROPOSED FINDINGS OF
                                            )     UNCONTROVERTED FACT
12  JUNG JIN CORPORATION, a CNMI corporation,)
    ASIA ENTERPRISES, INC., a CNMI corporation,)
13  PARK HWA SUN and KIM HANG KWON,          )
                                            )
14              Defendants.                  )

15          COMES NOW the Plaintiffs, by and through their attorney, pursuant to Fed. R. Civ. P. 56
16
    and Local Rule 56.1 with the following Proposed Findings of Uncontroverted Fact in support of (1)
17
    Plaintiffs' Motion for Summary Judgment against defendants Park Hwa Sun ("Park") and Kim Hang
18
    Kwon ("Kim"), and (2) Motion for a Default Judgment or for Summary Judgment against defendants
19
    Jung Jin Corporation ("Jung Jin") and Asia Enterprises, Inc., ("Asia").
20
    •   JURISDICTIONAL FACTS:
21
22          1.      The Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), applies to this
23  matter through the Covenant to Establish a Commonwealth of the Northern Mariana Islands in
24  Political Union with the United States of America, Article V, §502(a)(2).  Admitted by Defendants
25  in Verified Answer to the original Verified Complaint ("Answer"), ¶ 1.

26          2.      This Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331
27

(federal question jurisdiction), 28 U.S.C. § 1337(a) (proceedings arising under any Act of Congress regulating commerce).  Admitted by Defendants in Answer, ¶ 1.

3.    This Court also has jurisdiction under the FLSA, 29 U.S.C. § 216(b), to adjudicate Plaintiffs' claims.  Admitted by Defendants in Answer, ¶ 1.

4.    This Court has jurisdiction over Plaintiffs' non-FLSA claims pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction).  Admitted by Defendants in Answer, ¶ 1.

5.    Venue is properly placed in this Court as at all relevant times Plaintiffs were employees of Defendants doing business in Saipan, Commonwealth of the Northern Mariana Islands ("CNMI").  Admitted by Defendants in Answer, ¶ 1.

6.    At all times relevant to this action, Plaintiffs, and each of them, were employees within the meaning of § 203(e)(1) of the FLSA and § 9212(e) of the Commonwealth Minimum Wage and Hour Act, 4 C.M.C. §§ 9211 *et seq.* (2000) ("MWHA").  Admitted by Defendants in Answer, ¶ 6.

7.    At all times relevant to this action, Defendants were employers within the meaning of § 203(d) of the FLSA and § 9212(f) of the MWHA.  Admitted by Defendants in Answer, ¶ 6.

8.    At all times relevant to this action, Plaintiffs were employed within the meaning of § 203(g) of the FLSA and § 9212(d) of the MWHA.  Admitted by Defendants in Answer, ¶ 6.

9.    At all times relevant to this action, Plaintiffs were employed in Saipan, Commonwealth of the Northern Mariana Islands.  Admitted by Defendants in Answer, ¶ 6.

10.    At all times relevant to this action, Defendants were an enterprise within the meaning of § 203(r)(1) of the FLSA.  Admitted by Defendants in Answer, ¶ 6.

11.    At all times relevant to this action, Defendants were an enterprise engaged in commerce or in the production of goods for commerce within the meaning of § 203(s)(1) of the FLSA.  Admitted by Defendants in Answer, ¶ 6.

12.    At all times relevant to this action, Plaintiffs, as employees of Defendants, were engaged in commerce within the meaning of § 207(a)(1) of the FLSA.  Admitted by Defendants in

Answer, ¶ 6.

13.     At all times while employed by Defendants, Plaintiffs were employed, and actually performing work, in a job category or categories that are not exempt from the provisions of the FLSA and/or the MWHA.

14.     Defendants had at least $552,497.00 in gross revenues for the year 2002.  *See* Exhibits "C" and "D" and Table 1 attached hereto.

15.     Defendants had at least $863,760.00 in gross revenues for the year 2003.  *See* Exhibits "C" and "D" and Table 1 attached hereto.

16.     Defendants had at least $733,102.19 in gross revenues for the year 2004.  *See* Exhibits "C" and "D" and Table 1 attached hereto.

•     WAGE CLAIMS OF LI YING HUA:

17.     Plaintiff Li Ying Hua began her employment with Defendants on April 4, 2003.  Li Ying Hua Decl., ¶ 3.

18.     On December 29, 2003, Li Ying Hua entered into a contract with defendant Jung Jin through Park, its president, majority shareholder and alter ego.  *Id*., ¶ 6.

19.     Plaintiff Li Ying Hua's contract with Jung Jin was renewed on January 7, 2005, by defendant Kim.  *Id*., ¶ 8.

20.     Plaintiff Li Ying Hua's renewed contract was due to expire on January 14, 2006.  *Id*., ¶ 11.

21.     Plaintiff Li Ying Hua's initial contract required Jung Jin to pay her $3.05 per hour for each hour worked, plus overtime in the amount of 1.5 times that rate for all hours worked in excess of forty hours in one week.  *Id*., ¶ 10, Exhibit A, § D.

22.     Plaintiff Li Ying Hua's initial contract, stated that, with the exception of CNMI taxes and social security, no other deductions from her compensation shall be made by the employer.  *Id*., Exhibit A, § E.

23.    Plaintiff Li Ying Hua's initial contract stated that she would provide her own housing. *Id.*, Exhibit A, § J.1.

24.    Plaintiff Li Ying Hua's initial contract provided that it could only be terminated for cause and by providing plaintiff with fifteen (15) days advance written notice thereof. *Id.*, Exhibit A, § L.

25.    Plaintiff Li Ying Hua's January 7, 2005 renewal contract stated that her contract renewal was under the same terms and conditions as provided in her initial contract. *Id.*, Exhibit B.

26.    From April 4, 2003 through May 4, 2005, Plaintiff Li Ying Hua worked twelve (12) hours per day, seven (7) days per week for Defendants. Li Ying Hua Decl., ¶ 12; Answer to Plaintiff Li Ying Hua's First Interrogatories to Defendants, Interrogatory # 1 ("The propounding plaintiff worked 12 hours per day 7 days a week throughout the period of her employment, not counting absences for illness, breaks etc.").

27.    She never missed a day of work. Li Ying Hua Decl., ¶ 12.

28.    For her services from April 2003 through February 2004, Defendants paid Li Ying Hua a salary of $650.00 per month with no deductions for taxes. *Id.*, ¶ 18.

29.    For her services from March 2004 through May 2005, Defendants paid Li Ying Hua a salary of $650.00 per month, deducting from the salary, among other things, $50.00 each month for taxes. *Id.*, ¶ 19.

30.    From January 2004 through June 2004, Defendants deducted amounts from Li Ying Hua's salary for processing fees associated with her initial contract with Defendants in the total amount of $580.00. *Id.*, ¶ 20.

31.    On at least one occasion, Li Ying Hua was required to pay her own medical exam fee, police clearance fee and health certificate fee in the total amount of $75.00 to secure her employment with Defendants. *Id.*, ¶ 21.

32.    On three occasions during her employment with Defendants, Defendants deducted

from Li Ying Hua's salary the total amount of $215.00 for what Defendants claimed were "cash shortages" for which they claimed Li Ying Hua was responsible. *Id*., ¶ 22.

33.     Beginning in May 2004, for three months, Defendants required Li Ying Hua to live in housing provided by Defendants and deducted from Li Ying Hua's salary $150.00 for rent for such employer provided housing. *Id*., ¶ 23; Admitted by Defendants in Answer, ¶ 6.

34.     On May 4, 2005, due to continuing non-payment of her full wages by Defendants, and because of continued sexual advances and unwanted touching of her body by Kim, Li Ying Hua had to leave Defendants' employment. *Id*., ¶ 23.

35.     The last monthly salary Li Ying Hua received from Defendants was for the month of April 2005. *Id*., ¶ 25.

36.     During her employment with Defendants, Li Ying Hua worked 5,824 hours of "regular time" and 4,752 hours of "overtime." Counsel Decl., Exhibit A.

37.     During her employment with Defendants, Li Ying Hua should have been paid a total of $40,847.36 for the services she performed for Defendants. *Id*.

38.     During her employment with Defendants, Li Ying Hua received the sum total of $15,680.00 as free and clear compensation from Defendants for her services.

39.     Defendants are liable to Li Ying Hua in the amount of $23,815.16, plus an equal amount as liquidated damages, for a total of $47,662.52. *Id*.

•     WAGE CLAIMS OF XU JING JI:

40.     Plaintiff Xu Jing Ji began her employment with Defendants on November 28, 2003. Xu Jing Ji Decl., ¶ 3.

41.     On December 29, 2003, Xu Jing Ji entered into a contract with defendant Jung Jin through Park, its president, majority shareholder and alter ego. *Id*., ¶ 6.

42.     On January 7, 2005, defendant Kim executed a contract for Xu Jing Ji to work for Asia. *Id*., ¶ 9, Exhibit C.

43.    On January 21, 2005, defendant Park, now on behalf of Asia, executed a document securing the conditional transfer of Xu Jing Ji from Jung Jin to Asia.  *Id*., ¶ 8, Exhibit B.

44.    Plaintiff Xu Jing Ji's contract with Asia was due to expire on January 24, 2006.  *Id*., ¶ 13.

45.    Both of Plaintiff Xu Jing Ji's contracts required Defendants to pay her $3.05 per hour for each hour worked, plus overtime in the amount of 1.5 times that rate for all hours worked in excess of forty hours in one week.  *Id*., ¶ 12, Exhibit A and C, § D, Exhibit B.

46.    Both of Plaintiff Xu Jing Ji's contracts stated that, with the exception of CNMI taxes and social security, no other deductions from her compensation shall be made by the employer.  *Id*., Exhibit A and C, § E.

47.    Both of Plaintiff Xu Jing Ji's contracts stated that she would provide her own housing.  *Id*., Exhibit A and C, § J.1.

48.     Plaintiff Xu Jing Ji's contract with Asia provided that it could only be terminated for cause and by providing plaintiff with fifteen (15) days advance written notice thereof.  *Id*., Exhibit C, § L.

49.    From November 28, 2003 through April 25, 2005, Plaintiff Xu Jing Ji worked twelve (12) hours per day, seven (7) days per week for Defendants.  Xu Jing Ji Decl., ¶ 14; Answer to Plaintiff Xu Jing Ji's First Interrogatories to Defendants, Interrogatory # 1 ("The propounding plaintiff worked 12 hours per day 7 days a week throughout the period of her employment, not counting absences for illness, breaks etc.").

50.    Throughout her employment with Defendants, Xu Jing Ji only missed two days of work.  Xu Jing Ji Decl., ¶ 14.

51.    For her services from November 2003 through February 2004, Defendants paid Xu Jing Ji a salary of $650.00 per month with no deductions for taxes.  *Id*., ¶ 20.

52.    For her services from March 2004 through April 2005, Defendants paid Xu Jing Ji a

salary of $650.00 per month, deducting from the salary, among other things, $50.00 each month for taxes. *Id.*, ¶ 21.

53.    From January 2004 through June 2004, Defendants deducted amounts from Xu Jing Ji's salary for processing fees associated with her initial contract with Defendants in the total amount of $580.00. *Id.*, ¶ 22.

54.    On two occasions, Xu Jing Ji was required to pay her own medical exam fee, police clearance fee and health certificate fee in the total amount of $150.00 to secure her employment with Defendants. *Id.*, ¶ 23.

55.    On at least four occasions during her employment with Defendants, Defendants deducted from Xu Jing Ji's salary the total amount of $125.00 for what Defendants claimed were "cash shortages" for which they claimed Xu Jing Ji was responsible. *Id.*, ¶ 24.

56.    Beginning in May 2004 and continuing through December 2004, Defendants required Xu Jing Ji to live in housing provided by Defendants and deducted from Xu Jing Ji's salary $150.00 for rent for such employer provided housing. *Id.*, ¶ 25.

57.    On April 25, 2005, Kim informed Xu Jing Ji orally and without explanation that she was terminated. *Id.*, ¶ 28.

58.    The last monthly salary Xu Jing Ji received from Defendants was for the month of March 2005. *Id.*, ¶ 29.

59.    During her employment with Defendants, Xu Jing Ji worked 4,532 hours of "regular time" and 3,188 hours of "overtime." Counsel Decl., Exhibit B.

60.    During her employment with Defendants, Xu Jing Ji should have been paid a total of $28,423.64 for the services she performed for Defendants. *Id*.

61.    During her employment with Defendants, Xu Jing Ji received a sum total of $8,995.00 as free and clear compensation from Defendants for her services.

62.    Defendants are liable to Xu Jing Ji in the amount of $19,428.64, plus an equal amount

as liquidated damages, for a total of $38,857.28.  *Id.*

• WAGE CLAIMS OF LI ZHENG ZHE:

63. Plaintiff Li Zheng Zhe began his employment with Defendants on November 25, 2001.  Li Zheng Zhe Decl., ¶ 3.

64. On about June 5, 2002, Li Zheng Zhe entered into a contract with defendant Jung Jin through Park, its president, majority shareholder and alter ego.  *Id.*, ¶ 4, Exhibit A.

65. Defendants, through Park and Jung Jin, renewed Li Zheng Zhe's contract for an additional one-year term on about December 8, 2003.  *Id.*, ¶ 7, Exhibit B.

66. On January 7, 2005, defendant Kim executed a contract for Li Zheng Zhe to work for Asia.  *Id.*, ¶ 9, Exhibit D.

67. On January 21, 2005, defendant Park, now on behalf of Asia, executed a document securing the conditional transfer of Li Zheng Zhe from Jung Jin to Asia.  *Id.*, ¶ 8, Exhibit C.

68. Plaintiff Li Zheng Zhe's contract with Asia was due to expire on January 24, 2006. *Id.*, ¶ 13.

69. All of Plaintiff Li Zheng Zhe's contracts required Defendants to pay him $3.05 per hour for each hour worked, plus overtime in the amount of 1.5 times that rate for all hours worked in excess of forty hours in one week.  *Id.*, ¶ 12, Exhibit A, B & D, § D, Exhibit C.

70. All of Plaintiff Li Zheng Zhe's contracts stated that, with the exception of CNMI taxes and social security, no other deductions from his compensation shall be made by the employer.  *Id.*, Exhibit A, B & D, § E.

71. Both of Plaintiff Li Zheng Zhe's contracts stated that he would provide his own housing.  *Id.*, Exhibit A, B & D, § J.1.

72. Plaintiff Li Zheng Zhe's contract with Asia provided that it could only be terminated for cause and by providing plaintiff with fifteen (15) days advance written notice thereof.  *Id.*, Exhibit D, § L.

73.     From November 25, 2001 through April 25, 2005, Plaintiff Li Zheng Zhe worked fifteen (15) hours per day, seven (7) days per week for Defendants.  Li Zheng Zhe Decl., ¶ 14. Defendants admit that Li Zheng Zhe worked "12 hours per day 7 days a week throughout the period of her employment, not counting absences for illness, breaks etc." Answer to Plaintiff Li Ying Hua's First Interrogatories to Defendants, Interrogatory # 1.  Defendants also admit that "there was no need" to keep track of the hours Plaintiffs worked for Defendants.  Asia Depo. Trans, page 70, lines 1-7.

74.     Throughout his employment with Defendants, Li Zheng Zhe never missed a day of work.  Li Zheng Zhe Decl., ¶ 14.

75.     For his services, Defendants paid Li Zheng Zhe a salary of $900.00 per month.  *Id.*, ¶ 20;

76.     Beginning in June 2002, Defendants deducted $50.00 from Li Zheng Zhi's salary each month for taxes.  *Id.*, ¶ 20.

77.     From June 2002 through December 2002, Defendants deducted amounts from Li Zheng Zhe's salary for processing fees associated with his initial contract with Defendants in the total amount of $650.00.  *Id.*, ¶ 21.

78.     On three occasions, Li Zheng Zhe was required to pay his own medical exam fee, police clearance fee and health certificate fee in the total amount of $225.00 to secure his employment with Defendants.  *Id.*, ¶ 22.

79.     Beginning in November 2001 and continuing through April 2004, Defendants required Li Zheng Zhe to live in housing provided by Defendants and deducted from Li Zheng Zhe's salary $100.00 for rent for such employer provided housing.  *Id.*, ¶ 23.

80.     On April 25, 2005, Kim informed Li Zheng Zhe orally and without explanation that she was terminated.  *Id.*, ¶ 24.

81.     The last month salary Li Zheng Zhe received any salary from Defendants was for the

month of March 2005.  *Id.*, ¶ 25.

82.    During his employment with Defendants, Li Zheng Zhe worked 8,711 hours of "regular time" and 11,570 hours of "overtime."  Counsel Decl., Exhibit C.

83.    During his employment with Defendants, Li Zheng Zhe should have been paid a total of $79,559.15 for the services he performed for Defendants.  *Id.*

84.    During his employment with Defendants, Li Zheng Zhe received a sum total of $33,000 as free and clear compensation from Defendants for his services.

85.    Defendants are liable to Li Zheng Zhe in the amount of at least $40,886.50 plus an equal amount as liquidated damages, for a total of $81,773.00.  *Id.*

• DEFENDANTS' RECORD KEEPING:

86.    *Time Records*:

a.    Both Ms. Park and Mr. Kim were responsible for collecting and compiling the time that each of the plaintiffs worked.  Answer to Plaintiff Li Ying Hua's First Interrogatories to Defendants, Interrogatory # 13; Answer to Plaintiff Xu Jing Ji's First Interrogatories to Defendants, Interrogatory # 13; Answer to Plaintiff Li Zheng Zhe's First Interrogatories to Defendants, Interrogatory # 13;

b.    Defendants have no records which accurately reflect the actual number of hours Plaintiffs worked for Defendants or any of them.  Answer to Plaintiff Li Ying Hua's First Interrogatories to Defendants, Interrogatory # 2; Answer to Plaintiff Xu Jing Ji's First Interrogatories to Defendants, Interrogatory # 2; Answer to Plaintiff Li Zheng Zhe's First Interrogatories to Defendants, Interrogatory # 2;

c.    Kim claims there was no need to keep track of the hours Plaintiffs worked for Defendants.  Asia Depo. Trans, page 70, lines 1-7;

d.    Plaintiff Li Zheng Zhe agreed to work 15 hours a day, 7 days a week for $900.00 per month.  Asia Depo. Trans, page 72, line 8 to page 74, line 9;

e.    Plaintiff Li Ying Hua agreed to work up to 84 hours a week for a base salary of $700.00 per month.  Answer to Plaintiff Li Ying Hua's First Interrogatories to Defendants, Interrogatory # 5 and 9;

f.    Plaintiff Xu Jing Ji agreed to work up to 84 hours a week for a base salary of $700.00 per month.  Answer to Plaintiff Xu Jing Ji's First Interrogatories to Defendants, Interrogatory # 5 and 9.

87.    *Payment Records*:

a.    Each plaintiff was paid an monthly salary for an indeterminate number of hours.  Asia Depo. Trans, page 70, lines 8-17; Answer to Plaintiff Li Ying Hua's First Interrogatories to Defendants, Interrogatory # 5; Answer to Plaintiff Xu Jing Ji's First Interrogatories to Defendants, Interrogatory # 5; Answer to Plaintiff Li Zheng Zhe's First Interrogatories to Defendants, Interrogatory # 5;

b.    Defendants would issue bogus paychecks to Plaintiffs that would show 80 hours for a bi-weekly periods.  Plaintiffs would endorse the checks back to Defendants and Defendants would then pay Plaintiffs the agreed upon monthly salary instead.  Asia Depo. Trans, page 71, line 9 to page 72, line 16;

c.    The paycheck stubs did not match the actual payments of wages (and deductions from those wages) paid to Plaintiffs.  Asia Depo. Trans, page 74, lines 5-6.

88.    *Knowledge of record-keeping requirements*:

a.    When asked if there are any other witnesses to the monthly salary agreements with Plaintiffs, Kim stated:

All my previous employees were paid the same way.  Chinese only.
Filipinos were legally or formally time in and time out. It was, the time
cards were sometimes handwritten and sometimes printed.

Asia Depo. Trans., page 97, line 22 to page 98, line 3;

b.    When asked why the Filipino employees were treated differently than the Chinese

employees, Kim stated:

> They volunteered to do so.  Instead of working 40 hours a week, they
> volunteered to work longer hours and get paid more, and in, that's a
> traditional way for Chinese and Koreans.  We get paid by monthly
> salary, not hourly rate.

Asia Depo. Trans., page 98, lines 4-8.

89.    Kim acknowledges that he had a conversation with each Plaintiff regarding whether they wanted a monthly salary rather than an hourly salary based on time cards. This included the workers of Asia and Jung Jin – "It didn't matter."  Asia Depo. Trans., page 98, line 13 to page 99, line 11.

• <u>DEFENDANTS' ACTIONS RELATIVE TO THE EMPLOYEES</u>:

90.    During her employment with Defendants Li Ying Hua worked as a poker room cashier. Li Ying Hua Decl., ¶ 13.

91.    As a poker room cashier with Defendants, Li Ying Hua worked at various poker rooms of Defendants in Saipan, CNMI, including:  "J Poker" in Susupe, Saipan; "Sun's Poker," also located in Susupe, Saipan; and "JB Poker" in Chalan Kanoa, Saipan for various periods of time.  Li Ying Hua Decl., ¶ 14.

92.    Throughout her employment with Defendants, Li Ying Hua received most of her instructions from Park, although Park and Kim made it very clear that they were both her bosses and that Li Ying Hua should do whatever either of them said to her.  Li Ying Hua Decl., ¶ 15.

93.    Park is the person that initially informed Li Ying Hua of the salary she would receive for her services, the hours Li Ying Hua would work, and Park was the one who paid Li Ying Hua her salary each month.  Li Ying Hua Decl., ¶ 16.

94.    On a daily basis while Li Ying Hua was working at the various poker rooms of Defendants, Kim gave Li Ying Hua instruction regarding small job assignments while on duty.  Mr. Kim directed Li Ying Hua's daily work as a cashier.  Li Ying Hua Decl., ¶ 17.

95.    During her employment with Defendants, Xu Jing Ji worked as a poker room cashier.

Xu Jing Ji Decl., ¶ 15.

96.     As a poker room cashier with Defendants, Xu Jing Ji worked at various poker rooms of Defendants in Saipan, CNMI, including: "J Poker" in Susupe, Saipan and "Daora Poker" located in Chalan Lau Lau, Saipan.  Xu Jing Ji Decl., ¶ 16.

97.     Throughout her employment with Defendants, Xu Jing Ji received most of her instructions from Park, although Park and Kim made it very clear that they were both her bosses and that Xu Jing Ji should do whatever either of them said to her.  Xu Jing Ji Decl., ¶ 17.

98.     Park is the person that initially informed Xu Jing Ji of the salary she would receive for her services, the hours Xu Jing Ji would work, and Park was the one who paid me Xu Jing Ji her salary each month.  Xu Jing Ji Decl., ¶ 18.

99.     On a daily basis while Xu Jing Ji was working at the various poker rooms of Defendants, Kim gave Xu Jing Ji instruction regarding small job assignments while on duty.  Mr. Kim directed Xu Jing Ji's daily work as a cashier.  Xu Jing Ji Decl., ¶ 19.

100.    During his employment with Defendants, Li Zheng Zhe worked mainly as an overall maintenance person and caretaker for Defendants' various businesses, including performing security services.  On occasion Li Zheng Zhe would act as a cashier if needed.  Basically, Li Zheng Zhe performed whatever services Defendants required of him.  Li Zheng Zhe Decl., ¶ 15.

101.    During my employment with Defendants, Li Zheng Zhe worked at various poker rooms of Defendants in Saipan, CNMI, including: "Wonderful Poker" a/k/a "J Poker" in Susupe, Saipan, "Daora Poker" located in Chalan Lau Lau, Saipan, and "JB Poker" and "Welcome Landry" in Chalan Kanoa, Saipan, among Defendants other various establishments and poker rooms.  Li Zheng Zhe Decl., ¶ 16.

102.    Throughout his employment with Defendants, Li Zheng Zhe received most of his instructions from Kim, although Park and Kim made it very clear that they were both his bosses and that Li Zheng Zhe should do whatever either of them said to him.  Li Zheng Zhe Decl., ¶ 17.

103.   Park is the person that initially informed Li Zheng Zhe of the salary he would receive for his services, the hours Li Zheng Zhe would work, and Park was the one who paid Li Zheng Zhe his salary each month.  Li Zheng Zhe Decl., ¶ 18.

104.   On a daily basis while Li Zheng Zhe was working at the various poker rooms of Defendants, Kim gave Li Zheng Zhe instruction regarding job assignments while on duty at the various establishments and poker rooms of Defendants.  Mr. Kim directed Li Zheng Zhe's daily work. Li Zheng Zhe Decl., ¶ 19.

105.   Kim and Plaintiff Li Zheng Zhe worked together for Defendants' enterprise even substituting for other employees when needed.  Kim claims that he and Li Zheng Zhe were both employees of Jung Jin.  After Li Zheng Zhe was "transferred" to Asia, he continued to perform the same work for Jung Jin.  Asia Depo. Trans, page 69, lines 2 to 23.

• DEFENDANTS' ENTERPRISE:

106.   **Jung Jin had only two shareholders, Park and Kim, at all times relevant to Plaintiffs' claims.**  *See*, *e.g.*, Exhibits "A" and "B" hereto.

107.   **Asia had only two shareholders, Park and Kim, at all times relevant to Plaintiffs' claims.**  *See*, *e.g.*, Exhibit "A" hereto.

108.   **Park and Kim were each directors and officers of Jung Jin and Asia at all times relevant to Plaintiffs' claims.**  *See*, *e.g.*, Exhibit "A" hereto.

109.   **Kim and Park are or were husband and wife and/or hold themselves out to others as husband and wife.**  Asia Depo. Trans., page 46, line 5 to page 47 line 2; page 57, lines 6-20; Kim Pil Sun Kitami Depo. Trans., page 14, lines 10-15; page 26, lines 14-17; page 28, lines 17-21;  page 29, lines 11-12; Cindy Yu Depo. Trans., page 6, lines 10-17; Kim Ki Sung Depo. Trans., page 43, lines 13-20.  See also Exhibit "F" hereto (Park submitting Business Establishment Inspection Request form to CNMI Department of Labor referring to herself as "Mrs. Kim").

110.   **PARK and KIM are the principals of JUNG JIN and ASIA ENTERPRISES, and, at**

all times relevant hereto, they were acting directly and/or indirectly in the interest of **JUNG JIN** and **ASIA ENTERPRISES in relation to Plaintiffs.** Admitted by Defendants in Answer, ¶ 1.

111.    **Kim claims that Asia had a contract to perform services for Jung Jin which he believes explains the interrelationship between the two jointly owned corporations.** Asia Depo. Trans, page 26, line 15 to page 29, line 24.

112.    **Kim hired Plaintiffs and decided their salary and hours, and Park managed the paperwork and payment thereafter.** Asia Depo. Trans., page 99, line 13 to page 100, line 3.

113.    **Kim signed documents on behalf of Park and Jung Jin for, among other things, obtaining poker licenses for Jung Jin poker machines** (*see, e.g.*, Exhibit "G" hereto) **and employment applications submitted to the CNMI Department of Labor for Defendants' employees** (*see, e.g.*, Li Ying Hua Decl., Exhibit B) among various other documents.

114.    **Park was heavily involved in operating the business of both Asia and Jung Jin:**

a.    Park retained accounting services for both Asia and Jung Jin and Park was the individual with whom the tax preparer dealt for both Asia and Jung Jin about ninety percent of the time. Cindy Yu Depo. Trans., page 6, line 8 to page 9, line 10; page 13, line 21 to page 14, line 9;

b.    Park would direct the accountant on how she wanted items reported for tax and other purposes on Asia's and Jung Jin's tax returns and financial statements. Cindy Yu Depo. Trans., page 28, line 2 to page 30 line 15, page 36, lines 14-23;

c.    Park retained and paid for labor and immigration document processing services for both Asia and Jung Jun and Park was the individual with whom the document processor dealt for both Asia and Jung Jin about ninety percent of the time. Cindy Yu Depo. Trans., page 12, line 16 to page 13, line 20;

d.    Park provided the information upon which tax documents were prepared for both Asia and Jung Jin. Cindy Yu Depo. Trans., page 14, line 14 to page 16, line 18; Asia Depo.

Trans., page 48, lines 11-20 (discussing an Asia tax return, Kim stated that Cindy Yu and Park would prepare the tax documents and when the documents were ready to sign, Kim would go to Cindy Yu's office and sign the tax returns, but he never understood what they stated or meant);

e.    Park signed tax returns for Asia and Jung Jin.  Cindy Yu Depo. Trans., page 39, lines 9-19, page 42, line 13 to page 43, line 1, and Exhibits J, K & L thereto; and Exhibits "C" and "D" hereto;

f.    Park was authorized to sign and did sign nonresident employment documents on behalf of Asia and Jung Jin. Asia Depo. Trans., page 52, lines 3-23; page 66, lines 2-17; Li Ying Hua Decl., ¶¶ 6-7 (and Exhibits attached thereto); Xu Jing Ji Decl., ¶¶ 5-6 (and Exhibits attached thereto); Li Zheng Zhe Decl., ¶¶ 4-8 (and Exhibits attached thereto); and Exhibit "H" hereto;

g.    Park made the decisions regarding officers and directors of Asia.  Cindy Yu Depo. Trans., page 9, line 11 to page 10, line 17;

h.    Park "handled the books, she handled the money" for Asia, Jung Jin and Kim.  Asia Depo. Trans., page 46, line 24 to page 47, line 4;

i.    Park had check writing authority for Asia bank accounts. Asia Depo. Trans, page 66, lines 10-23;

j.    Kim entrusted the business of Asia to Park.  Asia Depo. Trans., page 51, lines 1-13; page 53, lines 17-21.

k.    Kim was "never heavily involved" with Cindy Yu with regard to the accounting of the enterprise. Asia Depo. Trans., page 97, lines 10-13;

l.    In response to a question related to the business expenses of Asia and Kim's personal expenses, Kim states: "I don't know any of this.  My job is to earn money and whatever I earn was given to Mrs. Park, and Mrs. Park does all the documents."  Asia Depo.

1    Trans., page 81, lines 14-20.

2    115.    **Park and Kim failed to properly account for and report the income and expenses of**

3    **Asia and Jung Jin treating the corporations and themselves as one enterprise:**

4    a.    Park and Kim would create fictitious figures for income, expenses and for the

5    purported liabilities of both Asia and Jung Jin.   Cindy Yu Depo. Trans., page 26, lines

6    19-23; page 28, line 2 to page 30, line 15; Asia Depo. Trans, page 49, line 24 to page

7    50, line 50;

8    b.    Kim admits that he believes the figures in Asia tax returns are not accurate – the

9    figures are "made up" – "that's how it works."  Asia Depo. Trans, page 78, line 22 to

10    page 79, line 6;

11    c.    Kim says that he and Asia do not have any receipts for any of the assets or other

12    property owned or purchased by Kim and Asia — that he threw them all away.  Asia

13    Dep. Trans., page 94, line 23 to page 95, line 7;

14    d.    Kim does not maintain a bank account of his own for expenses; the only bank account

15    he has in his own name is an account with a very low balance that he needed to open

16    and maintain to obtain a credit card for business use.  Asia Depo. Trans., page 17,

17    lines 14-24;

18    e.    Kim does not receive a salary from Asia; Asia Depo. Trans., page 18, line 23 to page

19    20, line 24;

20    f.    Kim has been in the Saipan for twenty years; Kim does not file personal income

21    returns nor does he pay personal income taxes.  Asia Depo. Trans., page 19, lines 2-22;

22    g.    All of Kim's expenses, including food, rent and utilities for his residence, are paid out

23    of the accounts of Asia.  Asia Depo. Trans., page 18, lines 6-22.; page 49, lines 4-6

24    (Kim stating "whatever I earned for myself was used for my pocket money, paying for

25    gas, the rent.");

26

27

h.    Kim considers the income of Asia as his own personal income. Asia Depo. Trans., page 18, lines 16-22.

i.    For the year 2002, Park claimed a salary of $12,000.00 from Jung Jin and income from all sources in the amount of $12,000.00. Exhibit "E" hereto.

j.    For the year 2003, Park claimed a salary of $12,000.00 from Jung Jin and income from all sources in the amount of $14,500.00 — $2,500.00 of which was gambling winnings from her own company, Jung Jin. Exhibit "E" hereto.

k.    For the year 2004, Park claimed a salary of $12,000.00 from Jung Jin and income from all sources in the amount of $12,000.00. Exhibit "E" hereto.

l.    No documents exist that show that either Park or Kim have ever paid self-employment taxes.

116.    **Park and Kim commingled assets, expenses and liabilities of each other and of Asia and Jung Jin treating the whole as one enterprise:**

a.    Kim and Park hold themselves out to others as husband and wife and, as such, Kim claims they were able to secure loans from others for their Susupe residence, for Asia and Jung Jin poker licensing fees and for various other personal and business expenses. Asia Depo. Trans., page 46, line 5 to page 47 line 2;

b.    Kim, on some occasions, refers to Park as his "wife" and "business partner." Asia Depo. Trans., page 57, lines 6-20;

c.    Third parties have heard Kim and Park refer to each other as husband and wife. Kim Pil Sun Kitami Depo. Trans., page 14, lines 10-15; page 26, lines 14-17; page 28, lines 17-21; page 29, lines 11-12; Cindy Yu Depo. Trans., page 6, lines 10-17; Kim Ki Sung Depo. Trans., page 43, lines 13-20;

d.    Kim claims that he had a poker business operating under Jung Jin. Asia Depo. Trans., page 26, lines 13-16;

e.   Kim claims he used to have several poker parlors — poker parlors licensed under the name of Jung Jin. Asia Depo. Trans., page 33, lines 9-21, page 37, line 2 to page 38, line 5;

f.   In 2004, Kim claims Asia "borrowed" four poker machines from Jung Jin to use in Kim's/Asia's poker parlor partnership with Kim Ki Sung. Asia Depo. Trans., page 58, line 21 to page 63, line 18;

g.   After the failure of his poker partnership with Kim Ki Sung, Kim claims he stored "his poker machines" in Welcome Poker, an establishment Jung Jin and Park claimed to have owned and recently transferred to Kim Ki Sung. Asia Depo. Trans., page 61 line 1 to page 63, line 24;

h.   The alleged Kim Ki Sung/KSK Loan:

    i.   Kim claims he owes Kim Ki Sung $180,000.00. Asia Depo. Trans., page 42, line 14;

    ii.  Kim also claims that Park went to Kim Ki Sung and borrowed up to $180,000.00, $30,000.00 to $40,000.00 at a time, in cash, and that Jung Jin was, therefore, also indebted to Kim Ki Sung. Asia Depo. Trans., page 92, line 12 to page 94, line 7;

    iii. Kim Ki Sung claims Kim owes him $26,000.00 for money Kim Ki Sung put into their poker partnership and that Park owes him $100,000.00 for money she borrowed, in cash; Kim Ki Sung Depo. Trans., page 30, line 13 to page 42, line 11;

    iv.  Kim Ki Sung also claims that "the couple – Kim and Park" are indebted to him. Kim Ki Sung Depo. Trans., page 39, line 13 to page 40, line 1;

    v.   In exchange for these debts of Kim and Park, Kim Ki Sung had Defendants assign all or substantially all of the assets of Jung Jin to Kim Ki Sung's

1    company - KSK Corp.  See, e.g., Kim Ki Sung Depo. Trans., page 37, line 13

2    to page 39, line 16 and Exhibits D, E, H, and I;

3    i.    The alleged Kitami Loan:

4    i.    Kim claims that Asia borrowed *approximately* $400,000.00 over a period of

5    years from a individual named Kim Pil Sun Kitami (Asia Depo. Trans., page

6    15, line 4 to page 16, line 6);

7    ii.    Kim, at times, alleges that he personally borrowed that money from Ms.

8    Kitami.  Asia Depo. Trans., page 16, lines 9-24; page 32, lines 14-23; page 43,

9    line 17 to page 44, line 7 (Kim insists that Asia and Kim owe Kitami, but Park

10    and Jung Jin have no obligation to Kitami);

11    iii.    Kim also contends that the money borrowed from Ms. Kitami was used to pay

12    poker licensing fees for Jung Jin, and for Asia during Asia's poker parlor

13    partnership with Kim Ki Sung. Asia Depo. Trans., page 32, line 14 to page 34,

14    line 6; page 38, lines 3-13 (money borrowed from Kitami by Kim was used to

15    pay the poker machine licensing fees of  Jung Jin); page 48, line 24 to page 49,

16    line 1 (the money borrowed by Kim from Kitami was used for Jung Jin license

17    fees and to build the Susupe residence);

18    iv.    Kim states that funds from Kitami were used by him to build his Susupe

19    residence which he claims as his own, individual property (Asia Depo. Trans.,

20    page 41, lines 7-14);

21    v.    Kim states that, at times, Park would go to Kitamai and borrow money which

22    increased the total amount he claims Kim and Asia owe to Kitami.  Asia Depo.

23    Trans., page 46, lines 5-24;

24    vi.    Kim states that he gave Kitami a mortgage on the Susupe residence and two

25    vehicles — both vehicles were purchased for almost $30,000, with cash, by

26

27

Park.  Asia Depo. Trans., page 44, line 8 to page 45, line 5; page 90, line 2 to page 90, line 13;

vii.   Kim claims that Park owns the vehicles, but that Asia used the vehicles as after-the-fact security for the alleged Kitami loan.  Kim states that the money used to by the cars was money "he worked hard to earn." Asia Depo. Trans., page 89, line 2 to page 90, line 13;

viii.  Documents confirm that Park is the registered owner of at least one of the vehicles Kim claims he used for part of the collateral demanded by Kim Pil Sun Kitami – vehicles purchased by Park with cash.  See Exhibit "I" hereto;

ix.   The alleged creditor, Kim Pil Sun Kitami says that the loans, in the alleged total approximate amount of $350,000.00, were "always personal" to Park — Kim, Asia and Jung Jin are *not* indebted to her.  Kim Pil Sun Kitami Depo. Trans., page 29, line 11 to page 30, line 30;

x.    Kim Pil Sun Kitami states that she cannot remember when she first started loaning Park money or exactly how much she loaned, because "we Koreans we just – without any documents we just lend out money and get our money back that's how we socialize." Kim Pil Sun Kitami Depo. Trans., page 30, line 4 to page 31, line 12;

j.   Kim claims that he was going to sell the laundrymat called Welcome Laundry, purportedly owned by Jung Jin, and use the proceeds to repay money he claims he owes to Kim Pil Sun Kitami. Asia Depo. Trans., page 33, lines 9-16;

k.   Asia has claimed at least $67,696.00 of construction and improvements to Park's and Kim's residence in Susupe as business expense deductions on Asia tax returns.  Cindy Yu Depo. Trans., page 35, line 19 to page 36, line 23 and Exhibits H (2004 Corporate Income Tax Return) & I (handwritten check ledger) thereto;

l.  Contrary to Asia's tax returns, Kim claims that he is sure Asia did not deduct the expenses of the construction of the Susupe residence, but Kim admits that he doesn't know anything about Asia's tax returns. Asia Depo. Trans, page 76, line 1 to page 79, line 8;

m.  Kim claims that either he or Asia owes an individual named Seo Yong Ki the amount of $50,000.00 for money borrowed by Park. Asia Depo. Trans., page 42, line 22 to page 43, line 4;

n.  In 2004 and 2005, and possibly at other times continuing to date, Asia paid the rent for the land upon which Park's and Kim's residence in Susupe is situated. Cindy Yu Depo. Trans., Exhibits H & I;

o.  Kim claims that the Susupe residence is his individual property. Asia Depo. Trans., page 40, line15 to page 41, line 16;

p.  Asia claims to have made unaccounted for "loans" to Jung Jin and claimed them as a liability in tax returns and financial statements. Cindy Yu Depo. Trans., page 38, line 17 to page 39, line 8 and Exhibit H (2004 Corporate Income Tax Return for Asia Enterprises, Inc.), Exhibit I (handwritten check ledger for Asia Enterprises, Inc.) and Exhibit L (2004 Corporate Income Tax Return for Jung Jin Corp.) thereto;

q.  Both Asia and Jung Jin carried "loans from shareholders" in various amounts on their financial statements as reported in their tax returns for at least the years 2003 and 2004 which at no time represented any amount of money provided by any or all of the shareholders of either entity to the respective entities. Cindy Yu Depo. Trans., page 28 line 2 to page 30, line 16, page 43 line 2 to page 44, line 14 and Exhibits D, E, G, H, K & L thereto;

r.  Kim believes he "is Asia for all matters;" Kim considers himself and Asia one and the same, at least for asset ownership and income purposes. Asia Depo. Trans, page 27,

lines 6-13, page 33, line 22 to page 37, line 1.

117.   **Kim claims to be the sole owner of Asia, but when questioned about its shareholders, officers, directors and various other affairs, he claims he cannot remember or does not know:**

    a.   Kim claims to be the sole owner of Asia.  Asia Depo. Trans., page 20, lines 21-24;

    b.   Kim claims that corporate documents are for show only.  Asia Depo. Trans., page 21, lines 1-12;

    c.   Kim believes Asia has three directors, but he "can't remember the name" of one of the directors.  Asia Depo. Trans., page 22, lines 13-21;

    d.   No records are kept of Asia meetings.  *See, e.g.*, Asia Depo. Trans., page 23, lines 2-8 (no minutes of purported board meeting to "close down" Asia);

    e.   Kim claims he doesn't know if he ever received a salary from Asia.  Asia Depo. Trans.,page 19, lines 8-20;

    f.   Kim doesn't know who responded to discovery requests on behalf of Asia in this litigation.  Asia Depo. Trans., page 19, line 23 to page 20, line 6;

    g.   Kim acknowledges that he was listed as an officer and director of Jung Jin and Park was listed as an officer and director of Asia, but he claims that sometime a couple of years before the day of Asia's deposition, after an argument between Kim and Park, each "pulled their names out." Asia Depo. Trans., page 23, lines 11-14.

118.   **In early 2005, Park and Kim "transferred" Plaintiffs Li Zheng Zhe and Xu Jing Ji from the contract employ of Jung Jin to the contract employ of Asia, knowing, among other things, that Asia, alone, did not have the business to support the hiring of the two, and with the actual intent, among other things, of closing the "business" of Asia soon thereafter, in an attempt to isolate the employment liability of Jung Jin, Park and Kim to the plaintiffs solely in Asia, a defunct corporation:**

    a.   Kim admits that business for Asia started to get bad as early as 2004; Asia Depo.

Trans., page 58, line 21 to page 59, line 12;

b.    Daora Poker, Kim/Asia's partnership with Kim Ki Sung, was "losing money little by little." Asia Depo. Trans, page 79, line 21 to page 80, line 19;

c.    Kim claims that Asia had to lie on its tax returns by showing income he claims Asia did not have in order to hire employees, including Plaintiffs. Asia Depo. Trans, page 79, line 211 to page 80, line19;

d.    Less than three months after Li Zheng Zhe and Xu Jing Ji were "transferred" to Asia, Kim and Kim Ki Sung held a meeting at which they told Li Zheng Zhe and Xu Jing Ji that they should transfer to some other employer because Asia's business was no good and Asia would be "shut down." Asia Depo. Trans., page 64, line 1 to page 65, line 12; page 67, line 21 to page 68, line 10; Answer to Plaintiff Li Ying Hua's First Interrogatories to Defendants, Interrogatory # 6; Answer to Plaintiff Xu Jing Ji's First Interrogatories to Defendants, Interrogatory # 6; Answer to Plaintiff Li Zheng Zhe's First Interrogatories to Defendants, Interrogatory # 6.

Respectfully submitted this 14th day of July, 2006.

/s/ Mark B. Hanson

_____
MARK B. HANSON

First Floor, Macaranas Building
Beach Road, Garapan
PMB 738, P.O. Box 10,000
Saipan, MP 96950
Telephone:    (670) 233-8600
Facsimile:    (670) 233-5262

Attorney for Plaintiffs