1   MARK B. HANSON, ESQ.
    Second Floor, Macaranas Building
2   Beach Road, Garapan
    PMB 738 P.O. Box 10,000
3   Saipan, Mariana Islands 96950
    Telephone:    (670) 233-8600
4   Facsimile:    (670) 233-5262
    E-mail:       mark@saipanlaw.com
5
    Attorney for Plaintiffs
6

7                IN THE UNITED STATES DISTRICT COURT
                            FOR THE
8                  NORTHERN MARIANA ISLANDS

9
10  LI YING HUA, LI ZHENG ZHE and XU JING JI, )   CASE NO. CV 05-0019
                                              )
        Plaintiffs,                           )
11                                            )
                                              )
12      vs.                                   )   MEMORANDUM OF
                                              )   FACTS AND LAW
13  JUNG JIN CORPORATION, a CNMI corporation, )
    ASIA ENTERPRISES, INC., a CNMI corporation,)
14  PARK HWA SUN and KIM HANG KWON,           )
                                              )   Date:  Wednesday, January 17, 2007
        Defendants.                           )   Time:  9:00 a.m.
15  _____)   Judge: Hon. Alex R. Munson, Chief Judge

16       COMES NOW the Plaintiffs, by and through their attorney, pursuant to Fed. R. Civ. P. 69(a)

17  and 18(b) and 7 C.M.C. §§ 4101-4104 and 4201-4210, with the following Memorandum in support

18  of a motion that the Court set aside a purported mortgage and liens in favor of third-party Kim Pil

19  Sun Kitami and allow Plaintiffs to sell certain real and personal property of the Defendants/Judgment

20  Debtors not subject to said mortgage and liens.  This Memorandum and Plaintiffs' post-judgment

21  motion are supported by the evidence on file with the Court in this matter, including: Plaintiffs'

22  Proposed Findings of Uncontroverted Fact (Docket #76 and #77), adopted without modification

23  as the Court's findings of fact in this case in its Order Granting Summary Judgment (Docket #87);

24  the Declarations of Stephen J. Nutting (Docket #25), Mark B. Hanson dated November 28, 2006

25  (Docket #116), Mark B. Hanson dated January 15, 2007; Transcripts of the depositions of Asia

26

27

1  Enterprises, Inc. (Docket #68), Cindy Yu (Docket #69), Kim Ki Sung (Docket #70); and Kim Pil

2  Sun Kitami (Docket #71) and the other pleadings and records on file in this matter.

3                                    INTRODUCTION

4          Plaintiffs have, *inter alia*, asked this Court to set-aside a mortgage and liens on real property

5  and two vehicles of Defendants located in the Commonwealth, seized by the United States Marshal

6  and currently in the custody of the attorney for Plaintiffs.  Plaintiffs are seeking this relief in the

7  pending, post-judgment proceedings in aid of their judgment pursuant to applicable Commonwealth

8  and federal law.  With the present liens attached to the real property and vehicles, the property is

9  unsalable.   The property also constitutes the bulk of Defendants' remaining assets in the

10  Commonwealth.

11         Kitami claims that she loaned Defendant Park Hwa Sun ("Park") the total of approximately

12  $350,000.00 in smaller loans of $5,000.00 to $30,000.00, and in one instance, $150,000.00, over a

13  several years, the last loan of money to Park which occurred in about March 2005.  Kitami has

14  absolutely no documentation or other evidence besides her own self-serving testimony and the

15  deposition testimony of Park's husband and business partner, Defendant Kim Hang Kwon ("Kim"),

16  to support her claims that she loaned Park or Kim money.

17         It was these alleged, undocumented loans that formed the basis of a formal promissory note,

18  secured by a mortgage on a large tract of land in Susupe, Saipan held in the name of Kim, and liens

19  on Kim's and Park's two vehicles in the Commonwealth, created by Kitami's attorney in January

20  2006.

21         As shown below, not only are the alleged loans wholly undocumented, but the purported

22  reasons for the loans themselves do not exist, the fraud on behalf of Kim, Park and Kitami involved

23  in January 2006 in creating the fictitious loans is admitted, and the evident purposes of the loans —

24  to frustrate Plaintiffs' efforts to collect on their judgment against Defendants — is presently being

25  realized.

26

27

1    The loans cannot stand as a barrier to Plaintiffs' recovery of their judgment. The burden is

2    on Kitami to establish the loans and, thus, the validity of the present liens on Defendants property.

3    This she cannot do; the Court must set-aside the liens and allow the sale of the property free and

4    clear.

5                                       INCONTROVERTIBLE FACTS

6    1.    On June 23, 2005, Plaintiffs filed their initial Verified Complaint against the

7    Defendants in this matter. Declaration of Mark B. Hanson dated November 28, 2006 ("Hanson Decl.

8    A"), ¶ 3.

9    2.    While the case was pending, and after initial discovery was conducted, on December

10   11, 2005, an advertisement appeared in the *Saipan Times* Korean language weekly newspaper wherein

11   the Defendants advertised for sale all of their assets in the Commonwealth. Declaration of Mark B.

12   Hanson dated January 15, 2007 ("Hanson Decl. B"), ¶ 3 and Exhibit "A" thereto.

13   3.    A translation of the document showed that the sales were "Urgent!" and "because of

14   some matter." Hanson Decl. B, ¶ 4.

15   4.    On December 22, 2005, shortly after the advertisement was brought to the attention

16   of Plaintiffs' counsel, Plaintiffs' counsel wrote Defendants' attorney Stephen J. Nutting indicating

17   that Plaintiffs believed that Defendants were planning on transferring all of their assets to avoid

18   subjecting them to the claims of Plaintiffs to satisfy the judgment Plaintiffs were going to obtain

19   against Defendants. Hanson Decl. B, ¶ 5.

20   5.    Shortly thereafter, on January 1, 2006, Defendants effected the transfer of the bulk of

21   their operating businesses (a laundrymat, a poker parlor and a market) to KSK Corp. as satisfaction

22   for alleged prior loans from Kim Ki Sung to Defendants. *See* Transcript of Deposition of Kim Ki

23   Sung ("Kim Ki Sung Depo. Trans.") at page 35, lines 14 to 23; Exhibits D through I.

24   6.    On about January 12, 2006, Defendants granted a mortgage in favor of Kim Pil Sun

25   Kitami effecting liens on Defendants' remaining property of value in the Commonwealth: two new

26

27

vehicles and Defendants' long-term leasehold interest in Lot 056 H 14, a 3,627 square meter parcel of improved property located in Susupe, Saipan, Commonwealth of the Northern Mariana Islands (the "Susupe Property"). Hanson Decl. A, ¶ 6; Hanson Decl. B, ¶ 7.

7.    Defendants continued to occupy the Susupe Property and maintained possession of the vehicles mortgaged by Kitami. Hanson Decl. B, ¶ 8.

8.    After transferring their interests in various assets and businesses on January 1, 2006 and January 12, 2006, Defendants were left with very few unencumbered assets. Hanson Decl. B, ¶ 9.

9.    On about January 22, 2006, two days prior to the date scheduled for the deposition of Jung Jin Corporation ("Jung Jin") and with her own deposition to follow few days thereafter, defendant Park Hwa Sun, the principal of Jung Jin, departed the Commonwealth for South Korea with no plans of returning to Saipan. *See* Transcript of Deposition of Asia Enterprises, Inc. ("Asia Depo. Trans."), page 8, lines 15 to 18; Declaration of Stephen J. Nutting in Support of Motion to Withdraw, ¶ 3.

10.    On August 24, 2006, judgment was entered by this Court for Plaintiffs in the above-captioned case and against all of the above-named Defendants, jointly and severally, in the amount of $209,798.55, plus post-judgment interest at the applicable rate. (Docket #93).

11.    On about November 19, 2006, three days before the date scheduled for a post-judgment deposition of defendant Kim Hang Kwon, defendant Kim Hang Kwon departed the Commonwealth for South Korea. Hanson Decl. A, ¶ 20.

12.    On December 7, 2006, the Court issued its first Order in Aid of Plaintiffs' Judgment, directing, *inter alia*, the United States Marshal to seize the real and personal property of Defendants located on the Susupe Property. (Docket #122).

13.    On December 22, 2006, the United States Marshal filed a Process Receipt and Return having completed the seizure of the real and personal property of Defendants directed by the Court's Amended Order in Aid of Judgment issued in this matter on December 7, 2006. (Docket #133).

14.    With the Process Receipt and Return, the Marshal filed an inventory of items of personal property seized on and about the Susupe Property.

15.    The same day, the Marshal relinquished custody of the seized items of personal property and the real property and improvements thereon at the Susupe Property to Plaintiffs' counsel pending further orders of this Court regard the disposition of such property to satisfy some or all of the judgment of Plaintiffs in this matter.

● **Defendants' Income**:

16.    Defendants had at least $552,497.00 in gross revenues for the year 2002.  Proposed Findings of Uncontroverted Fact ("Factual Findings") ¶14; Exhibits C, D and Table 1 (Docket #77).

17.    Defendants had at least $863,760.00 in gross revenues for the year 2003.  Factual Findings ¶15; Exhibits C, D and Table 1 (Docket #77).

18.    Defendants had at least $733,102.19 in gross revenues for the year 2004.  Factual Findings ¶16; Exhibits C, D and Table 1 (Docket #77).

19.    In about June 2003, Kim sold the operating assets of Asia Enterprises, Inc. ("Asia") (a marker and a poker parlor) for $100,000.00 cash.  Asia Depo. Trans, page 23, line 19 to page 24, line 24.

● **Park and Kim Had a History of Fraudulent Behavior**:

20.    Park and Kim would create fictitious figures for income, expenses and for the purported liabilities of both Asia and Jung Jin.   Factual Findings ¶115.a; Cindy Yu Depo. Trans., page 26, lines 19-23; page 28, line 2 to page 30, line 15; Asia Depo. Trans, page 49, line 24 to page 50, line 50.

21.    Kim admits that he believes the figures in Asia tax returns are not accurate – the figures are "made up."  Factual Findings ¶115.b; Asia Depo. Trans, page 78, line 22 to page 79, line 6.

22.    When asked in his deposition about a particular figure for construction expense

deductions shown in Asia's 2004 return, Kim explained:

> A.  I don't know where that came from, but that's got nothing to do with the house.  This is how it works.  I file for taxes, the number, the amount that I file for taxes does not mean that I actually earned that exact figure.  At the end of the year there comes a time where I will have to come up with numbers that would match the number that I file at the taxation office.  So that building improvement could have been the number I needed to come up with.
>
> Q.   So you just make up numbers in your tax returns?  Make them up?
>
> A.   That's how it works.

Asia Depo. Trans, page 78, line 22 to page 79, line 6.

23.     Kim claims that Asia had to lie on its tax returns by showing income he claims Asia did not have in order to hire employees, including Plaintiffs.  Factual Findings ¶118.c; Asia Depo. Trans, page 79, line 211 to page 80, line19.

24.     In December 2004, as a result of an audit conducted by the Commonwealth Division of Revenue and Taxation, Defendants agreed that Jung Jin Corp. had under reported its income in the years 2001-2003 by more than $275,000.00.  Asia Depo. Trans, Exhibit # 01452.

- **Defendants' Purported Loans from Kitami**:

25.     Kim claims that Asia borrowed *approximately* $400,000.00 over a period of years from a individual named Kim Pil Sun Kitami.  Asia Depo. Trans., page 15, line 4 to page 16, line 6.

26.     Kim alleges that he personally borrowed that money from Ms. Kitami  (Asia Depo. Trans., page 16, lines 9-24; page 32, lines 14-23; page 43, line 17 to page 44, line 7), that the money borrowed from Ms. Kitami was used to pay poker licensing fees for Jung Jin, and for Asia during Asia's poker parlor partnership with Kim Ki Sung (Asia Depo. Trans., page 32, line 14 to page 34, line 6; page 38, lines 3-13), and that funds from Kitami were used by him to build his Susupe residence which he claims as his own, individual property (Asia Depo. Trans., page 41, lines 7-14).

27.    Kim also states that, at times, Park would go to Kitamai and borrow money which increased the total amount he claims Kim and Asia owe to Kitami.  Asia Depo. Trans., page 46, lines 5-24.

28.    Kitami, on the other hand, claims that she only loaned money to Park and in the alleged total approximate amount of $350,000.00.  The loans were "always personal" to Park — Kim, Asia and Jung Jin are *not* indebted to her.  Transcript of Deposition of Kim Pil Sun Kitami ("Kitami Depo. Trans."), page 29, line 11 to page 30, line 30.  *See also* page 14, lines 10-13 (Kitami only loaned money to Park, not to Kim); page 29, lines 15-20 (same).

29.    Kitami states that she cannot remember when she first started loaning Park money or exactly how much she loaned, because "we Koreans we just – without any documents we just lend out money and get our money back that's how we socialize."  Kitami Depo. Trans., page 30, line 4 to page 31, line 12.

30.    Indeed, as Kitami testified in a deposition on February 21, 2006, and as Kitami admits in her Response to the Order to Show Cause, there are no documents that evidence any loans nor the provision of any money by Kitami to Kim and Park at any time.  *See*, *e.g.*, Kitami Depo. Trans., page 21, lines 11-12;

31.    Though documents were created by Kim and Park as purported evidence of indebtedness supporting their mortgaging the Susupe Property and their vehicles to Kitami, the "promissory notes" were not created until about December 2005, shortly before Kitami took the documents to her attorney and had him draft a promissory note and mortgage. Kitami Depo. Trans., page 21, line 13 to page 28, line 7 and Exhibit 3.

32.    Though Kitami's deposition is replete with evidence demonstrative of the untenable nature of Kitami's claimed loans supporting her present bogus liens, the following contiguous section of the transcript is telling:

Q.    When was the first time you loaned Mrs. Park money?

Page 7 of  36

1    A.    I don't clearly remember, but we Koreans we just -- without any
2    documents we just lend out money and get our money back that's how
     we socialize.
3    Q.    So how -- so how do you ever know how much money another
4    Korean owes you?
     A.    Because when the money is loaned in -- in small amounts, let's
5    say $5,000, $10,000, $20,000 the money is paid back in lump sum, in
6    one time.  And it's -- it's not a small amount of money and it -- I just
     remember other money that's being lend out to or being paid back.
7    Q.    Okay.  What -- all right.  So you don't remember the first time
     that Mrs. Park borrowed money from you?
8    A.    I don't know.  I don't remember.  There was a time where --
9    when I borrowed money from her and she borrows money from me too.
     Q.    Do you know how much money it was the very first time that
10   Mrs. Park borrowed money from you?
11   A.    I don't know that.  But usually between five to thirty thousand
     dollars.
12   Q.    This -- did you make any notes or write anything down when
13   she would borrow money from you?
     A.    No.
14   Q.    Now, she -- you said that she loaned you money also, right?
     A.    Yes.
15   Q.    Do you know when that was that you borrowed money from
16   Mrs. Park?
     A.    We were friends, we were long time friends, it was a long time
17   ago since I first borrowed money from her.
18   Q.    When you borrowed the money from Mrs. Park did you write
     down how much you owed Mrs. Park?
19   A.    No.  That's not how it works.
20   Q.    How about this $150,000 that was -- that Mrs. Park borrowed
     from you in about 2004, did you write down how much she borrowed
21   at that time?
22   A.    No.
     Q.    Beside the -- the Exhibits 1, 2 and 3, are there any documents
23   of which you're aware that would show Mrs. Park borrowing $150,000
24   from you?
     MR. PIERCE: Objection; vague and ambiguous as to show.
25   A.    No there isn't.  This is all.
26
27
                              Page 8 of  36

Kitami Depo. Trans., page 30, line 9 to page 31, line 19.

33.     Kitami is a long-time friend of Park.  Kitami Depo. Trans., page 31, line 8.

34.     Before Kitami became a supposed lender of several hundreds of thousands of dollars to Defendants, she herself was a borrower of substantial funds from Park and others.  Kitami Depo. Trans., page 9, line 23 to page 16, line 23.

35.     Kitami claims that for many years beginning in the 1990's, Park would loan Kitami money and Kitami would loan Park money, usually in amounts from $5,000.00 to $20,000.00 at a time.  Kitami Depo. Trans., page 14, line 14 to page 15, line 7.

36.     Kitami always loaned Park cash — never a check and she never got a receipt.  Kitami Depo. Trans., page 39, line 14 to page 40, line 15.

37.     Kitami had several start up businesses in Saipan and was always in need of money.  Park was one of the people from whom Kitami would borrow money.  Kitami Depo. Trans., page 9, line 23 to page 16, line 23.

38.     In fact, Kitami claimed that at one time she "urgently needed cash" to finance a project, and she testified that a later investment in a Saipan restaurant caused her to lose approximately $200,000.00.  Kitami Depo. Trans., page 12, line 17 to page 14, line 2.

39.     Kitami claims that she had to borrow $200,000.00 from her friends for her various investments in Saipan businesses.  Kitami Depo. Trans., page 16, line 4 to page 17, line 4.

40.     In her deposition, Kitami testified that sometime in the early-1990's, Kitami had borrowed $50,000.00 from a Korean bank and mortgaged her house in Korea to get money to begin

construction of an apartment building in Saipan.  Kitami Depo. Trans., page 9, line 20 to page 11, line 10.

41.    When asked if she had ever again mortgaged her house in Korea again she answered "no." Kitami Depo. Trans., page 11, lines 11-12.

42.    When asked if she had ever again borrowed money from any bank in Korea, Kitami answered "no." Kitami Depo. Trans., page 11, lines 13-15.

43.    However, when later questioned on her alleged loans to Park, Kitami claims that she did, indeed, borrow $150,000.00 from a Korean bank and mortgaged her house in Korea, albeit she claims it was a different house than the one she mortgaged for the $50,000.00 construction loan. Kitami Depo. Trans., page 32, line 6 to page 33, line 12.

44.    In any case, and despite the fact that Defendants had substantial income from the operations of their various business, Kitami now claims that Park is indebted to her in the amount of "about" $350,000.00 for the various loans she made to Park, the largest of which was $150,00.00 cash loan to Park allegedly given by Kitami to Park's sister in Korea sometime in 2004. Kitami Depo. Trans, page 30, lines 4-8.

45.    When asked in her deposition, Kitami says she has absolutely no documents that reflect that she obtained a loan from a Korean bank, nor does she have documents that reflect that she mortgaged a house in Korea.  She claims the Korean bank kept all of the documents.  Kitami Depo. Trans., page 41, line 10 to 42, line 21.

46.    Kitami also claims that she has paid the Korean bank loan she obtained for Park down to $50,000 or $60,000.00 and that Park has never given her any money for interest or principal on the Korean bank loan of 2004.  Kitami Depo. Trans., page 34, line 13 to page 35, line 13.

47.    Also telling of the lack of genuineness of the purported Korean bank loan Kitami alleges she obtained for Park in 2004 are the facts that Kitami claims she paid someone she believed was Park's sister the $150,000.00 in cash in Korea and did not obtain any documents that the person was who she claimed she was and that she was receiving $150,000.00 in cash.  Kitami Depo. Trans., page 37, line 16 to page 39, line 5.

48.    Kitami believes that the last loan she made to Park was in about March 2005.  Kitami Depo. Trans., page 40, lines 11-15.

49.    In about November 2005, Kitami returned from a trip to Korea and learned that Kim and Park and their two corporations had a lawsuit filed against them by some of their former employees — this lawsuit.  Kitami Depo. Trans., page 19, line 2 to page 20, line 3.

50.    Prior to that time, and despite that fact that Park had apparently never paid Kitami for any of the many loans Kitami claims she made to Park, Kitami never requested that Park document any of the loans, nor did Kitami herself documents any of the alleged loans she made to Park.

51.    Sometime in about December 2005, well after Kitami had allegedly loaned money to Park, Kitami says that she asked Park to "come up with a promissory note."  Kitami Depo. Trans., page 23, lines 14-17.

52.     Kim thereafter, in December 2005, created a delivered to Kitami a promissory note dated March 5, 2004, and purportedly signed by Kim on March 5, 2004, that states that on that day, March 5, 2004, Kim Hang Kwon is borrowing $150,000.00 from Kitami and that he would make payment on the promissory note on or before October 1, 2005.  Kitami Depo. Trans., page 21, line 13 to page 28, line 7 and Exhibit 3.  *See also* the translation of the Korean promissory note apparently signed by Kim, attached as Exhibit "B" to the Hanson Decl. B (Document Number 01732).

53.     Soon thereafter, Kim created two promissory notes, each in the amount of $100,000.00.  The notes were drafted in Korean and signed by Kim even though Kitami says she never loaned money to Kim — only to Park.  One note was purportedly signed by Kim on December 15, 2004, and the other note was purportedly signed on March 1, 2005, although both notes were created by Kim in December 2005.  Both of the notes also have due dates of October 1, 2005.  Kitami Depo. Trans., page 21, line 13 to page 28, line 7, Exhibits 1-2;  Hanson Decl. B., Exhibits "C" and "D" (translations signed by Kim) (Document Numbers 01729-30).

54.     Kim and Park delivered the promissory notes to Kitami who had her assistant deliver the documents to her attorney.  Kitami Depo. Trans., page 21, lines 1-9.

55.     The are most likely the documents filed by Kitami's attorney with the Commonwealth Record, attached to Kitami's Response to the Order to Show Cause, and the subject of these proceedings to void the mortgage on the Susupe Property and the liens on Defendants' vehicles.

- **Defendants' Purported Loans from Other Third Parties**:

56.     Kim claims that Park borrowed $180,000.00 from Kim Ki Sung, $30,000.00 to $40,000.00 at a time, in cash, and that Jung Jin was, therefore, indebted to Kim Ki Sung.  Asia Depo. Trans., page 92, line 12 to page 94, line 7.

57.     Kim Ki Sung, however, tells a different story.  He claims that he is owed a lesser amount — $26,000.00 for money Kim Ki Sung put into their poker partnership in mid-2004 through early-2005, and $100,000.00 for money Park borrowed, in cash, on one particular occasion on December 1, 2004.  Kim Ki Sung Depo. Trans., page 30, line 13 to page 42, line 11; page 40, line 7, to page 43, line 5.

58.     On about January 1, 2006, in exchange for these supposed debts of Kim and Park, Kim Ki Sung had Defendants assign all or substantially all of the assets of Jung Jin to Kim Ki Sung's company - KSK Corp.  *See, e.g.*, Kim Ki Sung Depo. Trans., page 37, line 13 to page 39, line 16 and Factual Findings, Exhibits D, E, H, and I;

59.     Kim also claims that either he or Asia owes an individual named Seo Yong Ki the amount of $50,000.00 for money borrowed by Park.  Asia Depo. Trans., page 42, line 22 to page 43, line 4.

- **The Susupe Property Is in Fact an Asset of Asia — Kim and Park Used Their Corporations' Income to Purchase and Improve the Susupe Property**:

60.     In 2004, Asia claimed $67,696.00 of construction and improvements to the Susupe Property as business expense deductions on Asia tax returns.   Factual Findings ¶116.k; Cindy Yu

Depo. Trans., page 35, line 19 to page 36, line 23 and Exhibits H (2004 Corporate Income Tax Return) & I (handwritten check ledger) thereto.

61.    In 2004 and 2005, and possibly at other times continuing to date, Asia paid the rent for the Susupe Property.  Factual Findings ¶116.n; Cindy Yu Depo. Trans., Exhibits H & I.

62.    Indeed, in his deposition, Kim admits that the house is "under Asia and myself."  Asia Depo. Trans., page 44, lines 2-7.

63.    During the years 2002-2004, Park claimed a salary of $12,000.00 per year from Jung Jin which was her sole income claimed each year from all sources.  Factual Findings ¶115.i-k; Exhibit E.

64.    Kim did not receive a salary from Asia.  Factual Findings ¶115.e; Asia Depo. Trans., page 18, line 23 to page 20, line 24.

65.    Kim has been in the Saipan for twenty years; Kim does not file personal income returns nor does he pay personal income taxes.  Factual Findings ¶117.f; Asia Depo. Trans., page 19, lines 2-22.

66.    All of Kim's expenses, including food, rent and utilities for his residence, are paid out of the accounts of Asia.  Factual Findings ¶117.g; Asia Depo. Trans., page 18, lines 6-22.; page 49, lines 4-6 (Kim stating "whatever I earned for myself was used for my pocket money, paying for gas, the rent.").

67.    Kim does not maintain a bank account of his own for expenses; the only bank account he has in his own name is an account with a very low balance that he needed to open and maintain

to obtain a credit card for business use.  Factual Findings ¶115.d; Asia Depo. Trans., page 17, lines 14-24.

68.    Kim considers the income of Asia as his own personal income.  Factual Findings ¶115.h; Asia Depo. Trans., page 18, lines 16-22.

69.    Kim says that he and Asia do not have any receipts for any of the assets or other property owned or purchased by Kim and Asia — that he threw them all away.  Factual Findings ¶115.c; Asia Dep. Trans., page 94, line 23 to page 95, line 7.

● **Defendants Financial Condition:**

70.    Asia closed down all operating businesses in about April or May 2005 and Kim "gave up the company."  Asia Depo. Trans., page 22, line 24 to page 23, line 1; page 61, line 21 to page 62, line 3.

71.    Jung Jin sold most of its operating businesses to KSK Corp. in January 2006.  Jung Jin had about 3 poker parlors remaining in operation in early-2006, none of which are now in existence.  In his January 2006 deposition, Kim discussed Park's intention to close more poker places in about March 2006.  Asia Depo. Trans., page 62, line 4-23.

72.    All of Asia's poker licenses were expired by December 2005.  When the last of Jung Jin's poker machine licenses expired in 2006, they were not renewed.  *See* Reply and Opposition to Motion to Compel, at 8 (Docket #111).

73.    As of January 2006, Kim claims he had no money.  Asia Depo. Trans., page 91, line 23 to page 92, line 1.

74.    Defendants' bank records reflect that, as of January 31, 2006, Asia had $314.78 in its bank account at the Bank of Hawaii.    Defendant Asia had no other bank accounts in the Commonwealth.  The balance of that account, as of October 31, 2006, was $244.28.

75.    Defendants' bank records reflect that, as of January 31, 2006, Jung Jin had $3,247.51 in its bank account at the Bank of Hawaii.  Defendant Jung Jin had no other bank accounts in the Commonwealth.

76.    On about April 7, 2006, Defendant Park issued Defendant Kim a check in the amount of $2.207.50, leaving a remaining balance in Jung Jin's account of $66.87.  The balance of that account, as of October 31, 2006, was $18.87.

THE FORM AND MANNER OF PLAINTIFFS' REQUEST
FOR RELIEF FROM THE KITAMI LIENS IS PROPER

In her Response, Kitami challenges the summary nature of these proceedings, arguing that she does not have the benefit of a "plenary proceeding" where she can challenge the subject matter jurisdiction of the Court and have the opportunity to perform discovery.  Neither contention holds water.  These proceedings are proper under the rules and Commonwealth law, this court is vested with ancillary subject matter jurisdiction over these post-judgment proceedings, and Kitami's claimed need for discovery is a red herring.

- **Ancillary, Summary Proceedings Are Proper:**

Kitami cannot serious contend that the Court lacks subject matter jurisdiction.  As this Court noted in *Kennedy v. Gabutin*, 2004 WL 2085480 (D.N.Mar.I.), the law in the Ninth Circuit is that

Page 16 of 36

1  District Court have ancillary jurisdiction over post-judgment proceedings against third-party

2  transferees of property in order to set aside fraudulent conveyances among other actions to vindicate

3

4  the Court's authority.  Quoting *Thomas, Head and Greisen Employees Trust v. Buster*, 95 F.3d 1449,

5  1453 (9th Cir. 1996), *cert. denied*, 520 U.S. 1117, 117 S.Ct. 1247 (1997), the Court wrote: "This power

6  'derives from the long-recognized principle that a federal court may assert authority over non-federal

7

8  claims 'when necessary to give effect to the court's judgments.'" *Kennedy v. Gabutin*, 2004 WL

9  2085480 at * 2.  *See also Jones V. North West Telemarketing, Inc.*, 136 F. Supp. 2d 1166, 1167-68,

10  1169 n.1 (D. Or. 2001) (court in post-judgment proceedings, applying Oregon law and recognizing

11

12  the court's inherent power to enforce its own judgments, finding ancillary jurisdiction to consider

13  setting aside fraudulent conveyances — also noting the ancillary authority of the court by virtue of

14  Fed. R. Civ. P. 18(b)).[1]

15      Further, Kitami fails to cite to any authority that requires Plaintiffs to file an amended

16

17  complaint and advance their requested relief against Kitami in a "plenary proceeding."  Indeed,

18  Commonwealth statutory execution procedures recognize that the property of the judgment debtor

19  may, in fact, be seized from the custody of a third party.  *See* 7 C.M.C. § 4204(b) (notice of sale may

20

21

22

23

24      [1] In her Response, Kitami cites to *Williams v. Pfeffer*, 117 F. Supp. 2d 331 (S.D.N.Y. 2000)
as an intervening case that possibly changed the law applicable here.  That case is inapposite.  In
25  *Williams*, the District Court adopted the Seventh Circuit's position, expressly acknowledging the
Ninth Circuit's opposite holding on the identical issue. The Ninth Circuit decision in *Thomas, Head*
26  is precedential as recognized in the 2001 *Jones* case from the District of Oregon.  The Seventh
Circuit's difference of opinion is of no relevance here.

27

be given to person who had custody of the property levied upon at the time of levy).[2]  To require a "plenary proceeding" to avoid fraudulent liens that effectively prevent the sale of a judgment debtor's property under state execution procedures would ignore the ancillary nature of the proceedings themselves and turn every collection effort into a new lawsuit.

Finally, Kitami's claimed need for discovery is a red herring.  What Plaintiffs have identified is the complete dearth of proof of loans from Kitami to the Defendants in this case.  Kitami claims that discovery would help her prove the validity of such loans.  It is Kitami in the first instance that must come forward with "significantly clear evidence of a legitimate supervening purpose" for the liens she is claiming on the property of the Defendants.  Kitami should have the documents she needs, but they do not exist.  Additional testimony of Defendants would also not benefit her case — as reproduced in full, Kim's testimony in the deposition of Asia was that Kitami made loans of approximately $400,000.00 to him and to Park.  Plaintiffs have no doubt that both Kim and Park, if called to task, would continue to maintain the validity of the loans in the absence of any documentary evidence to support such a contention and in the face of contrary evidence that suggests the mortgage and liens were solely implemented to frustrate Plaintiffs' collection efforts.

---

[2]  Plaintiffs also do not agree that the provisions of 7 C.M.C. § 4104 are not available.  While mindful of the Court's judgment in *Kochi v. Commonwealth Superior Court*, 2003 WL 23009002 (D.N.Mar.I.), Plaintiffs would argue that the case must be limited to its facts and that the issue in that case was the statute unconstitutional as applied, not on its face.  The Court in *Kochi* was concerned with procedures that did not afford notice and an opportunity to be heard.  *Id*. at *1.  Obviously, as in this case, procedures can be fashioned by the Court to afford the requisite due process while preserving the Commonwealth Legislatures' decision to allow broad enforcement procedures to judgment creditors.

Page 18 of 36

1
2
3
4
5

In any case, Kim and Park have fled the jurisdiction to Korea and are unavailable. Presumably, with the long-standing relationship of Kitami and Park, Kitami could obtain any testimonial evidence she needed to defend this matter without having to resort to discovery procedures available in "plenary proceedings."

6
7
8
9
10
11
12
13

Finally, Plaintiffs would note that if it was actually warranted, which it is not, the Court could allow "discovery" to Kitami under Fed. R. Civ. P. 69(a). Here, all an amended complaint would do would be to delay the proceedings even more. Plaintiffs would file an immediate motion for summary judgment and Kitami would, again, be unable to support a "need for discovery" in light of the facts and circumstances of the case and the obvious fact that no amount of discovery will turn up evidence that all of the parties, including Kitami, admit does not exist.

14

THE COMMON LAW OF FRAUDULENT CONVEYANCES

15
16
17
18

The Commonwealth has no statutory law regarding a transfer of property in fraud of creditors. *See Sullivan v. Tarope*, Civil Action No. 98-1293D, Order Granting Plaintiff's Motion for Summary Judgment *8 (CNMI Super. Ct. March 19, 2003).[3] In the absence of such statutory law, the rules

19
20
21
22
23

[3] Although 2 C.M.C. § 4520(a) cited by Ms. Kitami (a part of the Commonwealth's Real Estate Mortgage Law, 2 C.M.C. §§ 4511 *et seq.*) discusses the effect of a fraudulent transfer or fraudulent mortgage affecting real property in the Commonwealth as against subsequent purchasers or mortgagees thereof (they are void), the statute does not directly address transfers or liens in fraud of creditors — conveyances that hinder, delay, or defraud creditors — nor does the statute address fraudulent liens on personal property such as the two vehicles at issue in this case or provide any burdens of proof applicable thereto. Further, Plaintiffs can find no case applying § 4520 to any set of facts, much less conveyances in fraud of creditors.

24
25
26

The citations of Ms. Kitami to various cases as establishing the burden of proof applicable in this matter is also inapposite. As discussed below, the common law rule of fraudulent conveyances is a burden shifting rule — here, given the "badges of fraud" for which there is ample evidence submitted by Plaintiffs, it is Ms. Kitami who has the burden of coming forward with "'significantly clear' evidence of a legitimate supervening purpose" for the liens she is claiming in the property of

27

of the common law, as expressed in the restatements of the law approved by the American Law

Institute and, to the extent not so expressed as generally understood and applied in the United

States, are the rules of decision in the courts of the Commonwealth.  Title 7 C.M.C. § 3401 (2000).

In *Kupetz v. Wolf*, 845 F.2d 842, 846 (9th Cir. 1988), the Court of Appeals discussed the origin

at common law of fraudulent conveyance statutes:

> The present law of fraudulent conveyances has its roots in the
> Statute of 13 Elizabeth passed by Parliament in 1571.  The statute was
> directed at a practice by which debtors sold their property to friends or
> relatives for a nominal sum, thus defeating creditors' attempts to
> satisfy their claims against the debtor.  Once the creditor had given up
> its claim against the debtor, the debtor would reclaim the property that
> purportedly had been transferred.
>
> The basic thrust of that early statute was to prohibit transfers
> that hinder, delay, or defraud creditors.  Such transfers were prevented
> by making the collusive transferee liable to the creditor in the amount
> of the transfer.  For four centuries, the primary difficulty has been how
> to decide which transfers in fact hinder, delay, or defraud creditors.
> Because intent to defraud is difficult to prove, courts rely on "badges
> of fraud."   Thus, certain indicia of fraud may lead to the conclusion
> that the debtor had fraudulent intent.   The most common of these,
> now found in the UFCA [the Uniform Fraudulent Conveyances Act]
> and in Bankruptcy Code section 548, is to assume fraudulent intent
> when an *insolvent debtor makes a transfer and gets nothing or very little
> in return.*

the judgment debtors.

(Emphasis in original).[4] *See also Westminster Savings Bank v. Sauble*, 39 A.2d 862, 863 (Md. 1944) ("[The Statute of 13 Elizabeth] is declaratory of the common law and is construed liberally by the courts, both at law and in equity.").

"Surrounding circumstances which usually accompany an intent to hinder, delay or defraud creditors, and from which fraud may be inferred are called 'badges of fraud.'" *Sullivan v. Tarope*, Civil Action No. 98-1293D, Order Granting Plaintiff's Motion for Summary Judgment *9 (CNMI Super. Ct. March 19, 2003) (citing *Timmer v. Pietrzyk*, 261 N.W. 313, 314 (Mich. 1935).

"Badges of fraud" are " 'facts which throw suspicion on a transaction, and which call for an explanation.' "   Although they " 'do not of themselves or per se constitute fraud, ... they are facts having a tenancy [sic] to show the existence of fraud, ... [and] their value as evidence is relative and not absolute.' " *Premier Financial Services v. Citibank*, 912 P.2d 1309, 1313 n.2 (Ariz. App. 1995)

---

[4]  *See also Mankin v. Munn*, 823 F.2d 1296, 1300 n.2 (9th Cir. 1987):

> Conveyances made for the purpose of defrauding creditors have long been void at common law.  The first major statutory codification of the common law of fraudulent conveyances is that of 13 Elizabeth I Ch. 5 (1570).   That statute provided, in substance, that every conveyance made to the end, purpose and intent to hinder, delay or defraud creditors is void.   The Uniform Fraudulent Conveyance Act, approved by the National Conference of Commissioners on State Laws in 1918, is essentially a restatement of the statute of 13 Elizabeth. States which have not adopted the Uniform Fraudulent Conveyance Act or a similar version of the statute of 13 Elizabeth have recognized the statute of 13 Elizabeth as part of the common law.  11 U.S.C. § 548 is aimed only at such conveyances as would be fraudulent and voidable under common law or under the statute of 13 Elizabeth. *Coder v. Arts*, 213 U.S. 223, 242-43, 29 S.Ct. 436, 443-44, 53 L.Ed. 772 (1909) (applying statutory predecessor of 11 U.S.C. § 548).

(articulated in post-judgment garnishment proceedings against third-party transferee to collect deficiency judgment).

"It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors. Therefore, as is the case under the common law of fraudulent conveyance, courts applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer, taking particular note of certain recognized indicia or badges of fraud." *Acequia, Inc. v. Clinton*, 34 F.3d 800, 805-06 (9th Cir. 1994).

Once a creditor shows the existence of badges of fraud, the creditor's burden is satisfied and the burden of proving the validity of the questionable transaction falls on the transacting parties. *See, e.g., Sherry v. Ross*, 846 F. Supp. 1424, 1428(D. Hawaii 1994) (Hawaii applied common law rule of fraudulent conveyance from the Statute of Elizabeth until adoption of the UFTA in 1985); *Achiles v. Cajigal*, 39 Haw. 493, 1952 WL 7374 (1952) (discussing the history of the Statute of 13 Elizabeth, badges of fraud, and the common law of fraudulent conveyances).

> The "term 'badge of fraud' means any fact tending to throw suspicion upon the questioned transaction. It raises an inference that the conveyance was fraudulent, and throws upon the parties to the transaction the burden of making a satisfactory explanation by more persuasive proof of good faith than is ordinarily required."

*Sullivan v. Tarope*, Civil Action No. 98-1293D, Order Granting Plaintiff's Motion for Summary Judgment *8 (CNMI Super. Ct. March 19, 2003)(emphasis added)(string citations omitted).

1

2        The only written opinion from a Commonwealth court that Plaintiffs could find that

3    considered fraudulent transfers and "badges of fraud" was a published decision in *Sullivan v. Tarope*,

4    Civil Action No. 98-1293D,  Order Granting Plaintiff's Motion for Summary Judgment (CNMI

5    Super. Ct. March 19, 2003).  Although the summary judgment in *Sullivan* was later reversed by the

6    Commonwealth Supreme Court because of issues of material fact regarding an alleged *partida*, and

7    while the case is based on different facts and is a lower court decision, the case remains instructive

8    as the only Commonwealth case Plaintiffs could find on the subject of fraudulent conveyances.

9

10       The Commonwealth Superior Court in *Sullivan* acknowledged that:

11

12            "The history of the law of fraudulent conveyances shows that,
             from the earliest times, transfers of personal property in fraud of
13            creditors have been deemed void at common law." *Ocklawaha River
             Farms Co. v. Young*, 74 So. 644, 648 (Fla. 1917).  A creditor is defined
14            as one who has a claim, i.e., a right to payment, "whether or not the
             right is reduced to judgment, liquidated, unliquidated, fixed,
15            contingent, matured, unmatured, disputed, undisputed, legal,
             equitable, secured, or unsecured." UNIFORM FRAUDULENT TRANSFER
16            ACT § 1(3)-(4) (1984).  The principle underlying the common law was
             that, the creditor "had a claim upon the property of his debtor
17            constituting the fund from which the debt should be paid." *Young*, 74
             So. at 648.  If the debtor, in disposing of his property, ignores the
18            equitable right of his creditors to be paid out of the property in his
             hands, with the intent to delay or defraud his creditor, such disposition
19            is deemed inequitable and void.  *Id.* at 649.

20

21

22       *Sullivan* at 9 (emphasis omitted).

23       Finding the common law of fraudulent conveyances applicable to the case, the *Sullivan* court

24    stated that "[a]mong the indicia, or badges, of fraud, are:  inadequacy of consideration, insolvency

25    of transferor, relationship of the transferor and transferee, pendency or threat of litigation, and

26

27

transfer of the debtor's entire estate.  *Sullivan v. Tarope*, Civil Action No. 98-1293D,  Order Granting

Plaintiff's Motion for Summary Judgment (CNMI Super. Ct. March 19, 2003)(citing *Payne v.*

*Gilmore*, 382 P.2d 140, 142-43 (Okla. 1963).

The *Sullivan* court went to identify eight badges of fraud:

> (1) The transferor is indebted or insolvent;
> (2) The conveyance is general, i.e., the debtor's entire estate is diminished, thereby leaving him insolvent;
> (3) Consideration for the conveyance is absent;
> (4) The conveyance is secret and concealed;
> (5) The conveyance is made to a family member or to one of close relationship;
> (6) The conveyance is made while a suit against the debtor is pending or threatening;
> (7) The transferee takes the property in trust for the debtor;
> (8) The debtor remains in possession, reserves the use and benefit, and deals with the property as his own.

*Sullivan* at 10 (citing *Sherry v. Ross*, 846 F. Supp. 1424, 1429 (D. Haw. 1994)).

> Certain "badges of fraud" strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears.  These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee;  2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment;  and 6) that the Debtor received inadequate consideration for the transfer.

*In re: Woodfield*, 978 F.2d 516, 518 (9th Cir. 1992)(citations omitted).

> Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are:  (1) actual or threatened litigation against the debtor;  (2) a purported transfer of all or substantially all of

the debtor's property;    (3) insolvency or other unmanageable indebtedness on the part of the debtor;    (4) a special relationship between the debtor and the transferee;  and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer.  The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose.

*Acequia, Inc. v. Clinton*, 34 F.3d 800, 806 (9th Cir. 1994) (emphasis removed and citations omitted).  *See also BFP v. Resolution Trust Corporation*, 511 U.S. 531, 539, 114 S.Ct. 1757, 1763, 128 L.Ed.2d 556 (1994) (at common law under Statute of 13 Elizabeth, proof of badges of fraud created rebuttable presumption of actual fraudulent intent).

Plaintiff found at least two cases where the Court's considered bogus loans — loans for which no supporting documentation existed — applying badges of fraud and a rebuttable presumption.

In *Hassan v. I.R.S.*, 301 B.R. 614, 618, 623-24 (D. Fla 2003), the District Court upheld bankruptcy court's finding of willful avoidance of payment of taxes noting that the record was "ripe with badges of fraud" including that the debtor dealt mostly in cash and claimed he received loans for which no evidence existed:

First, the Hassans have submitted "implausible or inconsistent" explanations of behavior, such as the reasons for dealing largely in cash, including Dr. Hassan's almost immediate withdrawal of his salary income from his bank accounts after payment. [].  Second, there have also been transfers to family members that do not have adequate explanation.  There has, for example, been repayment of substantial loans to a daughter without an explanation or documentation of consideration. [].  There are inadequate records of many of the business dealings that the Hassans made during the relevant years.

Page 25 of  36

*Hassan* at 620.

The reviewing court noted that the bankruptcy court was unable to find  an adequate explanation for the debtor's extensive dealings in cash. *Id*. at 621. The review court also noted the bankruptcy court's disbelief of the debtor's "claims that his daughter would pay his bills and he was merely paying her back, but he has provided no documentation to support that claim, including records of the daughter's alleged payments to his credit card." *Id*.

As the *Hassan* court noted:  "a single badge of fraud may amount to only a suspicious circumstance, [but] a combination of them will justify a finding of fraud."  *Hassan* at 621 (quoting *In re Sternberg*, 229 B.R. 238, 246 (S.D. Fla. 1998) (citing *United States v. Fernon*, 640 F.2d 609 (5th Cir. 1981)).

Concluding that the bankruptcy court properly found fraud, the reviewing court noted, among other things, that the debtors "conducted their lives in a manner that prevented the attachment of assets by the IRS, even though they had significant income and otherwise enjoyed such income in their daily lives." *Hassan* at 624.[5]  *See also Acequia, Inc. v. Clinton*, 34 F.3d 800, 806 (9th Cir. 1994) (no documentation to confirm debtor's "innocent" explanations for transactions and citing cases and

---

[5] A NOTE ON TAX CASES:  Taxes are not dischargable in bankruptcy if the debtor willfully avoided the payment of taxes including actions taken by the debtor after an assessment to avoid the collection of assessed taxes. *See*, *e.g.*, *In re: Griffith*, 206 F.3d 1389 (11th Cir. 2000); *Hassan*, 301 B.R. 614 (D. Fla 2003).  The courts employ a badges of fraud evaluation to determine the dual object and subjective intent requirements of the debtors' willful conduct that had the effect of avoiding the payment and/or the collection of taxes. *Id*.  Further, the Ninth Circuit Court of Appeals has recognized that whether or not the common law, the UFTA or the Bankruptcy Act applies, each of the same, and the case law thereunder, are persuasive as to fraudulent conveyance law given their origins and similarity. *See*, *e.g.*, *In re: Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 534 (9th Cir. 1990).

Page 26 of  36

citing and quoting 4 *Collier on Bankruptcy* 10015-16, ¶ 548.02[5] at 548-41 to 548-46 (15th ed. 1994)

("Circumstances from which courts have been willing to infer fraud include ... a transfer for no

consideration where the transferor and the transferee have knowledge of the claims of creditors and

know the creditors cannot be paid ... [and] the fact that the transferee was an officer or was an agent

or creditor of an officer of an embarrassed corporate transferor....") (collecting cases)")).

> The fact that Clinton never documented Acequia's "loans" or
> "salary payments," and filed bankruptcy schedules and tax returns that
> made no reference to these transfers, supports the magistrate judge's
> determination that Clinton failed to rebut the circumstantial inference
> arising from the "badges of fraud."

*Acequia, Inc.* at 806.

Here, many badges of fraud exist and the burden here is necessarily shifted to Kitami to come

forward with some evidence of the existence of her loans to the Defendants/Judgment Debtors that

are the basis for the mortgage and liens granted to her in January 2006.

- **Badges of Fraud**:

1.    <u>Actual or threatened litigation against the debtor</u>.  *In re: Woodfield*, 978 F.2d at 518

(9th Cir. 1992); *Acequia, Inc.*, 34 F.3d at 806 (9th Cir. 1994); *Sullivan*, C.A. 98-1293D (CNMI Super.

Ct. March 19, 2003).

There is no doubt that the mortgage and liens in this case were granted while Plaintiffs' case

against Defendants/Judgment Debtors was pending.  *See* Facts ¶¶ 1-6, *supra*.

1

2      2.      <u>Insolvency or other unmanageable indebtedness on the part of the debtor</u>. *In re:*

3   *Woodfield*, 978 F.2d at 518 (9th Cir. 1992); *Acequia, Inc.*, 34 F.3d at 806 (9th Cir. 1994); *Sullivan*, C.A.

4   98-1293D (CNMI Super. Ct. March 19, 2003).

5          The transfers in January 2006 by Defendants of almost all of Jung Jin's operating assets to KSK

6   Corp. and Defendants' granting of liens on the Susupe Property and their vehicles left Defendants

7

8   with few unencumbered assets of any value.  *See* Facts ¶¶ 8, 70-76, *supra*.

9          As of the end of January 2006, Defendants had a little more than $3,500.00 of cash in their

10  two bank accounts with the Bank of Hawaii. *Id.*, ¶ 74-75.  In April 2006, Park transferred to Kim most

11
    of the cash remaining in Jung Jin's account. *Id.*, ¶ 75.  By October 31, 2006, Defendants' balances
12

13  in their only accounts in the Commonwealth, were down to a total of $263.15. *Id.*, ¶ 76.

14         The seizure and inventory of the personal property located on and about the Susupe Property

15
    reveals that, notwithstanding the tools, poker machines and some household goods seized by the
16

17  Marshal, the only assets of Defendants of any significant value is the improved Susupe Property, the

18  two vehicles, and the business transferred to KSK Corporation.  Hanson Decl. B., ¶ 21.

19         There is little doubt, as the evidence provided by Plaintiffs shows, that the transfers and liens

20
    effected by Defendants in January 2006 left Defendants insolvent — unable to pay their debts,
21

22  including the judgment obtained by Plaintiffs.

23      3.      <u>The conveyance is general, i.e., the debtor's entire estate is diminished, thereby leaving</u>

24
    <u>him insolvent</u>. *In re: Woodfield*, 978 F.2d at 518 (9th Cir. 1992); *Acequia, Inc.*, 34 F.3d at 806 (9th Cir.
25

26  1994); *Sullivan*, C.A. 98-1293D (CNMI Super. Ct. March 19, 2003).

27

As discussed above, the transfers effected by Defendants in January 2006 amounted to substantially all of there assets leaving Defendants insolvent. *See* Facts ¶¶ 8, 70-76, *supra*.

4.    <u>The transfer so completely depleted the debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment</u>. *In re: Woodfield*, 978 F.2d at 518 (9th Cir. 1992).

As discussed above, the transfers effected by Defendants in January 2006 amounted to substantially all of there assets leaving Defendants insolvent and Plaintiffs now unable to collect there substantial judgment against Defendants who have fled to Korea. *See* Facts ¶¶ 8, 70-76, *supra*.

5.    <u>A close relationship between the transferor and the transferee</u>. *In re: Woodfield*, 978 F.2d at 518 (9th Cir. 1992); *Acequia, Inc.*, 34 F.3d at 806 (9th Cir. 1994); *Sullivan*, C.A. 98-1293D (CNMI Super. Ct. March 19, 2003).

Kitami admits that she and Park were long-time friends. *See* Facts ¶ 33, *supra*.

6.    <u>The debtor remains in possession, reserves the use and benefit, and deals with the property as his own</u>. *Acequia, Inc.*, 34 F.3d at 806 (9th Cir. 1994); *Sullivan*, C.A. 98-1293D (CNMI Super. Ct. March 19, 2003).

There is no question that Kim and Park remained in possession of the Susupe Property and the two vehicles upon which Kitami has liens until the property was seized by the United States Marshal in December 2006. *See* Facts ¶ 7, *supra*.

7.      "'[I]mplausible or inconsistent' explanations of behavior, such as the reasons for dealing largely in cash." *Hassan*, 301 B.R. at 618, 623-24 (D. Fla 2003).

Both Kim and Kitami admit that they dealt exclusively in cash. *See* Facts ¶¶ 29-36, *supra*. Even when Kitami allegedly borrowed $150,000.00 from a Bank in Korea, she took the money in cash and allegedly gave the to a person whom she believed was the sister of Park in Korea without any identification nor obtaining an acknowledgment of receipt of the cash. *Id.*, ¶¶ 43-44. Kitami's only explanation — that's how Korean's socialize. *Id.*, ¶ 29.

8.      Repayment of substantial loans without an explanation or documentation of consideration. *Hassan*, 301 B.R. at 618, 623-24 (D. Fla 2003); *Acequia, Inc.*, 34 F.3d at 806 (9th Cir. 1994).

Here, Kitami readily admits that there is no documentation for any of the loans she claims she made to Park. *See* Facts ¶¶ 26-36, 40-47, *supra*; Response to Order to Show Cause at 5. Kitami's only explanation is, again — that's how Korean's socialize. *Id.*, ¶ 29.

That fact, however, is only one of many that casts a great shadow over all of Defendants' and Kitami's allegations that loans were ever made.

First, Kim's and Kitami's stories greatly vary: Kim claims that Kitami loaned Kim $400,000.00 (Facts ¶ 25-26), but Kitami claims that she loaned about $350,000.00 only to Park.  (Facts ¶ 27-29).

Second, Defendants' and Kitami's claimed loans are extremely convenient. Plaintiffs' counsel had just caught Defendants trying to sell off all of their assets.  Within two weeks thereafter, Defendants had made up bogus promissory notes and had Kitami take those notes to her attorney

to have a large mortgage and liens placed on their only remaining property of value, knowing that no judgment creditor could sell the property while subject to the $350,000.00 promissory note drafted by Kitami's attorney. *See* Facts ¶¶ 2-4, 51-55.

Third, the documents provided by Defendants with regard to their annual income (particularly tax assessments after being audited), and the fact that Kim sold all of Asia's assets in mid-2003 for $100,000.00 in cash, leave little doubt that Kim and Park had no need to borrow money to their businesses nor to by cars for cash nor to improve the Susupe Property. *See* Facts ¶¶ 16-19, *supra*.

Fourth, Kim testified that during the same period of time that Kim and Park allegedly borrowed $400,000.00 cash from Kitami, they also borrowed $180,000.00 cash from another friend, Kim Ki Sung and $50,000.00 cash from Seo Yong Ki, no amount of which was documented and none of which they ever repaid. See Facts, ¶¶ 56-59, *supra*.

Fifth, Kitami's testimony leaves great doubts as to whether she could even afford to loan Kim and Park any money, herself having for years borrowed from Park and other friends, losing huge sums of money in failed Saipan businesses. *See* Facts, ¶¶ 29-39, *supra*.

Sixth, Kitami lied in her deposition when she stated, unequivocally that had not borrowed from a Korean bank after she took out a $50,000.00 loan in early the 1990's, and then later, when asked where she got money to loan Park, claims that she took out another loan of $150,000.00 from a Korean bank in 2004. *See* Facts, ¶¶ 40-43, *supra*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Seventh, the total lack of documentation for the loans Kitami claims to have made to Park, particularly with regard to the alleged loan Kitami obtained from a bank in Korea, lack any modicum of believability.  Kitami actually wants everyone to believe that she took out a $150,000.00 loan from a Korean bank, on "flexible" repayment terms, that she has paid off near $100,000.00 of the loan to date without help from Park, and that she has absolutely no documentation to support any of those purported actions.  *See* Facts, ¶¶ 43-47, *supra*.  Kitami's testimony is wholly incredible.

Finally, and most tellingly, in December 2006, and well known to Kitami, Kim and Park created fictitious promissory notes fraudulently dating the notes back to 2004 and early-2005, claiming in the promissory notes that they were actually signed by Kim in 2004 and 2005, claiming in the promissory notes that the amounts reflected therein were due and payable before the notes were actually even created, and then they delivered those notes and signed translations to Kitami who had the fraudulent notes delivered to Kitami's attorney so that he could draft up a new, formal promissory note based on the fraudulent notes created days earlier by Kim and Park and a mortgage securing their repayment.  *See* Facts, ¶¶ 51-55.  It is also interesting to note that, despite Kitami's apparent knowledge that Kim and Park had no money to repay her these alleged loans, Kitami had her attorney make amount of $350,000.00 in the "new" promissory note (dated January 12, 2006, as apparently amended on January 16, 2006) due and payable on December 31, 2006 by which time both Park and Kim had left the Commonwealth.  Thereby, Kim and Park maintained possession of the assets and enjoyed the use of the assets until their respective departures from the Commonwealth, Kim's departure most likely advanced by the date of his noticed deposition.

In sum, there is overwhelming evidence to suggest that there was no reason for Kim and Park to being borrowing hundreds of thousands of dollars, there is absolutely no documentation to evidence any purported loans by Kitami to Kim and Park, and the testimony of Kitami and of Kim show inconsistences, untruths and wholly unbelievable propositions.  Kitami is not to be believed; no loans ever occurred.  Kitami has fraudulent liens on the property of Defendants/Judgment Debtors that is hindering Plaintiffs' ability to collect on their judgment and the Court should set-aside the alleged liens.

9.     <u>Kim and Park had a history of fraudulent behavior</u>.

Kim readily admits that, at least annual for a number of years, Kim and Park would submit knowingly false tax returns to the Commonwealth Division of Revenue and Taxation and a tax audit reflected that Defendants substantially under reported income for at least three years of their operations.  *See* Facts ¶¶ 20-24, *supra*.

10.     <u>Susupe Property is property of Asia, not Kim</u>.

The fact that Asia claimed as deductions on its tax returns the cost of improvements to the Susupe Property, the fact that Asia paid the monthly lease payment on the Susupe Property, and the fact that neither Kim nor Park had the money, personally, to pay for any of the improvements to the Susupe Property nor for the monthly lease payment, necessitates a finding that the Susupe Property was action corporate property of Asia — not the individual property of Kim as he claims.  *See* Facts ¶¶ 60-69, *supra*.

In sum, with the presence of numerous badges of fraud, the burden here undoubtedly has shifted to Kitami to prove the existence of the alleged loans to the Defendants/Judgment Debtors and the validity of the mortgage and liens Defendants granted to her that, if not set-aside, would prevent Plaintiffs from recovering a substantial portion of their judgment against Defendants. As the evidence submitted by Plaintiffs shows, Kitami is unable to meet her burden and the Court has sufficient grounds to set-aside the liens on the Susupe Property and on Defendants vehicles and to allow Plaintiffs to see the property at a public auction free of Kitami's bogus liens.

Were the Court to uphold liens granted by judgment debtors in circumstances such as those present in this case, a defendant could effectively judgment proof his assets by granting large liens on all of the defendant's assets in favor of friends for large, wholly undocumented "loans." Because they are liens, the defendant maintains ownership and control over the assets. Unless abandoned as is the case here, or in order to sell the assets for the judgment debtor free of the judgment, the supposed lienholder would never foreclose on the assets. However, such a foreclosure could also be implemented by the lienholder and the property sold with the proceedings secretly going to the judgment debtor, effectively avoiding judgments. Ultimately, large liens on property make them unsalable while the liens remain in place — a perfect scheme to defraud creditors like Plaintiffs here. Here, the Court must see through the fraud and set aside the bogus liens of Kitami.

//

//

//

1    Respectfully submitted this 15th day of January, 2007.

2

3                                         /s/ Mark B. Hanson

4                                               MARK B. HANSON

5                                         Second Floor, Macaranas Building

6                                         Beach Road, Garapan
                                          PMB 738, P.O. Box 10,000
7                                         Saipan, MP 96950
                                          Telephone:    (670) 233-8600
8                                         Facsimile:    (670) 233-5262
9                                         E-mail:       mark@saipanlaw.com

10                                        Attorney for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing will be deposited in the United States Post Office, first class mail, postage prepaid, addressed to the following:

Jung Jin Corporation                    Park Hwa Sun
P.O. Box 503428                         P.O. Box 503428
Saipan, MP 96950                        Saipan, MP 96950
(670) 235-4321                          (670) 235-4321

Asia Enterprises Inc.                   Kim Hang Kwon
P.O. Box 503448                         P.O. Box 503448
Saipan, MP 96950                        Saipan, MP 96950
(670) 235-4321                          (670) 235-4321

and that the following attorneys were served through the Court's electronic case filing system:

Richard W. Pierce
Second Floor, Alexander Building
Beach Road, San Jose
P.O. Box 503514
Saipan, MP 96950

January 15, 2007                        /s/ Mark B. Hanson
DATED: _____          _____
                                        MARK B. HANSON