

MARK B. HANSON, ESQ.
Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738 P.O. Box 10,000
Saipan, Mariana Islands 96950
Telephone:    (670) 233-8600
Facsimile:    (670) 233-5262
E-mail: markbhanson@gmail.com

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

| | |
|---|---|
| LI YING HUA, LI ZHENG ZHE and XU JING JI, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>JUNG JIN CORPORATION, a CNMI corporation,)<br>ASIA ENTERPRISES, INC., a CNMI corporation,)<br>PARK HWA SUN, KIM HANG KWON, )<br>KSK CORPORATION, a CNMI corporation, and )<br>KIM KI SUNG, )<br><br>Defendants. ) | CASE NO. CV 05-0019<br><br>PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST KSK CORPORATION AND KIM KI SUNG;<br><br>Date:  Thursday, July 17, 2008<br>Time:  8:30 a.m.<br>Judge: Hon. Alex R. Munson, Chief Judge |

COMES NOW the Plaintiffs, by and through their attorney, with the following proposed

findings of uncontroverted fact in support of Plaintiffs' motion pursuant to Fed. R. Civ. P. 56 for

summary judgment against Defendants KSK CORPORATION ("KSK") and KIM KI SUNG ("KIM")

(sometimes collectively referred to herein as "KSK") for the claims of successor liability, alter ego

liability and fraudulent conveyance contained in Plaintiffs' Second Amended Verified Complaint

filed in this matter on October 12, 2007.

1

**TABLE OF CONTENTS**

2

3    A.    HISTORY OF CASE TO DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4    B.    KIM KI SUNG COMES TO SAIPAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5    C.    KIM KI SUNG FORMS KSK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6    D.    KIM KI SUNG MEETS DEFENDANTS KIM HANG KWON
              AND PARK HWA SUN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
7

8    E.    KIM KI SUNG AND DEFENDANT KIM HANG KWON
              GO INTO BUSINESS TOGETHER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

9    F.    PLAINTIFFS FILE A LAWSUIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10   G.    KIM HANG KWON AND PARK HWA SUN LIQUIDATE THEIR ASSETS . . . . . 14

11   H.    KIM HANG KWON AND PARK HWA SUN RUN AWAY . . . . . . . . . . . . . . . . . . . 16

12   I.    THE ALLEGED KSK LOAN TO JUDGMENT DEBTORS . . . . . . . . . . . . . . . . . . . 17

13   J.    KIM KI SUNG AND KSK TAKE OUT A BANK LOAN . . . . . . . . . . . . . . . . . . . . . 19

14   K.    JUDGMENT DEBTORS' FINANCIAL CONDITION . . . . . . . . . . . . . . . . . . . . . . . . 20

15   L.    JUDGMENT DEBTORS' HISTORY OF FRAUDULENT CONDUCT . . . . . . . . . . . 21

16          ●    Kim Hang Kwon admits gross document and tax fraud.  . . . . . . . . . . . . . . . . 21

17          ●    Bogus loans from Kim Pil Sun Kitami. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18          ●    Other suspect conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

19

20

21

22

23

24

25

26

27

UNCONTROVERTED FACTS

**A.    HISTORY OF CASE TO DATE:**

1.    Plaintiffs filed their original Verified Complaint in this matter on June 22, 2005 against the four original defendants ("Judgment Debtors") to the action.  *See* Docket ("Doc.") # 1.

2.    On January 1, 2006, the Judgment Debtors effected the transfer of their operating businesses to a company called KSK Corporation, a corporation licensed under and doing business in the Commonwealth of the Northern Mariana Islands ("KSK").  *See* Deposition of Kim Ki Sung dated March 9, 2006 ("KSK  Depo. I") at page 35,  lines 14  to 23; Exhibits D through I (Doc. # 70).

3.    KSK is controlled by Kim Ki Sung, the husband of the record owner and president of the corporation.  *See infra*.

4.    After the sale by the Judgment Debtors of all or substantial all of their business assets in the Commonwealth to KSK, Defendant Park Hwa Sun departed the Commonwealth for South Korea with no plans of returning to Saipan.  *See* Deposition of Kim Hang Kwon, page 8, lines 15  to 18; Declaration of Stephen J. Nutting in Support of Motion to Withdraw, ¶ 3 ("Defendant Park Hwa Sun both personally and as the sole representative and contact person for the corporate defendant Jung Jin Corporation, has left the Commonwealth and is unavailable to assist the attorney in the preparation and defense of the case.").

5.    On January 27, 2006, at the time and date noticed for the deposition of defendant Jung Jin Corp. ("JUNG JIN"), no one appeared to testify.  *See* Transcript of Deposition of Jung Jin Corporation, page 6, lines 3 to 20.

6.    On February 1, 2006, a subpoena was issued for the deposition of Kim Sung Eun, the person listed as "president" of KSK as shown in documents on file with the Commonwealth government.

7.    On March 3, 2006, at the time, date and place indicated in the subpoena to Kim Sung Eun, Kim Ki Sung produced copies of documents, some of which are provided herewith as exhibits.

8.    On March 3, 2006, the Court granted the motion of Judgment Debtors' attorney, Stephen

J. Nutting, to withdraw in the case. *See* Motion, Declaration and Order, Doc. ## 24, 25 and 32.

9.      On March 9, 2006, at the time, date and place indicated in the subpoena to Kim Sung Eun, Kim Ki Sung appeared to testify on behalf of Kim Sung Eun. *See* KSK Depo. I, page 5, lines 3 to 9. Kim Ki Sung volunteered to have his own deposition taken, he was sworn in, and thereafter was taken the deposition of Kim Ki Sung. *Id.*, page 3, lines 21 to 23; page 5, lines 7 to 9. That was the first of two depositions of Kim Ki Sung in this matter. *See* KSK Depo. II, generally.

10.     On April 21, 2006, Plaintiffs moved, *inter alia*, to amend their Verified Complaint to include two additional defendants — KSK and Kim Ki Sung — as successors to the FLSA liability of the four original defendants. Doc. # 33.

11.     On May 12, 2006, the Court issued an Order granting, *inter alia*, Plaintiffs' motion to amend to add KSK and Kim Ki Sung as party defendants. Doc. # 43.

12.     Thereafter, Plaintiffs filed a First Amended Complaint and, on May 18, 2006, KSK and Kim Ki Sung were served with a summons and a copy of the First Amended Complaint. *See* FAC, Doc. # 45; Returns of Service, Doc. ## 46 & 47.

13.     On May 22, 2006, KSK and Kim Ki Sung filed a "special appearance" in the case objecting to the motion of Plaintiffs to amend their Verified Complaint to add the parties as defendants to the case. *See* Doc. # 49.

14.     Over Plaintiffs' objection, on June 20, 2006, the Court granted KSK's and Kim Ki Sung's motion to dismiss them from the case. *See* Order, Doc. # 63.

15.     In its dismissal of KSK and Kim Ki Sung from the action, *without prejudice*, the Court found that:

> Although the record here is more complete than for many motions at ths stage in the proceedings, the court concludes that it does not yet have sufficient information before it to justify the addition of Kim Ki Sung and KSK Corporation as defendants. In particular, there is not enough information about Ms. Park Hwa Sun's whereabouts, *pro se* defendant Kim Hang Kwon's potential liability for full payment of the alleged unpaid wages, and "the extent to which the predecessor is able to provide adequately relief directly."[sic] [].

> Finally, the court has not yet had the benefit of hearing testimony so as to be able to observe the demeanor of the various parties, which will aid it greatly in this fact-intensive process.
>
> Accordingly, the first amended complaint is dismissed, without prejudice to being re-filed.

Order, Doc. # 63 at 4-5 (citation omitted).

16.    On August 14, 2006, the Court granted Plaintiffs' motion for summary judgment against the four original defendants finding for Plaintiffs on all of their claims.  Doc. # 87.

17.    On August 24, 2006, a Judgment was issued for Plaintiffs in the total amount of $209,798.55. Doc. # 93.

18.    Thereafter, Plaintiffs initiated proceedings before the Court to collect the Judgment.  *See* Decl. of Counsel at ¶ 12 (Doc. # 169).  *See also* Doc. ## 95-167.

19.    On December 20, 2006, the United States Marshal Service executed a seizure order, seizing all real and personal property of the Judgment Debtors located on a house lot in Susupe, Saipan.  *See* Process Receipt and Return, Doc. # 133.

20.    The seizure and inventory of the personal property located on and about the Susupe Property revealed that, notwithstanding the tools, poker machines and some household goods seized by the Marshal, the only assets of Defendants of any significant value is the improved Susupe Property, the two vehicles, and the business transferred to KSK.  Declaration of Mark B. Hanson dated January 15, 2007 ("Hanson Decl. B") ¶ 21, Doc. # 141.

21.    On May 25, 2007, after extensive collection proceedings, the Court issued an Order approving the distribution of the proceeds, after costs and fees, of the various collection efforts of Plaintiffs against the original four defendants which proceeds represents most if not all of the assets currently within the reach of Plaintiffs.  Decl. of Counsel at ¶ 13.

22.    The total amount of the unsatisfied portion of the Judgment against the Judgment Debtors as of the date of this filing, including post-judgment interest thereon, is $171,664.88.  Declaration of Mark B. Hanson dated June 19, 2008 ("Hanson Decl. C") ¶ 6, Doc. # 217.

23.     On August 23, 2007, Plaintiffs again moved, *inter alia*, to amend their Verified Complaint to include claims for FLSA successor liability and fraudulent conveyance against KSK and Kim Ki Sung. Doc. # 168.

24.     On October 4, 2007, after full briefing and argument on the merits of Plaintiffs' second motion to amend, the Court granted Plaintiffs' leave to include the proposed amendments in an amended verified complaint. *See* Order Denying Plaintiffs' Motion to Reopen Judgment and Granting Motion to File Second Amended Complain; Doc. # 178.

25.     Accordingly, on October 12, 2007, Plaintiffs filed their Second Amended Verified Complaint. Doc. # 179.

**B.      KIM KI SUNG COMES TO SAIPAN**:

26.     Kim Ki Sung originally came to Saipan in 2001 having invested $150,000.00 in a friend's business called Managaha Shop.  Kim Ki Sung's friend with whom he invested his money is Mr. Lee Kyung Soo ("Mr. LEE").  Deposition of Kim Ki Sung dated April 10, 2008 ("KSK Depo. II" (Doc. # 213)), page 10, line 6 to 21; page 14 line 4; page 15, line 20 to page 16, line 22; page 59, line 15 to page 60, line 9; page 61, lines 7 to 24; page 63, lines 12 to 14; page 88, line 2 to 10.

27.     This "investment" of Kim Ki Sung with Mr. LEE was completely undocumented. KSK Depo. II, page 11, line 12 ("I don't have a record"); page 88, lines 11 to 16 (no agreement about investing $150,000).

28.     Kim Ki Sung claims the money he invested with Mr. LEE was from the sale of his apartment in Seoul, Korea.  KSK Depo. II, page 11, line 24 to page 12 line 1.

29.     Kim Ki Sung claims he sold the Seoul apartment for 340,000,000 Korean Won which, at the time, was approximately equal to $ 261,500.  KSK Depo. II, page 14, line 19 to page 15, line 11.

30.     From the proceeds of the sale of the apartment, Kim Ki Sung claims he invested $150,000 in Managaha Store by depositing the money into an account at a bank in Korea of another person — a friend of Mr. LEE's .  Kim Ki Sung cannot remember the name of the account holder nor can he

remember the name or general location of the Bank.  KSK Depo. II, page 10, line 22 to page 11, line 13; page 21, line 10 to page 22, line 1.

31.    Kim Ki Sung also claims he gave his sister-in-law, Kim Sung Hee, one hundred million Korean Won to hold for him and Kim Sung Eun for the future.  KSK Depo. II, page 17, line 12 to page 18, line 15; page 19, lines 18 to 24.

32.    Kim Ki Sung stated that he brought with him to Saipan the remainder of the proceeds of the sale of the apartment — between $20,000 and $ 50,000 Korean won converted into United States Dollars in Korea before he came to Saipan.  The money was brought to Saipan in cash on the airplane.  KSK Depo. II, page 20, line 12 to page 23, line 10.

33.    Kim Ki Sung has no documentation of the sale of the apartment, the investment in Managaha Store, the deposit of funds with Kim Sung Hee, or of the cash that he brought with him to Saipan. KSK Depo. I page 9, lines 17-21; KSK Depo. II, page 9, line 15 to page 23, line 10.  Kim Sung Eun Depo. Trans, page 52, line 16 to page 53, line 1.

34.    Besides the proceeds from the sale of the apartment, Kim Ki Sung and Kim Sung Eun had no more money in Korea.  KSK Depo. II, page 17, line 22 to page 18, line 3; page 23 lines 11 to 14.

35.    Neither Kim Ki Sung nor Kim Sung Eun left any debts in Korea when they came to Saipan. KSK Dep. II, page 23, lines 15 to 24.

36.    In exchange for Kim Ki Sung's investment in Managaha Store, Mr. LEE gave Kim Ki Sung a bogus position as "store manager" with his company Goldenbird Corporation which position Kim Ki Sung purportedly held until he effected a transfer to KSK in December 2005.  KSK Depo. II, page 39, line 3 to page 49, line 2; page 51, line 14 to page 57, line 1.

37.    Kim Ki Sung's job as a "store manager" for Goldenbird Corporation was merely a sponsorship arrangement providing Kim Ki Sung with CNMI immigration status — he never performed the duties of a store manager and actually performed very few services for Goldenbird Corporation in his purported four year employment with the company.  *Id.  See also* KSK Depo. II, page 40, lines 23 to

page 41, line 7; page 45, lines 3 to 10; page 50, line 15 to page 51, line 18 (Kim really running the business of KSK); page 53, lines 4 to 19 (same); page 56, lines 13 to 18 (same); page 57, line 2 to page 58, line 3 (same); page 62, lines 12 to 15 (same);

38.    As a "store manager" with a purported salary above the threshold necessary to allow the legal entry to the Commonwealth of Kim Ki Sung's immediate relatives, Kim Ki Sung was able to secure entry permits for his wife, Kim Sung Eun, and his three children.  *Id.*

**C.    KIM KI SUNG FORMS KSK**:

39.    KSK was formed in February 2003.  KSK Depo. I, page 14, lines 21 to 23; page 15, lines 1 to 4; KSK Depo. II, page 24, lines 2 to 7.

40.    It was Kim Ki Sung's idea to incorporate KSK.  KSK Depo. II, page 9, lines 11 - 14.

41.    KSK's name is an acronym for Kim Ki Sung ("Ki Sung Kim" with the family name last).  KSK Depo. I, page 14  lines 17  to 20;  KSK Depo. II, page 25, lines 5 to 8.

42.    The initial stated shareholders for the company were Kim Sung Eun with 90% of the common shares, and an individual named Choi Byung Kook who purportedly held 10% of the common shares of KSK.   KSK Depo. II, page 24, line 8 to page 28, line 20, and Exhibit 021 thereto.

43.    Neither of these stated initial shareholders contributed any money to capitalize KSK.  KSK Depo. II, page 65, line 18 to page 66, line 1.  See also Responses to Requests to Produce ## 11 and 12 attached hereto as Exhibit "A."

44.    The money to capitalize KSK came from the return by Mr. LEE of Kim Ki Sung's $150,000 investment in the Managaha Store.  KSK Depo. II, page 30, line 8 to page 31, line 5; page 37, line 21 to page 38, line 19; page 65, lines 14 to 17.

45.    For reasons unknown to either Kim Ki Sung or his wife Kim Sung Eun, the purported initial shareholder Choi Byung Kook was replaced as a shareholder by Kim Ok Ja — Kim Ki Sung's mother-in-law.  KSK Depo. II, page 24, line 8 to page 27, line 5.

46.    Presently KSK, by its corporate documents, purports to have two shareholders, Kim Sung Eun

and Kim Ok Ja.  KSK Depo. I; Exhibit J.

47.    Kim Sung Eun is Kim Ki Sung's wife who resides in Saipan.  KSK Depo. I, page 16, lines 12 to 15; KSK Depo. II, page 28, lines 10-11.

48.    Kim Ok Ja is Kim Ki Sung's mother-in-law who resides in Korea.  KSK Depo. I, page 16, lines 20 to 23; KSK Depo. II, page 28, lines 12-13.

49.    Kim Ok Ja, who first appears as a 10% shareholder of KSK in its 2003 Annual Report (submitted to the Commonwealth Registrar of Corporations on March 1, 2004), did not pay any money to Choi Byung Kook for her shares, nor has she contributed anything of value to KSK for her shares.  KSK Depo. II, page 65, line 18 to page 66, line 1.  *See also* Exhibit "B" hereto.

50.    Kim Sung Eun is a homemaker.  Kim Ki Sung runs the business.  Kim Sung Eun "doesn't touch" KSK business; she only signs documents when asked.  KSK Dep. II, page  25 lines 12 to 21;

51.    KSK has no real shareholders; the shareholders reflected in KSK documents and government filings are for show only.  KSK Dep. II, page 24, line 8 to page 30, line 11; page 36, line 9 to page 37, line 20.

52.    There are no formal meetings of the shareholders of KSK.  KSK Depo. II, page 34, lines 23-24; page 35, line 24 to page, 36, line 8;

53.    Kim Ki Sung was not made a shareholder, owner or director of KSK for visa reasons.  KSK Depo. II, page 31, line 3 to page 33, line 2.

54.    Kim Ki Sung's stated position with KSK was that of General Manager, though Kim Ki Sung was the sole authority over the company from its inception, including the period prior to the time when Kim Ki Sung effected his legal transfer from his purported employment by Goldenbird Corporation to that of the General Manger of KSK.  KSK Depo. II, page 40, lines 23 to page 41, line 7; page 45, lines 3 to 10; page 50, line 15 to page 51, line 18 (Kim really running the business of KSK); page 53, lines 4 to 19 (same); page 56, lines 13 to 18 (same); page 57, line 2 to page 58, line 3 (same); page 62, lines 12 to 15 (same).

55.     Although Kim Ki Sung is not listed as a shareholder or an officer of KSK Corp., he refers to the corporation as his own.  *See, e.g.*, KSK Depo. I, pages 13, line 19 to 14, line 23 (Kim opened his own poker parlor under the name Fun and Win with a corporation he formed named KSK Corporation which stands for Ki Sung Kim); page 21, line 13 to 22, line 23 (Kim has a company named KSK Corporation); page 24, line 22 to 25, line 9 (Kim wondering why "his" corporation and "his" business is being deposed); page 26, lines 4 to 8 (Kim denying any relationship of "his" corporation to defendant Kim Hang Kwon's corporation insisting that his loan was personal to Kim Hang Kwon, not a loan between their corporations); page 63, line 16 to 65, line 18 (Kim describing how he, his wife and KSK are all really one, and how he collects and uses money indiscriminately); KSK Depo. II, page 37, lines 7 to 20 (Kim stating that his wife and mother-in-law are only shareholders on paper, but that he is the real owner of the company).

56.     Kim Ki Sung claims to have personally given and received property to and from the Judgment Debtors, but he also claims that the assets he swapped for the debt owed to him are owned by "his" corporation – KSK Corp.  *See, e.g.*, KSK Depo. I, Exhibits D and E.

57.     As General Manager of KSK, Kim Ki Sung continues to sponsor his wife, Kim Sung Eun — the President and majority shareholder of KSK — as his immediate relative for immigration visa purposes.  KSK Depo. II, page 31, lines 4 to 23.

58.     Kim Sung Eun, as President and majority shareholder of KSK, continues to renew Kim Ki Sung's contract as General Manager for KSK.  KSK Depo. II, KSK Depo. II, page 31, lines 4 to 23.

59.     Though he is titled "General Manager," since its inception, Kim Ki Sung has been the sole decision-maker for KSK; he has commingled his own assets with those of KSK; he variously takes title to property in either his name of the name of KSK without regard to the source of the funds to purchase the property; he does not follow any corporate formalities, and he has wholly failed to make any distinction between himself, his family and the purportedly separate entity, KSK.  KSK Depo. II, page 78, lines 4 to page 83, line 11 (Kim had bags of money in the house in which he mixed money

from Korea and money from the operations of KSK); page 96, line 13 to page 97, line 1 (Kim used KSK revenues to play a Korean game called Kae and allegedly used the money generated from the game to lend and borrow money); page 116, line 22 to page 119, line 20 (Kim entered into new leases for KSK property in Kim's own name using KSK money to make payments); page 132, line 19 to 133, line 24 (Kim used his personal bank account for business); *id.* ("Please do not separate me from KSK. . . . This is all my, it's under all my operation."); page 7, lines 9 to 13 (used personal checks for KSK business).

60.    Within months of KSK's incorporation, Kim Ki Sung through KSK began opening poker arcades in Saipan.  KSK Depo. II, page 48, line 17 to page 48, line 2; page 50 line 18 to page 51, line 10.

61.    Kim Ki Sung presently holds title to substantial Saipan property in his own name, despite the fact that the funds to purchase the property have come, in whole or in part, from the operations of KSK — not from his salary or personal savings.  KSK Depo. II, page 107, line 20 to page 113, line 4 and Depo. Exhibit Docs. 234-240 (San Vicente building in Kim's name); page 116 line 22 to page 119, line 20 and Depo. Exhibit Docs. 478-484 (laundromat property in Kim's name); page 119, line 21 to page 121, line 5 (Susupe house in Kim's name).

**D.    KIM KI SUNG MEETS DEFENDANTS KIM HANG KWON AND PARK HWA SUN:**

62.    In 2003, Kim Ki Sung was introduced to defendants Kim Hang Kwon and Park Hwa Sun — also in the poker arcade business.  Kim Ki Sung became friends with Kim Hang Kwon; they played golf together a couple of times a week.  KSK Depo. II, page 66, line 2 to page 68, line 10.

63.    In about September or October 2004, Kim Hang Kwon and Park Hwa Sun purportedly approached Kim Ki Sung and asked for a $100,000 loan for an unspecified purpose.  KSK Depo. II, page 83, line 12 to page 85, line 2; page 93, lines 12 to 21 (Kim thinks it was about a month before December 1, 2004, possibly October 2004).

64.    During the same period of time, Kim Ki Sung himself was seeking funding in the amount of

$250,000 to purchase a building in San Vicente, Saipan. KSK Depo. II, page 107, line 20 to page 113, line 9.

65.     Despite Kim Ki Sung's need at that time for a large amount of cash, Kim Ki Sung claims he was able to secure and to loan Kim Hang Kwon and Park Hwa Sun $100,000 in cash. KSK Depo. II, page 113, line 10 to page 114, line 18.

66.     Part of the money for the alleged loan to Kim Hang Kwon supposedly came in cash from his wife's, Kim Sung Eun's, $60,000 "share" of a "community bank" involvement. KSK Depo. II, page 77, lines 13 to 16.

67.     The remaining $40,000 for the alleged loan to Kim Hang Kwon supposedly came from a stash of cash of Kim Ki Sung's — a brown paper bag in his house containing up to $50,000. KSK Depo. II, page 77, lines 13 to 16; page 78, line 7 to page 80, line 22.

68.     No amount of the actual payment of money of the purported loan by Kim Ki Sung to Kim Hang Kwon and/or Park Hwa Sun is documented. It was all in cash and only Kim Ki Sung, Kim Hang Kwon and Park Hwa Sun were witnesses to the alleged transaction. KSK Depo. II, page 78, line 4 to page 78, line 18; page 92, line 7 to page 93, line 7.

69.     There is also no documentation that Kim Sung Eun or Kim Ki Sung received $60,000 from the Kea Ton game to loan to Kim Hang Kwon as they claim. KSK Depo. II, page 95, lines 9 to 22. Kim Sung Eun Dep. Trans., page 40, lines 17-18. *See also* Response to Subpoena, Exhibit "D" hereto.

70.     At about the same time as Kim Ki Sung loaned Kim Hang Kwon $100,000, Kim Ki Sung himself borrowed $250,000 from three individuals to purchase the building in San Vicente. Again, no amount of the $250,000 loans to purchase the building are documented. KSK Depo. II, page 107, line 20 to page 114, line 18.

71.     Indeed, in later documentation of KSK and Kim Ki Sung's financial statements, including financial statements submitted by Kim Ki Sung and KSK in order to obtain a loan, there is no

mention of either the loan to Judgment Debtors or the loans by KSK to purchase the San Vicente Building. KSK Depo. II, page 114, line 19 to page, 116, line 7 and Depo. Exhibit Docs. 224-225.

72.    Kim Ki Sung admits that in his business dealings, including that of KSK, Kim Ki Sung deals mostly in cash. *See* KSK Depos. I and II, generally.

73.    It is also apparent that with the exception of Mr. LEE with whom Kim Ki Sung is a college friend, Kim Ki Sung knows little about the people from whom he and his wife borrow substantial sums of money nor about the financial resources of those to whom he loans substantial sums of money. *See* KSK Depos. I and II, generally.

**E.    KIM KI SUNG AND DEFENDANT KIM HANG KWON GO INTO BUSINESS TOGETHER:**

74.    In about May 2004, Kim Ki Sung and Kim Hang Kwon opened a poker parlor together named Daora Poker. Transcript of Deposition of Asia Enterprises, Inc. (Doc. # 68), page 30, lines 9 to 19; page 31, lines 21 to 23. KSK Depo. II, page 68, line 11 to page 77, line 1.

75.    Daora Poker was a partnership between Kim Ki Sung and Kim Hang Kwon with the intent that the two share profits equally. Asia Depo. Trans, page 58, line 23 to page 59, line 3; KSK Depo. II, page 75, lines 7 to 11.

76.    The partnership between partnership between Kim Ki Sung and Kim Hang Kwon was completely undocumented. KSK Depo. II, page 88, lines 17 to 20.

77.    Plaintiffs Li Zheng Zhi and Xu Jing Ji were employees of Daora Poker during periods relevant to their claims in this lawsuit. Supplemental Declaration of Li Zheng Zhi (Doc. # 215) ¶ 5; Supplemental Declaration of Xu Jing Ji (Doc. # 216), ¶ 5.

78.    Kim Ki Sung knew Li Zheng Zhi and Xu Jing Ji through their employment at Daora Poker. KSK Depo. II, page 100, line 10 to page 101, line 7.

79.    Kim Ki Sung, at times, directed the work of Plaintiff Li Zheng Zhi. Li Decl., ¶ 7; Xu Decl., ¶ 7.

Page 13 of 33

80.    Kim Ki Sung was present on April 25, 2005 at Daora Poker when Li Zheng Zhe and Xu Jing Ji were fired by Kim Hang Kwon.  Li Decl., ¶ 8; Xu Decl., ¶ 8.  See also Asia Depo. Trans, page 67, line 21 to page 68, line 5.

81.    Kim Hang Kwon claims to have closed down Daora Poker shortly thereafter.  Asia Depo. Trans, page 30, lines 9 to 19; page 61, line 21 to page 62, line 7.

82.    Asia Enterprises, Inc.'s income taxes for the period it (Kim Hang Kwon) was involved in the Daora Poker partnership shows net income in excess of $42,000.  Asia Depo. Trans, page 80, lines 1 to 6.  Kim Hang Kwon states Daora Poker was actually losing money; that the income figure in Asia's taxes was only made up so that they could hire employees — plaintiffs Li Zheng Zhe and Xu Jing Ji. *Id.*

**F.    PLAINTIFFS FILE A LAWSUIT**:

83.    After their termination, and together with another employee of the Judgment Debtors, on June 22, 2005, Plaintiffs Li and Xu filed suit against the Judgment Debtors. *See generally* Complaint, Doc. #1.

84.    In about August 2005, Mr. KIM learned that Plaintiffs had filed a lawsuit alleging that defendant the Judgment Debtors had failed to pay all of the wages they were due.  KSK Depo. I, page 19,  lines 2 to 3 ("I was quite shocked because according to the paper there was unpaid salary mentioned . . .").

85.    Kim Ki Sung read about the lawsuit in the Marianas Variety newspaper and heard about the lawsuit from other Korean's in the community, including Kim Ki Sung with whom he continued to play golf and socialize.  KSK Depo. I, page 19,  line 2 to page 21, line 8.  KSK Depo. II, page 103, line 1 to page 104, line 11.

**G.    KIM HANG KWON AND PARK HWA SUN LIQUIDATE THEIR ASSETS:**

86.    While this case was pending against Judgment Debtors, prior to the judgment but after initial discovery was conducted, on December 11, 2005, an advertisement appeared in the *Saipan Times*

Korean language weekly newspaper wherein the Defendants advertised for sale all of their assets in the Commonwealth.  Hanson Decl. B, ¶ 3 and Exhibit "A" thereto; Doc. # 141.

87.    A translation of the document showed that the sales were "Urgent!" and "because of some matter."  Hanson Decl. B, ¶ 4; Doc. # 141.

88.    On December 22, 2005, shortly after the advertisement was brought to the attention of Plaintiffs' counsel, Plaintiffs' counsel wrote the Judgment Debtors' attorney Stephen J. Nutting indicating that Plaintiffs believed that Judgment Debtors were planning on transferring all of their assets to avoid subjecting them to the claims of Plaintiffs to satisfy the judgment Plaintiffs were going to obtain against Defendants.  Hanson Decl. B, ¶ 5; Doc. # 141.

89.    Kim Ki Sung admits that he saw the advertisement in the Korean Times.  KSK Depo. II, page 104, lines 9 to page 105, line 14.

90.    Soon thereafter, on January 1, 2006, Judgment Debtors effected the transfer of the bulk of their operating businesses (a laundrymat, a poker parlor and a market) to KSK and Kim Ki Sung supposedly as satisfaction for alleged prior loans from Kim Ki Sung to Judgment Debtors (discussed in further detail below).  *See* KSK Depo. I, page 35,  lines 14  to 23; Exhibits D through I.

91.    Kim Hang Kwon claims that part of the consideration for the transfer was the debt Kim Hang Kwon thought he owned Kim Ki Sung from their Daora Poker partnership.  Asia Depo. Trans, page 63, lines 19 to 24.

92.    On about January 12, 2006, Judgment Debtors granted a mortgage in favor of Kim Pil Sun Kitami ("Kitami") effecting liens on Judgment Debtors' remaining property of value in the Commonwealth:  two new vehicles and Defendants' long-term leasehold interest in Lot 056 H 14, a 3,627 square meter parcel of improved property located in Susupe, Saipan, Commonwealth of the Northern Mariana Islands (the "Susupe Property").  Hanson Decl. B, ¶ 7, Doc. # 141.

93.    Kitami eventually relinquished her mortgage and liens after Plaintiffs challenged the efficacy of the supposed security interests in light of the suspect nature of the alleged underlying

indebtedness. *See* Relinquishment of Security Interests filed March 15, 2007 as Doc. # <u>150</u>.

**H.    KIM HANG KWON AND PARK HWA SUN RUN AWAY:**

94.    After transferring their interests in various assets and businesses on January 1, 2006 and January 12, 2006, Defendants were left with very few unencumbered assets. Hanson Decl. B, ¶ 9, Doc. # <u>141</u>.

95.    On about January 22, 2006, two days prior to the date scheduled for the deposition of JUNG JIN and with her own deposition to follow few days thereafter, defendant Park Hwa Sun, the principal of Jung Jin, departed the Commonwealth for South Korea with no plans of returning to Saipan. *See* Transcript of Deposition of Asia Enterprises, Inc. ("Asia Depo. Trans."), page 8, lines 15 to 18; Declaration of Stephen J. Nutting in Support of Motion to Withdraw, ¶ 3.

96.    On August 24, 2006, judgment was entered by this Court for Plaintiffs in the above-captioned case and against all of the above-named Defendants, jointly and severally, in the amount of $209,798.55, plus post-judgment interest at the applicable rate. (Docket #93).

97.    On about November 19, 2006, three days before the date scheduled for a post-judgment deposition of defendant Kim Hang Kwon, defendant Kim Hang Kwon departed the Commonwealth for South Korea. Declaration of Mark B. Hanson dated November 28, 2006 ("Hanson Decl. A"), ¶ 20, Doc. # <u>116</u>.

98.    Any cash on hand they took with them. As of October 31, 2006, all that remained in the bank accounts of Judgment Debtors was the aggregate amount of $263.15. Hanson Decl. C, ¶ 4.

99.    Through post-judgment collection efforts, Plaintiffs have been able to recover a total of $ 55,015.36 (net of costs) from the auction of property left behind by Kim Hang Kwon and Park Hwa Sun when the fled to Korea. The recovery to date represents 26 % of the Judgment without accounting for accrued interest. Hanson Decl. C, ¶ 5.

100.    KSK continues to own, control and operate the laundry, poker arcade and market it acquired from Judgment Debtors, but now under the name "Shany II" instead of "Welcome."

**I.     THE ALLEGED KSK LOAN TO JUDGMENT DEBTORS:**

101.     Kim Hang Kwon claims that Park Hwa Sun borrowed $180,000.00 from Kim Ki Sung, $30,000.00 to $40,000.00 at a time, in cash, and that Jung Jin was, therefore, indebted to Kim Ki Sung.  Asia Depo. Trans., page 92, line 12 to page 94, line 7.

102.     Kim Ki Sung, however, tells a different story.  He claims that he is owed a lesser amount — $26,000.00 for money Kim Ki Sung put into their poker partnership in mid-2004 through early-2005, and $100,000.00 for money Park borrowed, in cash, on one particular occasion on December 1, 2004.  Kim Ki Sung Depo. Trans., page 30, line 13 to page 42, line 11; page 40, line 7, to page 43, line 5.

103.     Kim Ki Sung alleges that on December 1, 2004, he gave Kim Hang Kwon and Park Hwa Sun the bag of cash containing $100,000.  KSK Depo. II, page 92, line 23 to page 93, line 11.

104.     Park Hwa Sun said she needed the $100,000 to pay back somebody she owed.  KSK Depo. II, page 98, lines 10 to 16.

105.     Kim Ki Sung also alleges that on December 1, 2004, Park Hwa Sun prepared a "a mortgage of the machinery and the poker . . . mortgage for the operation of the business."  KSK Depo. II, page 90, lines 10 to 13.

106.     When Kim Ki Sung gave Kim Hang Kwon and Park Hwa Sun the bag of cash containing $100,000, except for those three individuals, no other person was there.  KSK Depo. II, page 92, line 7 to page 93, line 7.

107.     Kim Ki Sung brought money from Korea for some other purpose, but allegedly ended up loaning it to Kim Hand Kwon and Park Hwa Sun because then needed the money.  KSK Depo. II, page 93, line 17 to page 94, line 9.

108.     During the same period of time, Kim Ki Sung himself was seeking funding in the amount of $250,000 to purchase a building in San Vicente, Saipan.  KSK Depo. II, page 107, line 20 to page 113, line 9.

109.     On about January 1, 2006, in exchange for these supposed debts of Kim and Park, Kim Ki

Sung had Defendants assign all or substantially all of the assets of Jung Jin to Kim Ki Sung's company - KSK Corp.  *See*, *e.g.*, Kim Ki Sung Depo. Trans., page 37, line 13 to page 39, line 16 and Factual Findings, Exhibits D, E, H, and I.

110.    The document that transferred poker machines from ASIA to KSK Corp. is entitled a bill of sale.  KSK Depo. I, Exhibit D.

111.    There was not a transfer of money for the machines, but rather the machines were transferred in "repayment" of a $26,000.00 "debt" allegedly owed by defendant Kim Hang Kwon, personally, as a "business partner" of Kim Ki Sung, personally.  KSK Depo. I page 26, lines 18 to 23; page27, lines 2 to15.

112.    The alleged promissory note reflecting the alleged $26,000 debt was, according to Kim Ki Sung, a "replacement of a promissory note" from an earlier time.  KSK Depo. I, page 37, lines 1-2.

113.    On about January 1, 2006, Park Hwa Sun executed a bill of sale for transfer to KSK Corp. of JUNG JIN's laundry machines. KSK Depo. I, Exhibit I.

114.    Again, no money exchanged hands – this transfer also was a swap for an alleged prior debt of Kim Hang Kwon and Park Hwa Sun to Kim Ki Sung personally.  KSK Depo. I, pages 50-51.

115.    As early as August 2005, KSK Corp. and Kim Ki Sung had notice of the potential liability in taking over the businesses of ASIA and JUNG JIN.  KSK Depo. I, page 18, line 7 to 21, line 8 (Kim first heard about this lawsuit in the newspaper and other third parties shortly after it was filed); page 59, lines 5 to 8 (Kim stating that defendants mentioned the labor complaint and said they should just swap assets for the alleged outstanding debt).

116.    JUNG JIN and ASIA have transferred all of their interests in laundry machines and other laundry assets, and the poker machines they operated in Welcome Poker, to KSK Corp. KSK Depo. I, Exhibits D and I.

117.    KSK continues to use those items and is still in the same physical location as the previous owners. *Id*.  KSK's business is running the laundrymat and poker parlor.  KSK Depo. I, page 22, lines

11 to 12.

118.    After the transfer of assets, KSK changed the name on the business licenses of the various establishments, but KSK continued to use the Judgment Debtors' trade names "Welcome Laundry," and "Welcome Poker" for the establishments acquired from Judgment Debtors.  KSK Depo. I page 38, lines 20 to 23; KSK Depo. II, page 106, line 14 to page 107, line 19; Kim Sung Eun Depo. Trans., page 63, lines 5 to 10.

119.    Indeed, KSK's "Welcome Laundry" appears in the phone book as late as PTI's *2007 Marianas Information Book*.  See Exhibit "E" hereto.

120.    After the take-over, KSK replaced the two Welcome Poker employees of Judgment Debtors, but retained the employees of the laundry and market.  KSK Depo. I, page 50, lines 19 to 23; page 51, lines 1 to 2;  KSK Depo. II, page 106, lines 4 to 10.

121.    KSK subleased the physical property where the businesses were located from JUNG JIN.  KSK Depo. I, , Exhibit H.

122.    KSK apparently pays its utility bills when they come due, but as of Kim Ki Sung's deposition on March 9, 2006, KSK had not changed the name of the accounts to KSK.  Indeed, Kim Ki Sung, at that time, was unsure in who's name the accounts were actually held.  KSK Depo. I, page 51, lines 3 to 11.

**J.      KIM KI SUNG AND KSK TAKE OUT A BANK LOAN:**

123.    At the same time Judgment Debtors were attempting to sell their assets, Kim Ki Sung and KSK applied for a $100,000 loan from the Bank of the Federated States of Micronesia ("FSM Bank").  KSK Depo. II, page 122, line 10 to page 130, lin 19.

124.    Shortly after the consummation of the transfer of Judgment Debtor's assets to KSK, KSK received approval for the FSM Bank loan, and received and immediately distributed the $100,000 proceeds thereof.  Kim Sung Eun Depo. Trans., page 79, line 9 to page 84, line 14 and Depo. Exhibit Docs. 228-231 and 296.

Page 19 of  33

125.    Kim Ki Sung and Kim Sung Eun lied to the FSM Bank, telling the Bank that KSK was taking out a loan to open a bakery and a merchandise wholesale business when they knew they were not going to use the loan proceeds for those purposes. *Id.*

**J.    JUDGMENT DEBTORS' FINANCIAL CONDITION IN 2005-2006**

126.    Defendants had at least $552,497.00 in gross revenues for the year 2002. Proposed Findings of Uncontroverted Fact ("Factual Findings") ¶14; Exhibits C, D and Table 1 (Docket #77).

127.    Defendants had at least $863,760.00 in gross revenues for the year 2003. Factual Findings ¶15; Exhibits C, D and Table 1 (Docket #77).

128.    Defendants had at least $733,102.19 in gross revenues for the year 2004. Factual Findings ¶16; Exhibits C, D and Table 1 (Docket #77).

129.    In about June 2003, Kim sold the operating assets of Asia Enterprises, Inc. ("Asia") (a marker and a poker parlor) for $100,000.00 cash. Asia Depo. Trans, page 23, line 19 to page 24, line 24.

130.    Asia closed down all operating businesses in about April or May 2005 and Kim "gave up the company." Asia Depo. Trans., page 22, line 24 to page 23, line 1; page 61, line 21 to page 62, line 3.

131.    Jung Jin sold most of its operating businesses to KSK Corp. in January 2006. Jung Jin had about 3 poker parlors remaining in operation in early-2006, none of which are now in existence. In his January 2006 deposition, Kim discussed Park's intention to close more poker places in about March 2006. Asia Depo. Trans., page 62, line 4-23.

132.    All of Asia's poker licenses were expired by December 2005. When the last of Jung Jin's poker machine licenses expired in 2006, they were not renewed. *See* Reply and Opposition to Motion to Compel, at 8 (Docket #111).

133.    As of January 2006, Kim claims he had no money. Asia Depo. Trans., page 91, line 23 to page 92, line 1.

134.    Defendants' bank records reflect that, as of January 31, 2006, Asia had $314.78 in its bank account at the Bank of Hawaii. Defendant Asia had no other bank accounts in the Commonwealth.

1  The balance of that account, as of October 31, 2006, was $244.28.

2  135.    Defendants' bank records reflect that, as of January 31, 2006, Jung Jin had $3,247.51 in its

3  bank account at the Bank of Hawaii.  Defendant Jung Jin had no other bank accounts in the

4  Commonwealth.

5  136.    On about April 7, 2006, Defendant Park issued Defendant Kim a check in the amount of

6  $2,207.50, leaving a remaining balance in JUNG JIN's account of $66.87.  The balance of that

7  account, as of October 31, 2006, was $18.87.

8  **K.      JUDGMENT DEBTORS' HISTORY OF FRAUDULENT CONDUCT**

9         ●    **Kim Hang Kwon admits gross document and tax fraud**.

10  137.    Kim claims that corporate documents are for show only.  Asia Depo. Trans., page 21, lines 1-

11  12.

12  138.    Park Hwa Sun and Kim Hang Kwon would create fictitious figures for income, expenses and

13  for the purported liabilities of both ASIA and JUNG JIN.  Factual Findings ¶115.a; Cindy Yu Depo.

14  Trans., page 26, lines 19-23; page 28, line 2 to page 30, line 15; Asia Depo. Trans, page 49, line 24 to

15  page 50, line 50.

16  139.    Kim Hang Kwon admits that he believes the figures in ASIA tax returns are not accurate – the

17  figures are "made up." Factual Findings ¶115.b; Asia Depo. Trans, page 78, line 22 to page 79, line

18  6.

19  140.    When asked in his deposition about a particular figure for construction expense deductions

20  shown in ASIA's 2004 return, Kim Hang Kwon explained:

21          A.  I don't know where that came from, but that's got nothing
    to do with the house.  This is how it works.  I file for taxes, the number,
22     the amount that I file for taxes does not mean that I actually earned
    that exact figure.  At the end of the year there comes a time where I
23     will have to come up with numbers that would match the number that
    I file at the taxation office.  So that building improvement could have
24     been the number I needed to come up with.

25          Q.  So you just make up numbers in your tax returns?  Make
26     them up?

27

A.   That's how it works.

Asia Depo. Trans, page 78, line 22 to page 79, line 6.

141.   Kim Hang Kwon claims that ASIA had to lie on its tax returns by showing income he claims ASIA did not have in order to hire employees, including Plaintiffs.  Factual Findings ¶118.c; Asia Depo. Trans, page 79, line 211 to page 80, line19.

142.   In December 2004, as a result of an audit conducted by the Commonwealth Division of Revenue and Taxation, Defendants agreed that JUNG JIN had under reported its income in the years 2001-2003 by more than $275,000.00.  Asia Depo. Trans, Exhibit # 01452.

- **Bogus Loans from Kim Pil Sun Kitami**.

143.   Kim Hang Kwon claims that Asia borrowed *approximately* $400,000.00 over a period of years from a individual named Kim Pil Sun Kitami.  Asia Depo. Trans., page 15, line 4 to page 16, line 6.

144.   Kim Hang Kwon alleges that he personally borrowed that money from Ms. Kitami  (Asia Depo. Trans., page 16, lines 9-24; page 32, lines 14-23; page 43, line 17 to page 44, line 7), that the money borrowed from Ms. Kitami was used to pay poker licensing fees for JUNG JIN and for ASIA during ASIA's poker parlor partnership with Kim Ki Sung (Asia Depo. Trans., page 32, line 14 to page 34, line 6; page 38, lines 3-13), and that funds from Kitami were used by him to build his Susupe residence which he claims as his own, individual property (Asia Depo. Trans., page 41, lines 7-14).

145.   Kim Hang Kwon also states that, at times, Park Hwa Sun would go to Kitamai and borrow money which increased the total amount he claims Kim Hang Kwon and ASIA owe to Kitami.  Asia Depo. Trans., page 46, lines 5-24.

146.   Kitami, on the other hand, claims that she only loaned money to Park Hwa Sun and in the alleged total approximate amount of $350,000.00.  The loans were "always personal" to Park Hwa Sung — Kim Hang Kwon, ASIA and JUNG JIN are *not* indebted to her.  Transcript of Deposition of Kim Pil Sun Kitami ("Kitami Depo. Trans."), page 29, line 11 to page 30, line 30.  *See also* page 14, lines 10-13 (Kitami only loaned money to Park, not to Kim); page 29, lines 15-20 (same).

147.    Kitami states that she cannot remember when she first started loaning Park Hwa Sun money or exactly how much she loaned, because "we Koreans we just – without any documents we just lend out money and get our money back that's how we socialize."  Kitami Depo. Trans., page 30, line 4 to page 31, line 12.

148.    Indeed, as Kitami testified in a deposition on February 21, 2006, and as Kitami admits in her Response to the Order to Show Cause, there are no documents that evidence any loans nor the provision of any money by Kitami to Kim Hang Kwon and Park Hwa Sun at any time.  *See*, *e.g.*, Kitami Depo. Trans., page 21, lines 11-12;

149.    Though documents were created by Kim Hang Kwon and Park Hwa Sun as purported evidence of indebtedness supporting their mortgaging the Susupe Property and their vehicles to Kitami, the "promissory notes" were not created until about December 2005, shortly before Kitami took the documents to her attorney and had him draft a promissory note and mortgage.  Kitami Depo. Trans., page 21, line 13 to page 28, line 7 and Exhibit 3.

150.    Though Kitami's deposition is replete with evidence demonstrative of the untenable nature of Kitami's claimed loans supporting her present bogus liens, the following contiguous section of the transcript is telling:

> Q.    When was the first time you loaned Mrs. Park money?
> A.    I don't clearly remember, but we Koreans we just -- without any documents we just lend out money and get our money back that's how we socialize.
> Q.    So how -- so how do you ever know how much money another Korean owes you?
> A.    Because when the money is loaned in -- in small amounts, let's say $5,000, $10,000, $20,000 the money is paid back in lump sum, in one time.  And it's -- it's not a small amount of money and it -- I just remember other money that's being lend out to or being paid back.
> Q.    Okay.  What -- all right.  So you don't remember the first time that Mrs. Park borrowed money from you?
> A.    I don't know.  I don't remember.  There was a time where -- when I borrowed money from her and she borrows money from me too.

Q.    Do you know how much money it was the very first time that Mrs. Park borrowed money from you?

A.    I don't know that.  But usually between five to thirty thousand dollars.

Q.    This -- did you make any notes or write anything down when she would borrow money from you?

A.    No.

Q.    Now, she -- you said that she loaned you money also, right?

A.    Yes.

Q.    Do you know when that was that you borrowed money from Mrs. Park?

A.    We were friends, we were long time friends, it was a long time ago since I first borrowed money from her.

Q.    When you borrowed the money from Mrs. Park did you write down how much you owed Mrs. Park?

A.    No.  That's not how it works.

Q.    How about this $150,000 that was -- that Mrs. Park borrowed from you in about 2004, did you write down how much she borrowed at that time?

A.    No.

Q.    Beside the -- the Exhibits 1, 2 and 3, are there any documents of which you're aware that would show Mrs. Park borrowing $150,000 from you?

MR. PIERCE: Objection; vague and ambiguous as to show.

A.    No there isn't.  This is all.

Kitami Depo. Trans., page 30, line 9 to page 31, line 19.

151.    Kitami is a long-time friend of Park Hwa Sun.  Kitami Depo. Trans., page 31, line 8.

152.    Before Kitami became a supposed lender of several hundreds of thousands of dollars to Defendants, she herself was a borrower of substantial funds from Park and others.  Kitami Depo. Trans., page 9, line 23 to page 16, line 23.

153.    Kitami claims that for many years beginning in the 1990's, Park Hwa Sun would loan Kitami money and Kitami would loan Park Hwa Sun money, usually in amounts from $5,000.00 to $20,000.00 at a time.  Kitami Depo. Trans., page 14, line 14 to page 15, line 7.

154.    Kitami always loaned Park Hwa Sun cash — never a check and she never got a receipt.  Kitami Depo. Trans., page 39, line 14 to page 40, line 15.

155.    Kitami had several start up businesses in Saipan and was always in need of money.  Park Hwa Sun was one of the people from whom Kitami would borrow money.  Kitami Depo. Trans., page 9, line 23 to page 16, line 23.

156.    In fact, Kitami claimed that at one time she "urgently needed cash" to finance a project, and she testified that a later investment in a Saipan restaurant caused her to lose approximately $200,000.00.  Kitami Depo. Trans., page 12, line 17 to page 14, line 2.

157.    Kitami claims that she had to borrow $200,000.00 from her friends for her various investments in Saipan businesses.  Kitami Depo. Trans., page 16, line 4 to page 17, line 4.

158.    In her deposition, Kitami testified that sometime in the early-1990's, Kitami had borrowed $50,000.00 from a Korean bank and mortgaged her house in Korea to get money to begin construction of an apartment building in Saipan.  Kitami Depo. Trans., page 9, line 20 to page 11, line 10.

159.    When asked if she had ever again mortgaged her house in Korea again she answered "no."  Kitami Depo. Trans., page 11, lines 11-12.

160.    When asked if she had ever again borrowed money from any bank in Korea, Kitami answered "no." Kitami Depo. Trans., page 11, lines 13-15.

161.    However, when later questioned on her alleged loans to Park Hwa Sun, Kitami claims that she did, indeed, borrow $150,000.00 from a Korean bank and mortgaged her house in Korea, albeit she claims it was a different house than the one she mortgaged for the $50,000.00 construction loan. Kitami Depo. Trans., page 32, line 6 to page 33, line 12.

162.    In any case, and despite the fact that Defendants had substantial income from the operations of their various business, Kitami claimed that Park Hwa Sun is indebted to her in the amount of "about" $350,000.00 for the various loans she made to Park Hwa Sun, the largest of which was $150,00.00 cash loan to Park Hwa Sun allegedly given by Kitami to Park Hwa Sun's sister in Korea sometime in 2004. Kitami Depo. Trans, page 30, lines 4-8.

163.    When asked in her deposition, Kitami says she has absolutely no documents that reflect that she obtained a loan from a Korean bank, nor does she have documents that reflect that she mortgaged a house in Korea.  She claims the Korean bank kept all of the documents.  Kitami Depo. Trans., page 41, line 10 to 42, line 21.

164.    Kitami also claims that she has paid the Korean bank loan she obtained for Park Hwa Sun down to $50,000 or $60,000.00 and that Park Hwa Sun has never given her any money for interest or principal on the Korean bank loan of 2004.  Kitami Depo. Trans., page 34, line 13 to page 35, line 13.

165.    Also telling of the lack of genuineness of the purported Korean bank loan Kitami alleges she obtained for Park Hwa Sun in 2004 are the facts that Kitami claims she paid someone she believed was Park Hwa Sun's sister the $150,000.00 in cash in Korea and did not obtain any documents that the person was who she claimed she was and that she was receiving $150,000.00 in cash.  Kitami Depo. Trans., page 37, line 16 to page 39, line 5.

166.    Kitami believes that the last loan she made to Park Hwa Sun was in about March 2005. Kitami Depo. Trans., page 40, lines 11-15.

167.    In about November 2005, Kitami returned from a trip to Korea and learned that Kim Hang Kwon and Park Hwa Sun and their two corporations had a lawsuit filed against them by some of their former employees — this lawsuit.  Kitami Depo. Trans., page 19, line 2 to page 20, line 3.

168.    Prior to that time, and despite that fact that Park Hwa Sun had apparently never paid Kitami for any of the many loans Kitami claims she made to Park Hwa Sun, Kitami never requested that Park Hwa Sun document any of the loans, nor did Kitami herself documents any of the alleged loans she made to Park Hwa Sun.

169.    Sometime in about December 2005, well after Kitami had allegedly loaned money to Park Hwa Sun, Kitami says that she asked Park Hwa Sun to "come up with a promissory note."  Kitami Depo. Trans., page 23, lines 14-17.

170.    Thereafter, in December 2005, Kim Hang Kwon created a delivered to Kitami a promissory note dated March 5, 2004, and purportedly signed by Kim Hang Kwon on March 5, 2004, that states that on that day, March 5, 2004, Kim Hang Kwon is borrowing $150,000.00 from Kitami and that he

would make payment on the promissory note on or before October 1, 2005. Kitami Depo. Trans., page 21, line 13 to page 28, line 7 and Exhibit 3. *See also* the translation of the Korean promissory note apparently signed by Kim Hang Kwon, attached as Exhibit "B" to the Hanson Decl. B (Document Number 01732).

171.    Soon thereafter, Kim Hang Kwon created two promissory notes, each in the amount of $100,000.00. The notes were drafted in Korean and signed by Kim Hang Kwon even though Kitami says she never loaned money to Kim Hang Kwon — only to Park Hwa Sun. One note was purportedly signed by Kim Hang Kwon on December 15, 2004, and the other note was purportedly signed on March 1, 2005, although both notes were created by Kim Hang Kwon in December 2005. Both of the notes also have due dates of October 1, 2005. Kitami Depo. Trans., page 21, line 13 to page 28, line 7, Exhibits 1-2; Hanson Decl. B., Exhibits "C" and "D" (translations signed by Kim Hang Kwon) (Document Numbers 01729-30).

172.    Kim Hang Kwon and Park Hwa Sun delivered the promissory notes to Kitami who had her assistant deliver the documents to her attorney. Kitami Depo. Trans., page 21, lines 1-9.

173.    Kim claims that Asia borrowed *approximately* $400,000.00 over a period of years from a individual named Kim Pil Sun Kitami (Asia Depo. Trans., page 15, line 4 to page 16, line 6).

174.    Kim, at times, alleges that he personally borrowed that money from Ms. Kitami. Asia Depo. Trans., page 16, lines 9-24; page 32, lines 14-23; page 43, line 17 to page 44, line 7 (Kim insists that Asia and Kim owe Kitami, but Park and Jung Jin have no obligation to Kitami).

175. Kim also contends that the money borrowed from Ms. Kitami was used to pay poker licensing fees for Jung Jin, and for Asia during Asia's poker parlor partnership with Kim Ki Sung. Asia Depo. Trans., page 32, line 14 to page 34, line 6; page 38, lines 3-13 (money borrowed from Kitami by Kim was used to pay the poker machine licensing fees of Jung Jin); page 48, line 24 to page 49, line 1 (the money borrowed by Kim from Kitami was used for Jung Jin license fees and to build the Susupe residence).

176. Kim states that funds from Kitami were used by him to build his Susupe residence which he claims as his own, individual property (Asia Depo. Trans., page 41, lines 7-14).

177. Kim states that, at times, Park would go to Kitamai and borrow money which increased the total amount he claims Kim and Asia owe to Kitami. Asia Depo. Trans., page 46, lines 5-24.

178. Kim states that he gave Kitami a mortgage on the Susupe residence and two vehicles — both vehicles were purchased for almost $30,000, with cash, by Park. Asia Depo. Trans., page 44, line 8 to page 45, line 5; page 90, line 2 to page 90, line 13.

179. The alleged creditor, Kim Pil Sun Kitami says that the loans, in the alleged total approximate amount of $350,000.00, were "always personal" to Park — Kim, Asia and Jung Jin are *not* indebted to her. Kim Pil Sun Kitami Depo. Trans., page 29, line 11 to page 30, line 30.

180. Kim Pil Sun Kitami states that she cannot remember when she first started loaning Park money or exactly how much she loaned, because "we Koreans we just – without any documents we just lend out money and get our money back that's how we socialize." Kim Pil Sun Kitami Depo. Trans., page 30, line 4 to page 31, line 12.

181.    Kim claims that he was going to sell the laundrymat called Welcome Laundry, purportedly owned by Jung Jin, and use the proceeds to repay money he claims he owes to Kim Pil Sun Kitami. Asia Depo. Trans., page 33, lines 9-16.

● **Other suspect conduct**.

182.    Kim also claims that either he or Asia owes an individual named Seo Yong Ki the amount of $50,000.00 for money borrowed by Park. Asia Depo. Trans., page 42, line 22 to page 43, line 4.

183.    ASIA also claims to have made unaccounted for "loans" to JUNG JIN and claimed them as a liability in tax returns and financial statements. Cindy Yu Depo. Trans., page 38, line 17 to page 39, line 8 and Exhibit H (2004 Corporate Income Tax Return for Asia Enterprises, Inc.), Exhibit I (handwritten check ledger for Asia Enterprises, Inc.) and Exhibit L (2004 Corporate Income Tax Return for Jung Jin Corp.) thereto.

184.    Both Asia and Jung Jin carried "loans from shareholders" in various amounts on their financial statements as reported in their tax returns for at least the years 2003 and 2004 which at no time represented any amount of money provided by any or all of the shareholders of either entity to the respective entities. Cindy Yu Depo. Trans., page 28 line 2 to page 30, line 16, page 43 line 2 to page 44, line 14 and Exhibits D, E, G, H, K & L thereto.

185.    In early 2005, Park Hwa Sun and Kim Hang Kwon "transferred" Plaintiffs Li Zheng Zhe and Xu Jing Ji from the contract employ of JUNG JIN to the contract employ of ASIA, knowing, among other things, that ASIA, alone, did not have the business to support the hiring of the two, and with the actual intent, among other things, of closing the "business" of ASIA soon thereafter, in an

attempt to isolate the employment liability of JUNG JIN, Park Hwa Sun and Kim Hang Kwon to the plaintiffs solely in ASIA, a defunct corporation:

    a.    Kim Hang Kwon admits that business for ASIA started to get bad as early as 2004; Asia Depo. Trans., page 58, line 21 to page 59, line 12;

    b.    Daora Poker, Kim Hang Kwon's/ASIA's partnership with Kim Ki Sung, was "losing money little by little." Asia Depo. Trans, page 79, line 21 to page 80, line 19;

    c.    Kim Hang Kwon claims that ASIA had to lie on its tax returns by showing income he claims Asia did not have in order to hire employees, including Plaintiffs. Asia Depo. Trans, page 79, line 211 to page 80, line19;

    d.    Less than three months after Li Zheng Zhe and Xu Jing Ji were "transferred" to Asia, Kim and Kim Ki Sung held a meeting at which they told Li Zheng Zhe and Xu Jing Ji that they should transfer to some other employer because Asia's business was no good and Asia would be "shut down." Asia Depo. Trans., page 64, line 1 to page 65, line 12; page 67, line 21 to page 68, line 10; Answer to Plaintiff Li Ying Hua's First Interrogatories to Defendants, Interrogatory # 6; Answer to Plaintiff Xu Jing Ji's First Interrogatories to Defendants, Interrogatory # 6; Answer to Plaintiff Li Zheng Zhe's First Interrogatories to Defendants, Interrogatory # 6.

1    Respectfully submitted this 19th day of June, 2008.

2

3                                              /s/ Mark B. Hanson

4                                                    MARK B. HANSON

5
                                               Second Floor, Macaranas Building
6                                              Beach Road, Garapan
                                               PMB 738, P.O. Box 10,000
7                                              Saipan, MP 96950
                                               Telephone:    (670) 233-8600
8                                              Facsimile:     (670) 233-5262
                                               E-mail: markbhanson@gmail.com
9

10                                             Attorney for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing will be deposited in the United States Post Office, first class mail, postage prepaid, addressed to the following:

> Jung Jin Corporation
> P.O. Box 503428
> Saipan, MP 96950
> (670) 235-4321

> Park Hwa Sun
> P.O. Box 503428
> Saipan, MP 96950
> (670) 235-4321

> Asia Enterprises Inc.
> P.O. Box 503448
> Saipan, MP 96950
> (670) 235-4321

> Kim Hang Kwon
> P.O. Box 503448
> Saipan, MP 96950
> (670) 235-4321

I further certify that the following were served with a copy of the foregoing via the Court's electronic case filing system and via e-mail:

> G. Anthony Long, Esq.
> LAW OFFICE OF G. ANTHONY LONG
> P.O. Box 504970
> Saipan, Mariana Islands 96950
> E-mail:      gal@nmilaw.com

June 19, 2008                    /s/ Mark B. Hanson

DATED: _____    _____

                                MARK B. HANSON