1   MARK B. HANSON, ESQ.
    Second Floor, Macaranas Building
2   Beach Road, Garapan
    PMB 738 P.O. Box 10,000
3   Saipan, Mariana Islands 96950
    Telephone:    (670) 233-8600
4   Facsimile:     (670) 233-5262
    E-mail:        mark@saipanlaw.com
5
    Attorney for Plaintiffs
6

7                   IN THE UNITED STATES DISTRICT COURT
                                   FOR THE
8                       NORTHERN MARIANA ISLANDS

9   LI YING HUA, LI ZHENG ZHE and XU JING JI, )   CASE NO. CV 05-0019
                                              )
10                  Plaintiffs,               )
                                              )
11          vs.                               )
                                              )
12  JUNG JIN CORPORATION, a CNMI corporation, )
    ASIA ENTERPRISES, INC., a CNMI corporation,)
13  PARK HWA SUN, KIM HANG KWON,              )
    KSK CORPORATION, a CNMI corporation, and  )
14  KIM KI SUNG,                              )
                                              )   Date:      July 17, 2008
15                  Defendants.               )   Time:      8:30 a.m.
                                              )   Judge:     Hon. Alex R. Munson
16  _____ )

17

18  _____

19

20            MEMORANDUM IN SUPPORT OF

21  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST

22          KSK CORPORATION AND KIM KI SUNG

23

24  _____

25

26

27

1

# TABLE OF CONTENTS

2

3    TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

4    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5    STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6    FACTS AND PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7      • *History of Case to Date* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

8      • *Mr. Kim Comes to Saipan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     • *Mr. Kim Forms KSK* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9      • *Mr. Kim Meets Defendants Kim Hang Kwon and Park Hwa Sun* . . . . . . . . . . . . . . . . . . . 6

10      • *Mr. Kim and Defendant Kim Hang Kwon Go Into Business Together* . . . . . . . . . . . . . . . . 7

11      • *Plaintiffs file a lawsuit* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     • *Kim Hang Kwon and Park Hwa Sun Liquidate their Assets* . . . . . . . . . . . . . . . . . . . . . . 8

12      • *Kim Hang Kwon and Park Hwa Sun Run Away* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13

14    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15      A.  SUCCESSOR LIABILITY UNDER THE FLSA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16      B.  SUCCESSOR LIABILITY WHERE TRANSFER IN FRAUD OF CREDITORS . . . . 13

17      C.  KSK IS SUCCESSOR TO THE LIABILITY OF DEFENDANTS . . . . . . . . . . . . . . . 14

18          1.     KSK is a bonafide successor under the

                  meaning of *Steinbach* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

19          2.     KSK had notice of the potential liability with regard

20                   to Plaintiffs' claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

21          3.     Plaintiffs do not have an adequate remedy against

22                   the Judgment Debtors directly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

23          4.     KSK is also liable as a successor because the intent of

                  the transfer to KSK was to avoid Plaintiffs as creditors . . . . . . . . . . . . . . 15

24          5.     KSK is Liable for Attorney's Fees and Costs under the FLSA . . . . . . . . 16

25

26

27

D. KIM KI SUNG IS THE ALTER EGO OF KSK CORPORATION . . . . . . . . . . . . . . . 16

E. THE TRANSFER OF PROPERTY CONVEYED BY THE
   ORIGINAL DEFENDANTS TO KSK CORPORATION
   IS VOIDABLE AS A FRAUDULENT CONVEYANCE . . . . . . . . . . . . . . . . . . . . . . . 18

    1.   The Common Law of Fraudulent Conveyances . . . . . . . . . . . . . . . . . . 19

    2.   Bogus Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    3.   Badges of Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        a.  *Actual or threatened litigation against the debtor* . . . . . . . . . . . . . . 25

        b.  *Insolvency or other unmanageable indebtedness on the part*
           *of the debtor* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        c.  *The conveyance is general, i.e., the debtor's entire estate*
           *is diminished, thereby leaving him insolvent* . . . . . . . . . . . . . . . . . . 27

        d.  *The transfer so completely depleted the debtor's assets that*
           *the creditor has been hindered or delayed in recovering*
           *any part of the judgment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        e.  *A close relationship between the transferor and the transferee* . . . . . 27

        f.  *"'[I]mplausible or inconsistent' explanations of behavior,*
           *such as the reasons for dealing largely in cash."* . . . . . . . . . . . . . . 27

        g.  *Repayment of substantial loans without an explanation or*
           *documentation of consideration* . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        h.  *Kim Hang Kwon and Park Hwa Sun had a history of*
           *fraudulent behavior* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    4.   Summary of Badges of Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1                              TABLE OF AUTHORITIES

2    Cases:

3        *Acequia, Inc. v. Clinton*, 34 F.3d 800 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 25

4        *Achiles v. Cajigal*, 39 Haw. 493, 1952 WL 7374 (1952)  . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5        *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505,

6            91 L. Ed. 2d 202 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

7        *Audit Servs., Inc. v. Rolfson*, 641 F.2d 757 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

8        *Balint v. Carson City*, 180 F.3d 1047 (9th Cir. 1999)(*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . 2

9        *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 114 S.Ct. 1757,

10           128 L.Ed.2d 556 (1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

11       *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 3548, 91 L.Ed. 2d 265 (1986)  . . . . . . . . . 1

12       *Chicago Truck Drivers, Helpers and Warehouse Workers Union*

13           *(Independent) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 51 (7th Cir. 1995) . . . . . . . . 12

14       *Coder v. Arts*, 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772 (1909) . . . . . . . . . . . . . . . . . . . . . 20

15       *E.E.O.C. v. Vucitech*, 842 F.2d 936 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

16       *Golden State Bottling, Inc. v. N.L.R.B.*, 414 U.S. 168, 94 S.Ct. 414 (1973) . . . . . . . . . . 11, 13

17       *Grimm v. Healthmont, Inc.*, 2002 WL 31549095 (D. Or. 2002) . . . . . . . . . . . . . . . . . . . . 12, 15

18       *Hassan v. I.R.S.*, 301 B.R. 614 (D. Fla 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-25

19       *Herrera v. Singh*, 118 F. Supp. 2d 1120 (E.D. Wash. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 12

20       *In re: Agricultural Research and Technology Group, Inc.*, 916 F.2d 528 (9th Cir. 1990) . 25 n.5

21       *In re: Sternberg*, 229 B.R. 238 (S.D. Fla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

22       *In re: Woodfield*, 978 F.2d 516 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

23       *Kupetz v. Wolf*, 845 F.2d 842 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

24       *Mankin v. Munn*, 823 F.2d 1296 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 n.4

25       *Martin v. Abbott Laboratories*, 689 P.2d 368 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

26       *Meade v. Cedarapids, Inc.*, 164 F.3d 1218 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

27       *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459 (9th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . 11

*Ocklawaha River Farms Co. v. Young*, 74 So. 644 (Fla. 1917) . . . . . . . . . . . . . . . . . . . . . . . 22

*Payne v. Gilmore*, 382 P.2d 140 (Okla. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Premier Financial Services v. Citibank*, 912 P.2d 1309 (Ariz. App. 1995) . . . . . . . . . . . . . . 20

*Sherry v. Ross*, 846 F. Supp. 1424 (D. Hawaii 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Steinbach v. Hubbard*, 51 F.3d 843 (9th Cir. 1995) . . . . . . . . . . . . . . . . . 10-11, 11 n.3, 12, 14

*Stoumbos v. Kilimnik*, 988 F.2d 949 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sullivan v. Tarope*, Civil Action No. 98-1293D,  Order Granting Plaintiff's

   Motion for Summary Judgment *8 (CNMI Super. Ct. March 19, 2003) . . . . . . . . 19-23

*Timmer v. Pietrzyk*, 261 N.W. 313, 314 (Mich. 1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Trustees for Alaska Laborers-Construction Industry Health &*

   *Sec. Fund v. Ferrell*, 812 F.2d 512 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Fernon*, 640 F.2d 609 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Westminster Savings Bank v. Sauble*, 39 A.2d 862 (Md. 1944) . . . . . . . . . . . . . . . . . . . . . . . 20

Statutes:

   Bankruptcy Code Section  11 U.S.C. § 548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

   Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 n.1, 10

   Fair Labor Standards Act, 29 U.S.C. § 216(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

   Title 7 C.M.C. § 3401 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   13 Elizabeth I Ch. 5 (1570) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 n.4

Rules:

   Fed. R. Civ. P. 56(c)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Other:

   4 *Collier on Bankruptcy* 10015-16, ¶ 548.02[5] at 548-41 to 548-46 (15th ed. 1994) . . . . . 25

   UNIFORM FRAUDULENT TRANSFER ACT § 1(3)-(4) (1984) . . . . . . . . . . . . . . . . . . . . 19-20, 22

INTRODUCTION

For the reasons discussed below, Defendants KSK Corporation ("KSK") and Kim Ki Sung ("KIM") — the principal and alter ego of KSK — are liable to Plaintiffs for Plaintiffs' labor claims stated in their Verified Complaint as successors to the business of the original corporate and individual defendants in this case — namely Jung Jin Corporation ("JUNG JIN"), Asia Enterprises, Inc. ("ASIA"), Kim Hang Kwon, and Park Hwa Sun (sometimes collectively referred to herein as the "original defendants" or "Judgment Debtors") including liability for attorney's fees and costs of this action to-date.[1] Alternatively, the Judgment Debtors in this matter fraudulently transferred all of their operating assets in Saipan to KSK and KIM which fraudulent transfer should be set-aside and the property now in the hands of KSK and KIM placed back within the reach of Plaintiffs.

STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Summary judgment pursuant to Fed. R. Civ. P. 56(c) is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 3548, 91 L.Ed. 2d 265 (1986). The burden of establishing the nonexistence of a genuine issue is on the party moving for summary judgement and thus, with regard to the counterclaims at issue in this motion, the burden rests upon CNMI Travel. *Id*.

In evaluating the merits of a summary judgment motion, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986) (citation omitted). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Id*. The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial.

---

[1] The Court entered Judgment against Judgment Debtors in this case on August 24, 2006 holding them jointly and severally liable to Plaintiffs for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*., and various state law claims. *See* Doc. # 93.

1   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249; *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir.
2   1999)(*en banc*).

3        Finally, where a material factual issue exists for trial, summary judgment is inappropriate and
4   should be denied. *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1221(9th Cir. 1999).  In other words,
5   if there is sufficient evidence which enable reasonable jurors to differ, summary judgment should be
6   denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-250.

7                           FACTS AND PROCEDURAL HISTORY[2]

8   • *History of Case to Date*:

9        1. Plaintiffs filed their original Verified Complaint in this matter on June 22, 2005 against the
10  four original defendants to the action — the Judgement Debtors.   Proposed Findings of
11  Uncontroverted Fact ("PFF"), ¶ 1.

12       2. On January 1, 2006, the Judgment Debtors effected the transfer of their operating businesses
13  to KSK.  PFF, ¶ 2.

14       3.  KSK Corporation is controlled by KIM, the husband of the record owner and president of
15  the corporation.  PFF, ¶ 3.

16       4. After the sale by the Judgment Debtors of all or substantial all of their business assets in the
17  Commonwealth to KSK, Defendant Park Hwa Sun departed the Commonwealth for South Korea
18  with no plans of returning to Saipan.  PFF, ¶ 4.

19       5. On January 27, 2006, at the time and date noticed for the deposition of defendant Jung Jin
20  Corp., no one appeared to testify.  PFF, ¶ 5.

21       6. On February 1, 2006, a subpoena was issued for the deposition of Kim Sung Eun, the person
22  listed as "president" of KSK as shown in documents on file with the Commonwealth government.
23  PFF, ¶ 6.

24       7. On March 9, 2006, at the time, date and place indicated in the subpoena to Kim Sung Eun,

25

26        [2] The facts upon which Plaintiffs base this Motion for Summary Judgment are fully set forth
    in Plaintiffs' Proposed Findings of Uncontroverted Fact submitted concurrently herewith. Citations
27  to established facts herein are to that Proposed Findings of Uncontroverted Fact.

1    Mr. KIM appeared to testify on her behalf.  PFF, ¶ 8.

2        8.  In the deposition of Mr. KIM, Plaintiffs learned the extent to which Mr. KIM and KSK had

3    taken over all or substantially all of the operating assets the Judgment Debtors.  PFF, ¶ 9.

4        9.  Accordingly, on April 21, 2006, Plaintiffs moved, *inter alia*, to amend their Verified

5    Complaint to include two additional defendants — KSK and Mr. KIM — as successors to the FLSA

6    liability of the four original defendants.  PFF, ¶ 10.

7        10.  On May 12, 2006, the Court issued an Order granting, *inter alia*, Plaintiffs' motion to

8    amend to add KSK and Mr. KIM as party defendants.  PFF, ¶ 11.

9        11.  Thereafter, Plaintiffs filed a First Amended Complaint and, on May 18, 2006, KSK and Mr.

10   KIM were served with a summons and a copy of the First Amended Complaint.  PFF, ¶ 12.

11       12.  On May 22, 2006, KSK and Mr. KIM filed a "special appearance" in the case objecting to

12   the motion of Plaintiffs to amend their Verified Complaint to add the parties as defendants to the

13   case.  PFF, ¶ 13.

14       13.  Over Plaintiffs' objection, on June 20, 2006, the Court granted KSK's and Mr. KIM's

15   motion to dismiss them from the case.  PFF, ¶ 14.

16       14.  In its dismissal of KSK and Kim Ki Sung from the action, *without prejudice*, the Court

17   found that:

18           Although the record here is more complete than for many motions at ths stage in
             the proceedings, the court concludes that it does not yet have sufficient information
19           before it to justify the addition of Kim Ki Sung and KSK Corporation as defendants.
             In particular, there is not enough information about Ms. Park Hwa Sun's whereabouts,
20           *pro se* defendant Kim Hang Kwon's potential liability for full payment of the alleged
             unpaid wages, and "the extent to which the predecessor is able to provide adequately
21           relief directly."[sic] [].  Finally, the court has not yet had the benefit of hearing
             testimony so as to be able to observe the demeanor of the various parties, which will
22           aid it greatly in this fact-intensive process.

23           Accordingly, the first amended complaint is dismissed, without prejudice to being
             re-filed.
24
     Order, Doc. # 63 at 4-5 (citation omitted); PFF, ¶ 15.
25
         15.  On August 14, 2006, the Court granted Plaintiffs' motion for summary judgment against
26
     the four original defendants finding for Plaintiffs on all of their claims.  PFF, ¶ 16.
27

16.   On August 24, 2006, a Judgment was issued for Plaintiffs in the total amount of $209,798.55.  PFF, ¶ 17.

17.  Thereafter, Plaintiffs initiated proceedings before the Court to collect the Judgment.  PFF, ¶ 18.

18.   On May 25, 2007, after extensive collection proceedings, the Court issued an Order approving the distribution of the proceeds, after costs and fees, of the various collection efforts of Plaintiffs against the original four defendants which proceeds represents most if not all of the assets currently within the reach of Plaintiffs.  PFF, ¶ 21

19.  The total amount of the unsatisfied portion of the Judgment against the Judgment Debtors as of the date of this filing is $171,664.88.  PFF, ¶ 22.

20.  On August 23, 2007, Plaintiffs again moved, *inter alia*, to amend their Verified Complaint to include claims for FLSA successor liability and fraudulent conveyance against KSK and Mr. KIM. PFF, ¶ 23.

21.  On October 4, 2007, after full briefing and argument on the merits of Plaintiffs' second motion to amend, the Court granted Plaintiffs' leave to include the proposed amendments in an amended verified complaint.  PFF, ¶ 24.

22.   Accordingly, on October 12, 2007, Plaintiffs filed their Second Amended Verified Complaint.  PFF, ¶ 25.

23.  Through discovery, it was established that:

• *Mr. Kim Comes to Saipan*:

   a.  Mr. KIM originally came to Saipan in 2001 having invested $150,000 in a friend's Mr. LEE's business called Managaha Shop.  This "investment" was completely undocumented;

   b.  Mr. LEE gave Mr. KIM a bogus position as "store manager" with his company Goldenbird Corporation which position Mr. KIM held until he effected a transfer to Mr. KIM's company KSK in December 2005;

   c.  Mr. KIM's job as a "store manager" for Goldenbird Corporation was merely a sponsorship arrangement providing Mr. KIM with CNMI immigration status — he never performed the

-4-

1    duties of a store manager and actually performed very few services for Goldenbird

2    Corporation in his purported four year employment with the company;

3    d.   As a "store manager" with a purported salary above the threshold necessary to allow the

4    legal entry to the Commonwealth of Mr. KIM's immediate relatives, Mr. KIM was able to

5    secure entry permits for his wife, Kim Sung Eun, and his three children;

6    • *Mr. Kim Forms KSK*:

7    e.   KSK was formed by Mr. KIM in February 2003. KSK's name is an acronym for Ki Sung Kim

8    — Mr. KIM;

9    f.   The initial stated shareholders for the company were Kim Sung Eun (Mr. KIM's wife) with

10   90% of the common shares, and an individual named Choi Byung Kook who purportedly

11   held 10% of the common shares of KSK;

12   g.   Neither of the stated shareholders contributed any money to capitalize KSK;

13   h.   The money to capitalize KSK came from the return by Mr. LEE of Mr. KIM's $150,000

14   investment in the Managaha Store;

15   i.   For reasons unknown to either Mr. KIM or his wife Kim Sung Eun, Choi Byung Kook was

16   replaced as a shareholder by Kim Ok Ja — Mr. Kim's mother-in-law;

17   j.   Kim Ok Ja, who first appears as a 10% shareholder of KSK in its 2003 Annual Report

18   (submitted to the Commonwealth Registrar of Corporations on March 1, 2004), did not pay

19   any money to Choi Byung Kook for her shares, nor has she contributed anything of value

20   to KSK for her shares;

21   k.   Mr. KIM was not a shareholder, owner or director of KSK for visa reasons. Mr. KIM's stated

22   position with KSK was that of General Manager, though Mr. KIM was the sole authority

23   over the company from its inception, including the period prior to the time when Mr. KIM

24   effected his legal transfer from his purported employment by Goldenbird Corporation to

25   that of the General Manger of KSK;

26   l.   As General Manager of KSK, Mr. KIM continues to sponsor his wife, Kim Sung Eun — the

27   President and majority shareholder of KSK — as his immediate relative for immigration visa

-5-

1    purposes;

2    m.  Kim Sung Eun, as President and majority shareholder of KSK, continues to renew Mr.

3        KIM's contract as General Manager for KSK;

4    n.  Though he is titled "General Manager," since its inception, Mr. KIM has been the sole

5        decision-maker for KSK; he has commingled his own assets with those of KSK; he variously

6        takes title to property in either his name of the name of KSK without regard to the source

7        of the funds to purchase the property; he does not follow any corporate formalities, and he

8        has wholly failed to make any distinction between himself, his family and the purportedly

9        separate entity, KSK;

10   o.  Within months of KSK's incorporation, Mr. KIM through KSK began opening poker

11       arcades in Saipan;

12   • *Mr. Kim Meets Defendants Kim Hang Kwon and Park Hwa Sun*:

13   p.  In 2003, Mr. KIM was introduced to defendants Kim Hang Kwon and Park Hwa Sun — also

14       in the poker arcade business.  Mr. KIM became friends with Kim Hang Kwon; they played

15       golf together a couple of times a week;

16   q.  In about September or October 2004, Kim Hang Kwon and Park Hwa Sun purportedly

17       approached Mr. KIM and asked for a $100,000 loan for an unspecified purpose;

18   r.  During the same period of time, Mr. KIM himself was seeking funding in the amount of

19       $250,000 to purchase a building in San Vicente, Saipan;

20   s.  Despite Mr. KIM's need at that time for a large amount of cash, Mr. KIM claims he was

21       able to secure and to loan Kim Hang Kwon and Park Hwa Sun $100,000 in cash, partly from

22       his wife $60,000 "share" of a "community bank" involvement and partly from cash he

23       happened to have in a brown paper bag in his house;

24   t.  Part of the money for the alleged loan to Kim Hang Kwon supposedly came in cash from

25       his wife's, Kim Sung Eun's, $60,000 "share" of a "community bank" involvement;

26   u.  The remaining $40,000 for the alleged loan to Kim Hang Kwon supposedly came from a

27       stash of cash of Kim Ki Sung's — a brown paper bag in his house containing up to $50,000.;

-6-

v.  No amount of the actual payment of money of the purported loan by Mr. KIM to Kim Hang Kwon and/or Park Hwa Sun is documented;

w.  There is also no documentation that Kim Sung Eun or Kim Ki Sung received $60,000 from the Kea Ton game to loan to Kim Hang Kwon as they claim;

x.  At about the same time, Mr. KIM borrowed $250,000 from three individuals to purchase the building in San Vicente.  Again, no amount of the $250,000 loans to purchase the building are documented;

y.  Indeed, in later documentation of KSK and Mr. KIM'S financial statements, including financial statements submitted by Mr. KIM and KSK in order to obtain a loan, there is no mention of either the loan to Judgment Debtors or the loans by KSK to purchase the San Vicente Building;

• *Mr. Kim and Defendant Kim Hang Kwon Go Into Business Together*:

z.  In about May 2004, Mr. KIM and Kim Hang Kwon opened a poker parlor together named Daora Poker;

aa. Daora Poker was a partnership between Mr. KIM and Kim Hang Kwon with the intent that the two share profits equally;

bb.     The partnership between partnership between Kim Ki Sung and Kim Hang Kwon was completely undocumented;

cc. Plaintiffs Li Zheng Zhi and Xu Jing Ji were employees of Daora Poker;

dd.     Mr. KIM, at times, directed the work of Plaintiff Li Zheng Zhi;

ee. Kim Ki Sung knew Li Zheng Zhi and Xu Jing Ji through their employment at Daora Poker;

ff.  Kim Ki Sung, at times, directed the work of Plaintiff Li Zheng Zhi;

gg. Mr. KIM was present on April 25, 2005 at Daora Poker when Li Zheng Zhe and Xu Jing Ji were fired by Kim Hang Kwon;

hh.     Kim Hang Kwon claims to have closed down Daora Poker shortly thereafter;

ii.  Asia Enterprises, Inc.'s income taxes for the period it (Kim Hang Kwon) was involved in the Daora Poker partnership shows net income in excess of $42,000.  Kim Hang Kwon states

-7-

1    Daora Poker was actually losing money; that the income figure in Asia's taxes was only made

2    up so that they could hire employees — plaintiffs Li Zheng Zhe and Xu Jing Ji;

3    • *Plaintiffs file a lawsuit*:

4    jj.  After their termination, and together with another employee of the Judgment Debtors, on

5    June 22, 2005, Plaintiffs Li and Xu filed suit against the Judgment Debtors;

6    kk.  In about August 2005, Mr. KIM learned that Plaintiffs had filed a lawsuit alleging that

7    defendant the Judgment Debtors had failed to pay all of the wages they were due;

8    ll.  Kim Ki Sung read about the lawsuit in the Marianas Variety newspaper and heard about the

9    lawsuit from other Korean's in the community, including Kim Ki Sung with whom he

10   continued to play golf and socialize;

11   • *Kim Hang Kwon and Park Hwa Sun Liquidate their Assets*:

12   mm.  On December 11, 2005, the Judgment Debtors began advertising their various

13   business and non-business assets for sale in Saipan's Korean newspaper;

14   nn.  On January 1, 2006, the Judgement Debtors affected the transfer of substantially all

15   of the operating assets of their businesses in Saipan to KSK — namely "Welcome

16   Laundry," "Welcome Poker" and "Welcome Market";

17   oo.  The consideration for the transfer of assets from Judgment Debtors to KSK was

18   purportedly forgiveness of the alleged debts of Kim Hang Kwon from his failed

19   partnership with Mr. KIM and for the purported $100,000 loan from Mr. KIM and

20   Kim Sung Eun;

21   pp.  At the same time Judgment Debtors were attempting to sell their assets, Mr. KIM and

22   KSK applied for a $100,000 loan from the Bank of the Federated States of Micronesia

23   ("FSM Bank").

24   qq.  Shortly after the consummation of the transfer of Judgment Debtor's assets to KSK,

25   KSK received approval for the FSM Bank loan, and received and immediately

26   distributed the $100,000 proceeds thereof;

27   rr.  After the transfer of assets, KSK changed the name on the business licenses of the various

-8-

1    establishments, but KSK continued to use the Judgment Debtors' trade names "Welcome

2    Laundry," and "Welcome Poker" for the establishments acquired from Judgment Debtors;

3    ss.  Indeed, KSK's "Welcome Laundry" appears in the phone book as late as PTI's *2007*

4    *Marianas Information Book*;

5    tt.  After the take-over, KSK replaced the two Welcome Poker employees of Judgment Debtors,

6    but retained the employees of the laundry and market;

7    uu.    KSK apparently pays its utility bills when they come due, but as of March 9, 2006,

8    KSK had not changed the name of the accounts to KSK.  Indeed, Mr. KIM, at that

9    time, was unsure in who's name the accounts were actually held;

10   • *Kim Hang Kwon and Park Hwa Sun Run Away*:

11   vv.  On about January 22, 2006, two days prior to the date scheduled for the deposition of JUNG

12   JIN and with her own deposition to follow few days thereafter, defendant Park Hwa Sun fled

13   to Korea;

14   ww.    On August 24, 2006, this Court entered a Judgment in favor of Plaintiffs and against

15   the Judgment Debtors, jointly and severally, in the amount $209,798.55;

16   xx.  On about November 19, 2006, three days before the date scheduled for a post-judgment

17   deposition of defendant Kim Hang Kwon, defendant Kim Hang Kwon fled to Korea;

18   yy.  Any cash on hand they took with them.  As of October 31, 2006, all that remained in the

19   bank accounts of Judgment Debtors was the aggregate amount of $263.15;

20   zz.  Through post-judgment collection efforts, Plaintiffs have been able to recover a total of $

21   55,015.36 (net of costs) from the auction of property left behind by Kim Hang Kwon and

22   Park Hwa Sun when the fled to Korea.  The recovery to date represents 26% of the

23   Judgment without accounting for accrued interest;

24   aaa.    KSK continues to own, control and operate the laundry, poker arcade and market it

25   acquired from Judgment Debtors, but now under the name "Shany II" instead of

26   "Welcome."

27

1                                          ARGUMENT

2          The Ninth Circuit Court of Appeals has definitively held that, in this Circuit, a successor of

3    a business may be liable for the FLSA liability of its predecessor.  Liability will attach to the successor

4    where the successor is (1) a bona fide successor, (2) with notice of the potential liability, and (3) the

5    predecessor is not able to provide adequate relief directly.  More broadly (outside of the federal labor

6    law context which is dealt with distinctly), a successor in interest to business assets will also be liable

7    to creditors of the company if the transfer was intended to avoid payments to those creditors.

8          Here, KSK (and its alter ego Mr. KIM) is, indeed, the bona fide successor to the operating

9    business assets of Judgment Debtors.  KSK (and its alter ego Mr. KIM) took the assets with notice

10   of the claims of Plaintiffs for unpaid wages.  It is also patently apparent that Judgment Debtors have

11   insufficient assets from which Plaintiffs can seek relief directly.  Accordingly, pursuant to Ninth

12   Circuit law, KSK and its alter ego Mr. KIM are jointly and severally liable with Judgment Debtors for

13   Plaintiffs' Judgment against Judgment Debtors.

14         At this stage of the litigation, there is no genuine dispute about the facts upon which KSK's

15   and Mr. KIM's liability is based.  Summary judgment for Plaintiffs is appropriate.

16         Further, and alternatively, the transfer of Judgment Debtor's assets to KSK was, actually, a

17   liquidation of those assets prior to the Judgment Debtors' fleeing to Korea to avoid the eminent

18   judgment of Plaintiffs against them.  As such, the transaction itself was a fraudulent conveyance.

19         There is also no genuine dispute as to these facts.  Accordingly, if the Court is disinclined to

20   grant Plaintiffs summary judgment on their successor liability claim, the Court should nevertheless

21   grant Plaintiffs summary judgment on their fraudulent conveyance claim, void the fraudulent transfer

22   of Judgment Debtors assets, and place the assets back within reach of Plaintiffs for satisfaction of the

23   outstanding balance of the Judgment.

24   A.    SUCCESSOR LIABILITY UNDER THE FLSA.

25         The seminal case of *Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. 1995), and its progeny

26   hold that there is successor liability for violations of the Fair labor Standards Act, 29 U.S.C. §§ 201

27   *et seq.* (the "FLSA").

                                              -10-

The FLSA was passed to protect workers' standards of living through the regulation of working conditions. 29 U.S.C. § 202. That fundamental purpose is as fully deserving of protection as the labor peace, anti-discrimination, and worker security policies underlying the NLRA, Title VII, 42 U.S.C. § 1981, ERISA, and MPPAA. The analysis set forth in the cases extending potential liability under these statutes justifies application of the doctrine here as well. Consequently, we conclude that successorship liability exists under the FLSA.

*Steinbach v. Hubbard*, 51 F.3d at 845.

After establishing that successor liability exists, generally, under the FLSA, the *Steinbach* Court went on to espouse the standard for successor liability:

[S]uccessor liability can attach when 1) the subsequent employer was a bona fide successor and 2) the subsequent employer had notice of the potential liability. *See Golden State Bottling, Inc. v. N.L.R.B.*, 414 U.S. [168] at 171-72 n.2, 173, 94 S.Ct. [414] at 419 n.2, 419-20 (1973) [a seminal Supreme Court case upholding National Labor Relations Board's authority to enforce reinstatement and back-pay order on *bona fide* successor to business]. Whether an employer qualifies as a bona fide successor will hinge principally on the degree of business continuity between the successor and predecessor. []. The Ninth Circuit has fleshed out this test when dealing with other employee individual rights statutes by adding a third consideration: the extent to which the predecessor is able to provide adequate relief directly. [].

*Id.* at 846 (some citations omitted).[3]

Business continuity is established by weighing (1) the similarity of business operations; (2) use of the same physical facilities; (3) use of the same workforce; (4) existence of the same jobs under the same working conditions; (5) presence of the same supervisors; (6) use of the same methods of production; and (7) production of similar products and/or services. *See NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 463-64 (9th Cir.1985).

---

[3] Though the *Steinbach* court held that successorship liability exists under the FLSA, the court there refused to find that the successor in that case was liable. There, the successor had only temporarily taken over the predecessor's business. *Steinbach v. Hubbard*, 51 F.3d at 846 ("in this case, no permanent transfer occurred.").

-11-

1  *Herrera v. Singh*, 118 F. Supp. 2d 1120, 1123 (E.D. Wash. 2000) (applying successor liability to the
2  Agricultural Workers Protection Act, citing *Steinbach v. Hubbard*).

3         In one case, a court in the Ninth Circuit held that: "A subsequent employer is a successor
4  employer if it hires most of its employees from the previous employer's work force and conducts
5  essentially the same business as its predecessor without a fundamental change in working
6  conditions." *Grimm v. Healthmont, Inc.*, 2002 WL 31549095 (D. Or. 2002) (citing *Trustees for*
7  *Alaska Laborers-Construction Industry Health & Sec. Fund v. Ferrell*, 812 F.2d 512 (9th Cir. 1987) (an
8  individual member of a joint venture who continued to operate the same business with the same
9  employees and equipment after the joint venture ceased operations was a successor employer for
10 purposes of ERISA liability)). *See also Chicago Truck Drivers, Helpers and Warehouse Workers Union*
11 *(Independent) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 51 (7th Cir. 1995) (reversing the lower
12 court's dismissal and allowing successor liability claim to proceed despite prior bankruptcy discharge
13 of predecessor, stating: "Here, those facts include the apparent nature of the acquisition of Old
14 Tasemkin by New Tasemkin--which clearly had the effect, intended or no, of frustrating unsecured
15 creditors while resurrecting virtually the identical enterprise.").

16        The Seventh Circuit, Judge Posner, has stated of successor liability in the Title VII context:

17        When the successor company knows about its predecessor's liability, knows the
18        precise extent of that liability, and knows that the predecessor itself would not be able
          to pay a judgment obtained against it, the presumption should be in favor of successor
19        liability, even if the successor (as here) purchased the assets of its predecessor rather
20        than merged the predecessor into it or consolidated with it. This solution prevents
          the externalizing of the liability without disappointing the reasonable expectations of
21        investors (and hence impeding the market for corporate assets). The successor, if he
22        knows of his potential liability, will demand compensation in the form of a lower price
23        for the assets, and in this way the burden of liability will be shifted back to the owners
24        of those assets, where it belongs.

25 *E.E.O.C. v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988) (holding a successor company liable for its
26 predecessor's liability for Title VII pregnancy discrimination).

27        Another Seventh Circuit oft cited opinion (cited in *Steinbach*) is of import here.  In

-12-

*Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985) the court found that an "innocent" successor could be liable for a § 1981 claim for actions of the predecessor to the business.

> One of the underlying reasons for the successor doctrine is that an employee's statutory rights should not be vitiated by the mere fact of a sudden change in the employer's business. That employee should be able to enforce against a successor a claim or judgment that he could have successfully enforced against a predecessor. Unless extraordinary circumstances exist, an injured employee should not be made worse off by a change in the business.

*Musikiwamba v. ESSI, Inc.*, 760 F.2d at 750.

The *Musikiwamba* court also made it clear that, to avoid liability, a successor has a due diligence duty to inquire of the extent of the potential liabilities of the predecessor business prior to the acquisition of the business.

> Normally, the burden would be on the successor to find out from the predecessor all outstanding potential and actual liabilities. But a successor who has exercised due diligence and failed to uncover evidence of the plaintiff's lawsuit will not be found to have notice when a pleading listing it as a defendant is filed the very day the transaction is to take place.

*Musikiwamba v. ESSI, Inc.*, 760 F.2d at 752 (7th Cir. 1985). *See also Golden State Bottling, Inc. v. N.L.R.B.*, 414 U.S. 168, 182-185, 94 S.Ct. 414, 424-425 (1973) (any liability for backpay, reinstatement, or seniority imposed on the successor could have been reflected in the purchase price for the assets or in an indemnification clause in the sales agreement).

B.    SUCCESSOR LIABILITY WHERE TRANSFER IN FRAUD OF CREDITORS.

A successor to a business can also be liable for the predecessor's debts under a more broadly applicable standard of law.

> Traditionally, a corporation purchasing the assets of another corporation does not, by reason of the purchase of assets, become liable for the debts and liabilities of the selling corporation. The courts have recognized, however, that the traditional rule allows a transferring corporation, under certain circumstances, to effectively avoid its obligations to the detriment of *creditors* and minority *shareholders*. Thus, Washington has recognized four narrow exceptions to the traditional rule: (1) the purchaser

-13-

expressly or impliedly agrees to assume liability; (2) the purchase is a *de facto* merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability.

*Martin v. Abbott Laboratories*, 689 P.2d 368, 384 (1984) (citation omitted)(emphasis in original). *See also Stoumbos v. Kilimnik*, 988 F.2d 949, 961 (9th Cir. 1993) ("court would extend liability to transfers other than straightforward purchases. Otherwise, unscrupulous businesspersons would be able to avoid successor liability and cheat creditors merely by changing the form of the transfer. Several states have explicitly included the phrase 'or otherwise transfers' in their formulation of the law." (citation omitted)).

C.    KSK IS SUCCESSOR TO THE LIABILITY OF DEFENDANTS.

        1.    KSK is a bonafide successor under the meaning of *Steinbach*.

        Judgment Debtors transferred substantially all of their operating assets to KSK. PFF, ¶¶ 90, 109-113, 116. KSK caused the contract employees of Judgment Debtors to be legally transferred to the employ of KSK. PFF, ¶ 120. KSK subleased from Judgment Debtors the physical property where the businesses were located. PFF, ¶ 121. KSK continues to run the business with the same assets in the same physical location. PFF, ¶ 117. After the transfer, KSK continued to use the name "Welcome Laundry" — the trade name used by Judgment Debtors — on its signs at the premises and in the phone book. PFF, ¶ 118.

        2.    KSK had notice of the potential liability with regard to Plaintiffs' claims.

        By his own admission, as early as August 2005, Mr. KIM had notice of Plaintiffs' claims for unpaid wages and sexual harassment in the workplace. PFF, ¶ 115. Indeed, it appears that Mr. Kim and the Judgment Debtors may have structured the transfer of Judgment Debtor's assets in the manner they did with the false belief that it would avoid liability for any judgment against Judgment Debtors for Plaintiffs' claims. PFF, ¶ 115. There is simply no genuine dispute that Mr. KIM and KSK were on notice of the potential liability of Judgment Debtors for Plaintiffs' claims.

-14-

3.  <u>Plaintiffs do not have an adequate remedy against the Judgment Debtors directly</u>.

After extensive, time consuming collection efforts directly against Judgment Debtors' assets, Plaintiffs have managed to collect $55,015.36 of the $209,798.55 Judgment against Judgment Debtors.  Kim Hang Kwon and Park Hwa Sun long ago fled the country.  There is no genuine dispute that Plaintiffs' do not have an adequate remedy against Judgment Debtors for collection of the Judgment.

In short, KSK and Mr. KIM conduct essentially the same business as its predecessors, Judgment Debtors, without a fundamental change in working conditions.  *See Grimm v. Healthmont, Inc.*, 2002 WL 31549095 (D. Or. 2002).  That undisputed fact, together with KSK's undisputed prior knowledge of Plaintiffs' claims in this lawsuit, and the fact that Plaintiffs have exhausted their ability to collect their judgment directly from Judgment Debtors, all support this Court finding that KSK is a successor to the liability of the Judgment Debtors in this matter.

4.  <u>KSK is also liable as a successor because the intent of the transfer to KSK was to avoid Plaintiffs as creditors</u>.

Judgment Debtors transferred all of their operating assets to KSK for alleged loans the funds for which remain wholly undocumented and the probability of which is not believable.  As discussed in the section on fraudulent conveyances below, substantial evidence exists to suggest that the transaction between Judgment Debtors, Mr. KIM and KSK was nothing more than a sham constructed to avoid the eventual substantial Judgment obtained by Plaintiffs.  Indeed, Mr. KIM suggests that the form of the transfer was suggested by Judgment Debtors and accepted by Mr. KIM *for the specific purpose* of avoiding any liability to Plaintiffs.  PFF, ¶ 115.

Subsequent to the transaction that delivered all of Judgment Debtors' operating business assets, the principals fled the Commonwealth to Korea with whatever money they and their companies had at the time, leaving behind very little from which Plaintiffs could satisfy their Judgment.  The transaction, being nothing more than a sham to avoid Plaintiffs' Judgment, carried with it successor liability.  The Court should hold KSK and Mr. KIM liable for the unsatisfied amount of Plaintiffs' Judgment.

-15-

1    5.  <u>KSK Is Liable for Attorney's Fees and Costs under the FLSA</u>.

2    Section 216(b) of the FLSA provides, in part:

3        *An action to recover the liability* prescribed in either of the preceding sentences may
         be maintained against any employer . . . in any Federal or State court of competent
4        jurisdiction by any one or more employees for and in behalf of himself or themselves
         and other employees similarly situated. . . .  The court *in such action* shall, in addition
5        to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee
         to be paid by the defendant, and costs of the action.
6
     29 U.S.C. § 216(b) (emphasis added).
7
         This present "action" against KIM and KSK is an action to recover an FLSA liability from KIM
8
     and KSK.  Accordingly, Plaintiffs are entitled to reasonable attorney's fees pursuant to 29 U.S.C. §
9
     216(b) for this action.
10
     D.   KIM KI SUNG IS THE ALTER EGO OF KSK CORPORATION.
11
             Generally, a corporation and its shareholders are deemed "separate entities and,
12
     consequently, share holders are not liable to third persons for corporate debts beyond
13
     their investment in stock of the corporation."  *Economic Dev. Loan Fund v. Pangelinan*,
14
     2 CR 451, 457-58 (D.N.M.I. App. Div. 1986).  Where, however, shareholders treat the
15
     corporation not as a "separate entity but instead as an instrument to conduct their own
16
     personal business," the corporation and the shareholder are deemed one entity under the
     alter ego doctrine, and the court may "pierce the corporate veil" for purposes of liability.
17
     *Id.*, 2 CR at 458.
18
             The alter ego theory is usually used to attach liability to individual shareholders
     of a corporation.
19
20       * * *

21           Whether a corporation and a shareholder may be deemed one for purposes of
     liability under the alter ego doctrine requires a two-part examination.  First, the court
22
     must look at several factors to determine whether the corporation and shareholder are
23
     indeed acting as one.  *Pangelinan*, 2 CR at 458.  Among these commonly examined are:
24
         [U]ndercapitalization, failure to observe corporate formalities,
25       nonpayment of dividends, siphoning of corporate funds by dominant
         stockholders, nonfunctioning of other officers or directors, absence of
26       corporate records, use of the corporation as a facade for the operations
27       of the dominant stockholders, and use of the corporate entity in

                                          -16-

1    promoting injustice or fraud.

2    *Id.*

3    Other relevant factors considered by courts may include:

4

5    1. Whether the individual is in a position of control or authority over
     the entity;

6    2. Whether the individual controls the entity's actions without need
7    to consult others;

8    3. Whether the individual uses the entity to shield himself from
     personal liability;

9    4. Whether the individual uses the business entity for his or her own
10   financial benefit;

11   5. Whether the individual mingles his own affairs in the affairs of the
     business entity; [and]

12   6. Whether the individual uses the business entity to assume his own
13   debts, or the debts of another, or whether the individual uses his own funds
14   to pay the business entity's debts.

15   *Towe* [*Antique Ford Found. v. I.R.S.*], 999 F.2d [1387] at 1391 (citations omitted).[fn]

16

17   Only when the court has determined that a corporation and shareholder are
18   identical will it then proceed to determine whether it will "pierce the corporate veil" for
     purposes of liability. To do so, the court must apply a two-part test. First, "[w]hether the
19   interests of the dominant stockholders are so intertwined with those of the corporation
20   that separate entities no longer exist, and[, second] [w]hether injustice or fraud would
     result if the fiction of separate entities was upheld." *Pangelinan*, 2 CR at 458.[fn]
21

22   *United Enterprises, Inc. v. King*, 4 N.M.I. 304, 307 (1995) (footnotes omitted).

23   By his own admission, KSK is Kim Ki Sung's business.  PFF, ¶¶ 55.  He cannot and does not

24   distinguish between his business and the business of KSK. PFF, ¶ 59. KSK's purported shareholders,

25   officers and directors are his wife, and his mother-in-law, neither of whom has contributed anything
26
     to the company and neither of whom  has any operational control over the company.  PFF, ¶¶ 48,
27

-17-

50.  Kim Sung Eun, Mr. KIM's wife and the supposed 90% shareholder, signs documents for the

company, but she is otherwise only responsible for the family household, not the business.  PFF, ¶

50.  In short, the corporate form here is a sham — the arrangements made only to secure immigration

status.  PFF, ¶¶ 57-58.

Other evidence of the sham nature of the corporate form include the complete and total

commingling of assets and the failure to follow corporate formalities.  PFF, ¶ 59.

Kim Ki Sung is, in fact, the true, sole principal of KSK; and KSK having no separate identity

from that of Kim Ki Sung, KSK is merely Kim Ki Sung's alter ego.  *See United Enterprises, Inc. v. Kim*,

4 N.M.I. 304 (1995).  Kim Ki Sung is liable for the corporation's obligations.

Here, the amount of the outstanding Judgment against Judgment Debtors is not small.  PFF,

¶ 22.  Mr. KIM holds title to substantial Saipan property in his own name despite the fact that the

funds to purchase the property have come, in whole or in part, from the operations of KSK — not

from his salary or personal savings.  PFF, ¶ 61.  Any judgment against KSK alone could effectively

screen Mr. KIM's "personal assets" from attachment to satisfy the liability to Plaintiffs.  The onus

was on Mr. KIM to properly manage the business of KSK to make its assets distinct from his own.

He has not done that.  Plaintiffs should not be burdened in collection by Mr. KIM's complete and

utter failure to respect the corporate form.

E.    THE TRANSFER OF PROPERTY CONVEYED BY THE ORIGINAL DEFENDANTS TO
      KSK CORPORATION IS VOIDABLE AS A FRAUDULENT CONVEYANCE.

Notwithstanding that KSK and its alter ego Mr. KIM are successors to the liability of the

Judgment Debtors to Plaintiffs, the transfer of all of the operating assets of the Judgment Debtors

to KSK was a fraudulent conveyance.  The transaction should be voided by this Court and the

-18-

property brought back within the reach of Plaintiffs as judgment creditors.

1.    The Common Law of Fraudulent Conveyances.

The Commonwealth has no statutory law regarding a transfer of property in fraud of creditors. *See Sullivan v. Tarope*, Civil Action No. 98-1293D,  Order Granting Plaintiff's Motion for Summary Judgment *8 (CNMI Super. Ct. March 19, 2003).  In the absence of such statutory law, the rules of the common law, as expressed in the restatements of the law approved by the American Law Institute and, to the extent not so expressed as generally understood and applied in the United States, are the rules of decision in the courts of the Commonwealth.  Title 7 C.M.C. § 3401 (2000).

In *Kupetz v. Wolf*, 845 F.2d 842, 846 (9th Cir. 1988), the Court of Appeals discussed the origin at common law of fraudulent conveyance statutes:

> The present law of fraudulent conveyances has its roots in the Statute of 13 Elizabeth passed by Parliament in 1571.  The statute was directed at a practice by which debtors sold their property to friends or relatives for a nominal sum, thus defeating creditors' attempts to satisfy their claims against the debtor.  Once the creditor had given up its claim against the debtor, the debtor would reclaim the property that purportedly had been transferred.

> The basic thrust of that early statute was to prohibit transfers that hinder, delay, or defraud creditors.  Such transfers were prevented by making the collusive transferee liable to the creditor in the amount of the transfer.  For four centuries, the primary difficulty has been how to decide which transfers in fact hinder, delay, or defraud creditors.  Because intent to defraud is difficult to prove, courts rely on "badges of fraud."  Thus, certain indicia of fraud may lead to the conclusion that the debtor had fraudulent intent.   The most common of these, now found in the UFCA [the Uniform Fraudulent Conveyances Act] and in Bankruptcy Code section 548, is to assume fraudulent intent when an *insolvent debtor makes a transfer and gets nothing or very little in return.*

1  (Emphasis in original).[4] *See also Westminster Savings Bank v. Sauble*, 39 A.2d 862, 863 (Md. 1944)

2
3  ("[The Statute of 13 Elizabeth] is declaratory of the common law and is construed liberally by the

4  courts, both at law and in equity.").

5  "Surrounding circumstances which usually accompany an intent to hinder, delay or defraud

6  creditors, and from which fraud may be inferred are called 'badges of fraud.'" *Sullivan v. Tarope*, Civil

7  Action No. 98-1293D,  Order Granting Plaintiff's Motion for Summary Judgment *9 (CNMI Super.

8
9  Ct. March 19, 2003) (citing *Timmer v. Pietrzyk*, 261 N.W. 313, 314 (Mich. 1935)).

10  "Badges of fraud" are " 'facts which throw suspicion on a transaction, and which call for an

11  explanation.' "  Although they " 'do not of themselves or per se constitute fraud, ... they are facts

12
13  having a tenancy [sic] to show the existence of fraud, ... [and] their value as evidence is relative and

14  not absolute.' " *Premier Financial Services v. Citibank*, 912 P.2d 1309, 1313 n.2 (Ariz. App. 1995)

15  (articulated in post-judgment garnishment proceedings against third-party transferee to collect

16  deficiency judgment).

17
18  "It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay

19  _____

[4]  *See also Mankin v. Munn*, 823 F.2d 1296, 1300 n.2 (9th Cir. 1987):

20  
21          Conveyances made for the purpose of defrauding creditors have
        long been void at common law.  The first major statutory codification
22      of the common law of fraudulent conveyances is that of 13 Elizabeth
        I Ch. 5 (1570).   That statute provided, in substance, that every
        conveyance made to the end, purpose and intent to hinder, delay or
23      defraud creditors is void.   The Uniform Fraudulent Conveyance Act,
        approved by the National Conference of Commissioners on State Laws
24      in 1918, is essentially a restatement of the statute of 13 Elizabeth.
        States which have not adopted the Uniform Fraudulent Conveyance
25      Act or a similar version of the statute of 13 Elizabeth have recognized
        the statute of 13 Elizabeth as part of the common law. 11 U.S.C. § 548
26      is aimed only at such conveyances as would be fraudulent and voidable
        under common law or under the statute of 13 Elizabeth. *Coder v. Arts*,
27      213 U.S. 223, 242-43, 29 S.Ct. 436, 443-44, 53 L.Ed. 772 (1909)
        (applying statutory predecessor of 11 U.S.C. § 548).

or defraud creditors. Therefore, as is the case under the common law of fraudulent conveyance, courts applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer, taking particular note of certain recognized indicia or badges of fraud." *Acequia, Inc. v. Clinton*, 34 F.3d 800, 805-06 (9th Cir. 1994).

Once a creditor shows the existence of badges of fraud, the creditor's burden is satisfied and the burden of proving the validity of the questionable transaction falls on the transacting parties. *See, e.g., Sherry v. Ross*, 846 F. Supp. 1424, 1428 (D. Hawaii 1994) (Hawaii applied common law rule of fraudulent conveyance from the Statute of Elizabeth until adoption of the UFTA in 1985); *Achiles v. Cajigal*, 39 Haw. 493, 1952 WL 7374 (1952) (discussing the history of the Statute of 13 Elizabeth, badges of fraud, and the common law of fraudulent conveyances).

> The "term 'badge of fraud' means any fact tending to throw suspicion upon the questioned transaction. <u>It raises an inference that the conveyance was fraudulent, and throws upon the parties to the transaction the burden of making a satisfactory explanation by more persuasive proof of good faith than is ordinarily required.</u>"

*Sullivan v. Tarope*, Civil Action No. 98-1293D, Order Granting Plaintiff's Motion for Summary Judgment *8 (CNMI Super. Ct. March 19, 2003)(emphasis added)(string citations omitted).

The only written opinion from a Commonwealth court that Plaintiffs could find that considered fraudulent transfers and "badges of fraud" was a published decision in *Sullivan v. Tarope*, Civil Action No. 98-1293D, Order Granting Plaintiff's Motion for Summary Judgment (CNMI Super. Ct. March 19, 2003). Although the summary judgment in *Sullivan* was later reversed by the Commonwealth Supreme Court because of issues of material fact regarding an alleged *partida*, and while the case is based on different facts and is a lower court decision, the case remains instructive as the only Commonwealth case Plaintiffs could find on the subject of fraudulent conveyances.

-21-

The Commonwealth Superior Court in *Sullivan* acknowledged that:

"The history of the law of fraudulent conveyances shows that, from the earliest times, transfers of personal property in fraud of creditors have been deemed void at common law." *Ocklawaha River Farms Co. v. Young*, 74 So. 644, 648 (Fla. 1917). A creditor is defined as one who has a claim, i.e., a right to payment, "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." UNIFORM FRAUDULENT TRANSFER ACT § 1(3)-(4) (1984). The principle underlying the common law was that, the creditor "had a claim upon the property of his debtor constituting the fund from which the debt should be paid." *Young*, 74 So. at 648. If the debtor, in disposing of his property, ignores the equitable right of his creditors to be paid out of the property in his hands, with the intent to delay or defraud his creditor, such disposition is deemed inequitable and void. *Id.* at 649.

*Sullivan* at 9 (emphasis omitted).

Finding the common law of fraudulent conveyances applicable to the case, the *Sullivan* court stated that "[a]mong the indicia, or badges, of fraud, are: inadequacy of consideration, insolvency of transferor, relationship of the transferor and transferee, pendency or threat of litigation, and transfer of the debtor's entire estate. *Sullivan v. Tarope*, Civil Action No. 98-1293D, Order Granting Plaintiff's Motion for Summary Judgment (CNMI Super. Ct. March 19, 2003)(citing *Payne v. Gilmore*, 382 P.2d 140, 142-43 (Okla. 1963)).

The *Sullivan* court went to identify eight badges of fraud:

(1) The transferor is indebted or insolvent;
(2) The conveyance is general, i.e., the debtor's entire estate is diminished, thereby leaving him insolvent;
(3) Consideration for the conveyance is absent;
(4) The conveyance is secret and concealed;
(5) The conveyance is made to a family member or to one of close relationship;
(6) The conveyance is made while a suit against the debtor is pending or threatening;
(7) The transferee takes the property in trust for the debtor;
(8) The debtor remains in possession, reserves the use and benefit, and deals with the property as his own.

*Sullivan* at 10 (citing *Sherry v. Ross*, 846 F. Supp. 1424, 1429 (D. Haw. 1994)).

> Certain "badges of fraud" strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears. These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer.

*In re: Woodfield*, 978 F.2d 516, 518 (9th Cir. 1992)(citations omitted).

> Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer. The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose.

*Acequia, Inc. v. Clinton*, 34 F.3d 800, 806 (9th Cir. 1994) (emphasis removed and citations omitted).

At common law under Statute of 13 Elizabeth, proof of badges of fraud creates a rebuttable presumption of actual fraudulent intent. *See BFP v. Resolution Trust Corporation*, 511 U.S. 531, 539, 114 S.Ct. 1757, 1763, 128 L.Ed.2d 556 (1994).

### 2.   Bogus Loans.

Plaintiff found at least two cases where the Court's considered bogus loans — loans for which no supporting documentation existed — applying badges of fraud and a rebuttable presumption.

In *Hassan v. I.R.S.*, 301 B.R. 614, 618, 623-24 (D. Fla 2003), the District Court upheld bankruptcy court's finding of willful avoidance of payment of taxes noting that the record was "ripe

-23-

with badges of fraud" including that the debtor dealt mostly in cash and claimed he received loans

for which no evidence existed:

> First, the Hassans have submitted "implausible or inconsistent" explanations of
> behavior, such as the reasons for dealing largely in cash, including Dr. Hassan's almost
> immediate withdrawal of his salary income from his bank accounts after payment. [].
> Second, there have also been transfers to family members that do not have adequate
> explanation.    There has, for example, been repayment of substantial loans to a
> daughter without an explanation or documentation of consideration. [].    There are
> inadequate records of many of the business dealings that the Hassans made during the
> relevant years.

*Hassan* at 620.

The reviewing court noted that the bankruptcy court was unable to find an adequate

explanation for the debtor's extensive dealings in cash. *Id.* at 621. The review court also noted the

bankruptcy court's disbelief of the debtor's "claims that his daughter would pay his bills and he was

merely paying her back, but he has provided no documentation to support that claim, including

records of the daughter's alleged payments to his credit card." *Id.*

As the *Hassan* court noted: "a single badge of fraud may amount to only a suspicious

circumstance, [but] a combination of them will justify a finding of fraud." *Hassan* at 621(quoting

*In re*: *Sternberg*, 229 B.R. 238, 246 (S.D. Fla. 1998) (citing *United States v. Fernon*, 640 F.2d 609 (5th

Cir. 1981)).

Concluding that the bankruptcy court properly found fraud, the reviewing court noted, among

other things, that the debtors "conducted their lives in a manner that prevented the attachment of

assets by the IRS, even though they had significant income and otherwise enjoyed such income in

their daily lives." *Hassan* at 624.[5]  *See also Acequia, Inc. v. Clinton*, 34 F.3d 800, 806 (9th Cir. 1994)

(no documentation to confirm debtor's "innocent" explanations for transactions and citing cases and

citing and quoting 4 *Collier on Bankruptcy* 10015-16, ¶ 548.02[5] at 548-41 to 548-46 (15th ed. 1994)

("Circumstances from which courts have been willing to infer fraud include ... a transfer for no

consideration where the transferor and the transferee have knowledge of the claims of creditors and

know the creditors cannot be paid ... [and] the fact that the transferee was an officer or was an agent

or creditor of an officer of an embarrassed corporate transferor....") (collecting cases)")).

> The fact that Clinton never documented Acequia's "loans" or "salary payments,"
> and filed bankruptcy schedules and tax returns that made no reference to these
> transfers, supports the magistrate judge's determination that Clinton failed to rebut
> the circumstantial inference arising from the "badges of fraud."

*Acequia, Inc.* at 806.

Here, many badges of fraud exist and the burden here is necessarily shifted to Mr. KIM and

KSK to come forward with "significantly clear" evidence of a legitimate purpose for the exchange of

the Judgment Debtor's business assets for alleged, utterly undocumented "loans."

3.  Badges of Fraud:

a.  *Actual or threatened litigation against the debtor.*

There is no doubt that the transaction between KSK, Mr. KIM and the Judgment Debtors in

---

[5] A NOTE ON TAX CASES:  Taxes are not dischargable in bankruptcy if the debtor willfully avoided the payment of taxes including actions taken by the debtor after an assessment to avoid the collection of assessed taxes. *See, e.g., In re: Griffith*, 206 F.3d 1389 (11th Cir. 2000); *Hassan*, 301 B.R. 614 (D. Fla 2003).  The courts employ a badges of fraud evaluation to determine the dual object and subjective intent requirements of the debtors' willful conduct that had the effect of avoiding the payment and/or the collection of taxes.  *Id.*  Further, the Ninth Circuit Court of Appeals has recognized that whether or not the common law, the UFTA or the Bankruptcy Act applies, each of the same, and the case law thereunder, are persuasive as to fraudulent conveyance law given their origins and similarity. *See, e.g., In re: Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 534 (9th Cir. 1990).

-25-

this case occurred while Plaintiffs' case against Judgment Debtors was pending.  PFF, ¶ 83, 86-100.

> b. *Insolvency or other unmanageable indebtedness on the part of the debtor*.

The transfers in January 2006 by Judgment Debtors of all of their operating assets to KSK and Defendants' granting of liens to a third-party on the Susupe Property and their vehicles left Defendants with few unencumbered assets of any value.  PFF, ¶¶ 86-100, 126-136.

As of the end of January 2006, Judgment Debtors had a little more than $3,500.00 of cash in their two bank accounts with the Bank of Hawaii.  PFF, ¶¶ 135-136.  In April 2006, Park Hwa Sun transferred to Kim Hang Kwon most of the cash remaining in JUNG JIN's account.  PFF, ¶ 136.  By October 31, 2006, Judgment Debtors' balances in their only accounts in the Commonwealth were down to a total of $263.15.  PFF, ¶ 136.

The seizure and inventory in December 2006 of the personal property of Judgment Debtors located on and about their Susupe, Saipan property revealed that, notwithstanding the tools, poker machines and some household goods seized by the Marshal, the only assets of Judgment Debtors of any significant value was the improved Susupe property, the two vehicles, and the business transferred to KSK.  PFF, ¶ 99.  The total amount received by the public sale of the Susupe property and all of its contents, including the two vehicles, was $55,015.36 (net of costs), which represents the total amount of the Judgment collected by Plaintiffs to-date.  PFF, ¶ 99.

There is little doubt, as the evidence provided by Plaintiffs shows, that the transfers and liens effected by Judgment Debtors in January 2006 left Judgment Debtors insolvent — unable to pay their debts, including the judgment obtained by Plaintiffs.

      c.    *The conveyance is general, i.e., the debtor's entire estate is diminished, thereby leaving him insolvent.*

As discussed above, the transfers effected by Defendants in January 2006 amounted to substantially all of the Judgment Debtors' assets leaving the Judgment Debtors insolvent.  PFF, ¶¶ 98-99, 126-136.

      d.    *The transfer so completely depleted the debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment.*

As discussed above, the transfers effected by Judgment Debtors in January 2006 amounted to substantially all of there assets leaving Judgment Debtors insolvent and Plaintiffs now unable to collect there substantial judgment against Judgment Debtors who have fled to Korea. PFF, ¶¶ 98-99, 126-136.

      e.    *A close relationship between the transferor and the transferee.*

Mr. KIM admits that he and Kim Hang Kwon were friends; they played golf together at least two times a week.  PFF, ¶ 62.  Mr. KIM and Kim Hang Kwon, through Defendant ASIA also were partners in Daora Poker, a poker arcade at which both plaintiffs Li Zheng Zhi and Xu Jing Ji were employed.  PFF, ¶¶ 74-82.  Mr. KIM claims to have loaned defendants Kim Hang Kwon and Park Hwa Sun $100,000 with no repayment schedule at a time when Mr. KIM admits that he was desperate to find $250,000 in cash to purchase a building in San Vicente.  PFF, ¶¶ 103, 108.  There is no genuine dispute that a close relationship existed between Mr. KIM and the Judgment Debtors.

      f.    *"'[I]mplausible or inconsistent' explanations of behavior, such as the reasons for dealing largely in cash."*

Both Mr. KIM and Kim Hang Kwon admit that they dealt exclusively in cash.  PFF, ¶¶ 32, 65-68, 72, 101, 129, 154, 162, 165.  Mr. KIM claims to have sold an apartment in Seoul, Korea for

approximately $261,500 for which he has no documentation.  PFF, ¶ 29.  Mr. KIM claims he has

brought all of those proceeds to Saipan for which he has no documentation.  PFF, ¶¶ 26-33.  Mr.

KIM claims he invested $150,000 in cash in the business of his friend Mr. LEE for which no

documentation exists.  Mr. KIM claims to have borrowed $250,000 in cash from various individuals

for which no documentation exists while at the same time loaning Kim Hang Kwon $100,000 in cash

for which no credible documentation exists.  PFF, ¶ 70.  Mr. KIM claims that his wife, Kim Sung

Eun, received $60,000 in cash from the "banker" of a Korean "community bank" for which no

documentation exists.  PFF, ¶ 60.  Mr. KIM claims that he had, on occasions, a brown paper bag in

his house with as much as $50,000.00 in cash in it.  PFF, ¶ 67.

        With the exception of his college friend Mr. LEE, Mr. KIM admittedly knows very little about

the people from who he borrows substantial sums of money and, business wise, to whom he loans

substantial sums of money.  PFF, ¶ 73.

        Even the FSM Bank loan proceeds received by Mr. KIM in January 2006 were immediately

disbursed to third-parties and were admittedly *not* used for the purposes for which Mr. KIM

represented to the FSM Bank that the loan proceeds were to be used.   PFF, ¶¶ 123-125.  Also telling

in the transaction and thereafter is the fact that in none of the financial statements submitted to the

FSM Bank in connection with the FSM Bank loan do KSK, Mr. KIM or Kim Sung Eun identify any

of the substantial obligations Mr. KIM claims they had at the time, nor the alleged $100,000 loan to

Kim Hang Kwon.  PFF, ¶ 71.

        In short, there is no genuine dispute as to the fact that Mr. KIM has provided implausible and

inconsistent explanations, and in many instances no explanation at all, for what seems to be patently

-28-

reckless and arguably fraudulent financial behavior.  There is also no genuine dispute that Mr. KIM

deals almost exclusively in cash.

        g.    *Repayment of substantial loans without an explanation or documentation of consideration.*

Here, the FSM Bank loan, the proceeds of which were purportedly used to pay back

undocumented loans, and the timing of which coincided with the transfer of assets from Judgment

Debtors to KSK in the same amount, is the only properly document financial transaction in which

Mr. KIM appears to have ever been involved.  PFF, ¶¶ 123-125.

The extremely suspect, after the fact, documentation of the purported $100,000 loan from

Mr. KIM to Kim Hang Kwon is the only other example of a loan transaction of Mr. KIM where there

is any documentation whatsoever.  Telling, of the alleged loan, however, is Mr. KIM's complete

inability to provide documentation as to the source of the funds he allegedly loaned to Kim Hang

Kwon.    PFF, ¶¶ 66-69.

That fact, however, is only one of many that casts a great shadow over all of the Judgment

Debtors' and Mr. KIM's allegations that the transfer of all of Judgment Debtors' operating business

assets to KSK in January 2006 was for any legitimate purpose.

Casting further doubt on the legitimacy of any loan transaction between Mr. KIM and Kim

Hang Kwon , is the fact that the documents provided by Judgment Debtors with regard to their

annual income (particularly tax assessments after being audited), and the fact that Kim Hang Kwon

sold all of Asia's assets in mid-2003 for $100,000.00 in cash, leave little doubt that Kim Hang Kwon

and Park Hwa Sun had no need to borrow money to their businesses nor to by cars for cash nor to

improve the Susupe Property.

Moreover, during the same period Mr. KIM claims he loaned Kim Hang Kwon $100,000, and notwithstanding the demonstrable income by the parties, Kim Hang Kwon claims he and Park Hwa Sun borrowed approximately $400,000.00 in cash from another friend Kim Pil Sun Kitami.  PFF, ¶¶ 143-147.  All of that alleged loan or series of loans from Kitami were also wholly undocumented. PFF, ¶ 148.

Kim Hang Kwon also testified in his deposition, that he and Park Hwa Sun borrowed *not* $100,000, but $180,000 in cash from Mr. KIM and also $50,000 in cash from another person named Seo Yong Ki, all during the same period of time and no amount of which was documented.  PFF, ¶¶ 101, 182.

In sum, there is overwhelming evidence to suggest that there was no reason for Kim Hang Kwon and Park Hwa Sun to being borrowing hundreds of thousands of dollars, and there is basically no believable evidence that any loans exist.  Equally, there is little believability in Mr. KIM's ability to loan Kim Hang Kwon $100,000, particularly given that Mr. KIM was, at the same time, borrowing $250,000 from other people to buy a building in San Vicente.

h.   *Kim Hang Kwon and Park Hwa Sun had a history of fraudulent behavior.*

Kim Hang Kwon readily admits that, at least annual for a number of years, he and Park Hwa Sun would submit knowingly false tax returns to the Commonwealth Division of Revenue and Taxation and a tax audit reflected that Defendants substantially under reported income for at least three years of their operations.  PFF, ¶¶ 138-142.

More tellingly, however, is that in December 2006, Kim Hang Kwon and Park Hwa Sun created fictitious promissory notes payable to Kim Pil Sun Kitami fraudulently dating the notes back

-30-

to 2004 and early-2005, claiming in the promissory notes that they were actually signed by Kim Hang Kwon in 2004 and 2005, claiming in the promissory notes that the amounts reflected therein were due and payable before the notes were actually even created, and then they delivered those notes and signed translations to Kitami who had the fraudulent notes delivered to Kitami's attorney so that he could draft up a new, formal promissory note based on the fraudulent notes created days earlier by Kim and Park and a mortgage securing their repayment.  PFF, ¶¶ 143-181.

    4.    Summary of Badges of Fraud:

    In sum, with the presence of numerous badges of fraud, the burden here undoubtedly has shifted to Mr. KIM to come forward with "significantly clear" evidence of a legitimate purpose for the exchange of the Judgment Debtor's business assets for alleged, utterly undocumented "loans."

    If not set-aside, the transfer by Judgment Debtor of all of its operating business assets to Mr. KIM and KSK for what appears to be fraudulent prior "loans," and nothing else, combined with the fact that Mr. KIM and KSK received the same amount in proceeds from the FSM Bank as the supposed "purchase price" for Judgment Debtors' assets, could prevent Plaintiffs from recovering a substantial portion of their judgment against the Judgment Debtors.  As the evidence submitted by Plaintiffs shows, Mr. KIM is unable to meet her burden and the Court has sufficient grounds to set-aside the January 2006 transfer of assets from Judgment Debtors to KSK to allow Plaintiffs to continue with their collection efforts against the assets of the Judgment Debtors.

<strong>CONCLUSION</strong>

    For the reasons stated herein, there is no genuine issue of material fact with regard to the facts necessary to hold KSK Corporation liable as a successor for the Judgment for Plaintiffs and against

-31-

the Judgment Debtors.  There is also no genuine issue of material fact with regard to Mr. KIM's

status as the alter ego of KSK Corporation.  Accordingly, Plaintiffs respectfully request a judgment

pursuant to Rule 56 that KSK and Mr. KIM are jointly and severally liable to Plaintiffs for the

unsatisfied amount of the August 24, 2006 Judgment against Judgment Debtors, including all

interest thereon and attorney's fees and costs to date.

Alternatively, Plaintiffs respectfully request that the Court find that the transfer to KSK and

Mr. KIM of all of the Judgment Debtors' operating assets of its businesses was a fraudulent

conveyance and Plaintiffs request that the Court void the transfer and put the fraudulently conveyed

property back within reach of the collection efforts of Plaintiffs.

Respectfully submitted this 19th day of June, 2008.


/s/ Mark B. Hanson

MARK B. HANSON

Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738, P.O. Box 10,000
Saipan, MP 96950
Telephone:    (670) 233-8600
Facsimile:    (670) 233-5262
E-mail: markbhanson@gmail.com

Attorney for Plaintiffs

-32-

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing will be deposited in the United States Post Office, first class mail, postage prepaid, addressed to the following:

| | |
|---|---|
| Jung Jin Corporation<br>P.O. Box 503428<br>Saipan, MP 96950<br>(670) 235-4321 | Park Hwa Sun<br>P.O. Box 503428<br>Saipan, MP 96950<br>(670) 235-4321 |
| Asia Enterprises Inc.<br>P.O. Box 503448<br>Saipan, MP 96950<br>(670) 235-4321 | Kim Hang Kwon<br>P.O. Box 503448<br>Saipan, MP 96950<br>(670) 235-4321 |

I further certify that the following were served with a copy of the foregoing via the Court's electronic case filing system and via e-mail:

G. Anthony Long, Esq.
LAW OFFICE OF G. ANTHONY LONG
P.O. Box 504970
Saipan, Mariana Islands 96950
E-mail:        gal@nmilaw.com

DATED: _____

June 19, 2008        /s/ Mark B. Hanson

MARK B. HANSON

-33-